**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PATRICK QUINN, IRENE ROBINSON, )
ANTWAIN MILLER, MARC KAPLAN, )
CHRISTOPHER BALL, DANIEL )
MORALES-DOYLE, and JITU BROWN, )
                                 )
    Plaintiffs, )
                                 )     No. 16-cv-9514
        v. )
                                 )
BOARD OF EDUCATION OF THE CITY )    **Jury Demanded**
OF CHICAGO; JAMES MEEKS, STEVEN )
GILFORD, MELINDA LABARRE, CURT )
BRADSHAW, LULA FORD, CRAIG )
LINDVAHL, ELIGIO CERDA PIMENTEL, )
CESILIE PRICE, and JOHN SANDERS, )
 members of the ILLINOIS STATE BOARD )
OF EDUCATION, in their official capacities; )
and STATE OF ILLINOIS, )
                                 )
    Defendants. )

## COMPLAINT

### Introduction

1.    Plaintiffs hereby challenge under federal law the legality of Section 34-3 of the Illinois School Code—as revised in the Chicago School Reform Amendatory Act of 1995 ("1995 Act")—which bars plaintiffs and other Chicago citizens from voting or participating in the processes leading to the selection of the members of the Board of Elections of the City of Chicago. Section 34-3 gives the Mayor of the City of Chicago the exclusive right to select these members, without any confirmation of the City Council or any other role for the City Council or the voters in the direction or control of Chicago public schools.

2.    First, as set out in Count I, in violation of 42 U.S.C. § 1983, and acting under color of Section 34-3 of the Illinois School Code, the Board of Education of the City of Chicago,

and the members of the State Board of Education have unlawfully deprived the plaintiffs and all other Illinois citizens living in Chicago of the equal and unimpaired right to vote that is provided to all other Illinois citizens and is guaranteed to them by the Equal Protection Clause of the Fourteenth Amendment. In the twenty years of experience under the 1995 Act, the system of exclusive mayoral control—and the deprivation of plaintiffs' constitutional right to vote—has failed to substantially advance any legitimate purpose. To the contrary, after twenty years of mayorally appointed boards, the Chicago public schools are far worse off financially than at the time the 1995 Act deprived the voters of any role in the selection of Board members. Furthermore, the mismanagement of the Board has been astonishing. The next to last Chief Executive Officer put in place by the Board was guilty of corruption and is now serving time in prison. The looming financial bankruptcy of the Chicago public schools after twenty years of mismanagement by mayorally appointed boards imperils the very right of Chicago children to a public education. Finally, Illinois School Code deprives only Chicago citizens of the right to vote in a manner that is arbitrary, capricious, in bad faith and pre-textual, as further set out below. Many Illinois school districts are equally or in greater financial jeopardy, or have equally bad or worse records of educational achievement, yet in those districts the right to vote has been unimpaired. The experiment in mayoral control in Chicago has been a failure and does not plausibly justify the severe and destructive impact on the plaintiffs' right to vote and hold accountable the officials running their public schools.

3.     Furthermore, in violation of 42 U.S.C. § 1983, and acting under color of Section 34-3, the Chicago Board of Education and state officials enforce or oversee a system whereby the Chicago Board of Education can levy taxes in the billions of dollars without being accountable to any legislative body or to the electorate. Accordingly, Section 34-3 of the Illinois

School Code also unlawfully deprives the plaintiffs and other citizens of Chicago of their property without the due process guaranteed by the Fourteenth Amendment.

4.      In addition, by virtue of Section 34-3 of the Illinois School Code, as amended by the 1995 Act, the defendant State of Illinois currently has an electoral scheme that results in the denial or abridgment of the right of the minority race plaintiffs to vote on account of their race or color, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. That is, the Illinois School Code in its current form and as amended in 1995 interacts with social and historical conditions to cause an inequality in the opportunities of for Illinois Black and white voters to elect their preferred representatives. Specifically, the General Assembly sought in the 1995 Act to deny plaintiffs the right to vote in the one district, namely, Chicago, where Black and other minority race citizens constitute a majority or a substantial percentage of voters who could influence the outcome of school board elections and where the property wealth of that district is largely owned by white people or white-owned businesses. The purpose of the 1995 Act was to limit the ability of minority race voters to determine how much of that property wealth can be taxed and used almost entirely for the education of minority race children and only a small fraction of white children. This Court can infer such intent from the historic neglect and racial segregation of the Chicago public schools, the new racial polarization in voting in local elections at the time of the 1995 Act, the peculiar and unprecedented exclusion even of the City Council with its minority race aldermen from any role in the confirmation of members of the Board of Education, and the coded racial language prevalent at the time describing the Chicago public schools were the worst in the nation. The alleged purpose of this exclusion of the right to vote is evidently pretextual as there are many local school districts which have lower educational achievement and significant financial deficits but the right to vote is unimpaired. The actual

relevant classification used by the State to deny the right to vote is one where the public schools like Chicago's serve minority race children at the expense of largely white-owned residential and commercial wealth.

5.     Finally, the minority race plaintiffs also challenge the deprivation of the right to vote under the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment. Plaintiffs seek preliminary and permanent injunctive relief requiring the defendants to submit a plan for the election of members of the Chicago Board of Education on the same basis and in the same manner as now provided for all other local school districts.

**Parties**

6.     Plaintiff Patrick Quinn is a resident of Chicago, a registered voter, an owner of real property in Chicago. He served as a Local School Council member during the first term that LSCs existed. He is a plaintiff as to Counts I and II only.

7.     Plaintiff Irene Robinson is an African American resident of Chicago, a Chicago Public Schools grandparent, a registered voter, and a former LSC member. She is a plaintiff as to all Counts.

8.     Plaintiff Antwain Miller is an African American resident of Chicago, a Chicago Public Schools parent, and a registered voter. He is a plaintiff as to all Counts.

9.     Plaintiff Marc Kaplan is a resident of Chicago and a registered voter. He is a plaintiff as to Counts I and II only.

10.     Plaintiff Daniel Morales-Doyle is a resident of Chicago, a Chicago Public Schools parent, a long-time LSC member, a registered voter, and an owner of real property in Chicago. He is a plaintiff as to Counts I and II only.

11.     Plaintiff Christopher Ball is a resident of Chicago, a Chicago Public Schools parent, and a registered voter. He is a plaintiff as to Counts I and II only.

12.     Plaintiff Jitu Brown is an African American resident of Chicago, a Chicago Public Schools parent, a registered voter, and an owner of real property in Chicago. He is a plaintiff as to all Counts.

13.     Defendant Board of Education of the City of Chicago is a school district of the State of Illinois, and a body politic and corporate.

14.     Defendants James Meeks, Steven Gilford, Melinda LaBarre, Curt Bradshaw, Lula Ford, Eligio Cerda Pimentel, Cesilie Price, and John Sanders are members of the Illinois State Board of Education and oversee and set policies and learning standards for the public schools of Illinois, including the Chicago public schools. They are sued only in their official capacity as the state officials chiefly responsible for the execution and administration of the Illinois School Code.

15.     Defendant State of Illinois is a state within the meaning of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 and a recipient of federal funds for purposes of Title VI of the Civil Rights Act of 1964. It is sued as a defendant only as to claims under Section 2 of the Voting Rights Act and Title VI of the Civil Rights Act, and is not a defendant as to Counts I and II below or any claim arising under 42 U.S.C.§ 1983.

## Jurisdiction

16.     The Court has jurisdiction over all counts in this case pursuant to 28 U.S.C. § 1331 because they arise under the Constitution and laws of the United States, namely the Fourteenth and Fifteenth Amendments, the Voting Rights Act, the Civil Rights Act of 1964, and 42 U.S.C. § 1983. The Court also has jurisdiction over Counts I, II, III, and IV pursuant to 28 U.S.C. § 1343 because they seek relief from the deprivation of civil rights, including the right to vote.

17.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 because some of the defendants are located or reside in this district and all the events and omissions giving rise to the claims occurred in this district.

## Facts

18.     There are 859 public school districts in Illinois, including 373 elementary school districts, 99 high school districts, and 387 unit districts.

19.     Under the Illinois School Code, in all but one district, the citizens of Illinois have an unimpaired right to elect the members of school boards that carry out the function of state government to provide for the public education of its citizens.

20.     The one exception, District 299, covers the City of Chicago and is identical in boundary with the City of Chicago, a home rule entity.

21.     District 299 does not have an elected school board, and plaintiffs and other citizens living in Chicago do not have the same right to vote given under the Illinois School Code to all other citizens of Illinois.

22.     Pursuant to 34-3 of the Illinois School Code, the Mayor of the City of Chicago has the sole and exclusive authority to appoint the members of the Board, at his pleasure, without any oversight.

23.     In particular, to ensure the Mayor's exclusive control, the City Council of Chicago has no role in the approval or confirmation of the members of the Board.

24.     The Board of Education is not an administrative body of the City of Chicago but a "unit of local government" within the meaning of Article VII, section 8 of the Illinois Constitution.

25.     This appointed Board has the exclusive power to levy property taxes upon plaintiffs and other citizens of Chicago, without any accountability to the City Council, or the

6

General Assembly, or any other legislative body or body of elected officials. Nor does the Mayor of the City of Chicago, apart from his power to appoint members of the Board, have any statutory right to review or approve the levying of taxes by the Board of Education.

26.     In its fiscal year 2017 budget, the defendant Chicago Board of Education projects that it will receive 2.66 billion dollars in property tax revenue in this fiscal year.

27.     In the last five years the Board has levied over 11 billion dollars in property taxes, with approximate annual levies as follows:

| Fiscal Year | Property Tax Revenue |
|---|---|
| 2016 | $ 2,359,800,000 |
| 2015 | $ 2,289,000,000 |
| 2014 | $ 2,197,000,000 |
| 2013 | $ 2,106,000,000 |
| 2012 | $ 2,106,000,000 |

28.     Plaintiffs have paid taxes levied in this manner to the Board of Education.

29.     Formerly the Board of Education was an administrative body that was appointed by the Mayor and accountable to the City Council of Chicago for tax and expenditure decisions.

30.     Consequently, while there was an appointed board, there was legislative oversight or accountability to a body of legislators elected by the people of Chicago.

31.     In 1872—acting under the former Illinois Constitution—the General Assembly originally set up a Board of Education, with members appointed by the Mayor and confirmed by the City Council.

32.     Up through the adoption of the Illinois Constitution of 1970, the City of Chicago—not the Mayor of the City alone as at present but the City itself—oversaw all aspects of public education in Chicago, including the taxation of the citizens of Chicago for such public education.

33.     In particular, through the 1960s, the budget of the Board of Education was subject to the approval by the City Council.

34.     The former Section 34-55 of the Illinois School Code provided, "This Article does not authorize the board to levy or collect any tax, but the city council shall, upon the demand and under the direction of the board, annually levy all school taxes." Ill. Rev. Stat. 1963, chap. 122, par. 34-55.

35.     In 1988, the General Assembly enacted the Chicago School Reform Act of 1988.

36.     The 1988 Act gave citizens of Chicago much greater ability to participate in the processes leading to the selection of the members of the Board of Education.

37.     In the 1988 Act, the General Assembly gave citizens of Chicago the right to elect Local School Councils (LSCs) which had authority to appoint and remove the principals and otherwise govern the local neighborhood schools.

38.     The 1988 Act abolished the 11-member Board of Education, expanded the Board to 15 members and created a School Board Nominating Commission, composed of 23 parent and community representatives from the Local School Councils and just 5 members appointed by the Mayor.

39.     Under the 1988 Act, the members of the School Board Nominating Commission gave the Mayor a slate of three candidates only to fill each vacant position on the 15-member Board.

40.     The Mayor then had only 30 days to choose the 15 board members from the list that the Commission proposed.

41.     The Mayor's choices were then subject to approval or disapproval by 50-member City Council.

42.     The 1998 Act was designed to increase voter control over the operation of the Chicago public schools, although the Board of Education was still technically "appointed."

43.     The 1988 Act was designed to give special representation rights to parents of the children served by the Chicago public schools and explicitly aimed at taking the racial and ethnic composition of the student population into account.

44.     In 1988, less than 13% percent of the student population in Chicago's public schools was white.

45.     The 1988 Act did in fact increase the participation of African American and Latino voters in the governance of the schools and the process leading up to appointment of the members of the Board.

46.     African American citizens voted in LSC elections in greater numbers and at a higher rate than white citizens.

47.     In 1995, following the increased electoral activity of minority race voters in the selection of the Board of Education, the General Assembly passed the Chicago School Reform Amendatory Act (1995 Act).

48.     The 1995 Act eliminated the role of Local School Councils in the political processes leading up to the appointment of Board members.

49.     The 1995 Act also sought to eliminate the role of voters and especially African Americans who voted at higher rates in the political processes leading up to the appointment of Board members.

50.     The 1995 Act eliminated the School Board Nominating Commission and gave the Mayor the exclusive right to select the new School Reform Board of Trustees through 1999, and the exclusive right to select the reconstituted Board of Education thereafter.

51.     The 1995 Act also eliminated any role of the City Council in the confirmation or selection of members of the Board.

52.     The City Council then as now consists of 50 aldermen, many of whom are minority race and elected locally from wards that often have large minority race populations.

53.     The 1995 Act gave unprecedented control over the public schools to just a single elected official, the Mayor, who then—as now—is a white person.

54.     In the twenty years since enactment of the 1995 Act, all the members of the Board have been selected by a Mayor who has been white.

55.     African American children in Chicago public schools historically been subject to racial discrimination by the white leadership of the City, and have been deprived by such segregation of a fair and equal right to an education.

56.     Until the 1980s, Black voters were subjected to the dominance of the predominantly white Democratic party organization, and were powerless to prevent this neglect of the education of their children.

57.     On September 24, 1980, the United States Department of Justice filed a lawsuit challenging the historic and long standing racial segregation in the Chicago public schools.

58.     Shortly thereafter, the Chicago Board of Education and the Department of Justice entered a consent decree that acknowledged a history of racial segregation and isolation of Black students.

59.     On September 24, 2009, when the consent decree was dissolved, over 90 percent of the students attending Chicago public schools were people of color.

60. Unlike other local school districts that serve all or nearly all children of color, Chicago retained a substantial white population, which owned the majority of the property wealth that is used for the support of the Chicago public schools.

61. By the 1980s and in the years just prior to the 1995 Act, voting in local elections had become racially polarized, as Black voters no longer were subservient to a white-dominated Democratic party organization.

62. Furthermore, as a result of the 1988 Act providing for LSCs and the School Board Nominating Commission, Black voters had an increasing role in the governance of the schools that their children attended.

63. Pursuant to the terms of Section 34-3 as amended at the time, after being elected in 1989, Mayor Richard M. Daley appointed an Interim Board to hold office until the School Board Nominating Commission could provide him with slates of nominees to fill the seats.

64. In the years that followed, Mayor Daley refused on a number of occasions to appoint nominees provided to him by the School Board Nominating Commission.

65. Against this background, the General Assembly in 1995 eliminated the provisions of the 1988 Act that gave this influence to Black voters.

66. To further limit the influence of African American voters, the General Assembly also took the unprecedented step of removing the City Council—which had many minority race aldermen—from any role in the selection of members of the School Board.

67. The purported object of the 1995 Act was to address an alleged educational crisis.

68. Nationally prominent figures like William Bennett consistently used wild and overheated language to describe the now all-black Chicago public schools as the worst in the

11

nation, and in and out of the General Assembly, such racially charged statements or sentiments were commonly expressed or believed by white legislators.

69.     However many other local school districts—including districts that served mainly white students—had the same or lower levels of educational achievement, and the right to vote in those districts was unimpaired.

70.     This description of the Chicago public schools as the worst in the country--though there are far worse even in Illinois—was coded racial language that reflected the racial polarization of the City in the 1980s.

71.     Since the deprivation of the right to vote, there has been no significant increase in the educational achievement of the Black student population.

72.     While the graduation rates of students have increased, there is no necessary correlation between the high school graduation rate and educational achievement, or preparation for college, and at various times such rates have been inflated or manipulated by the Board.

73.     Furthermore there has been no significant increase in the graduation rates of African American students, who remain racially isolated and segregated at least in part because indifference to racial segregation by the appointed Board even when schools are closed and students reassigned.

74.     The most significant change since the 1995 Act has been the underfunding of Chicago public schools and the increase of indebtedness of the Chicago public school system.

75.     Since the 1995 Act, the property tax rate in Chicago dropped to the lowest level of the six-county Chicago area, and for many years, it was among the lowest in the State.

76.    At the same time, the Chicago Board of Education chose for years to forego funding of its employee pension plans and as a direct result of such action, now goes year to year from one financial crisis to the next.

77.    The CEOs appointed by the Chicago Board of Education in several cases have lacked any teaching or educational background, contrary to best practices.

78.    In addition, at least one recent CEO engaged in criminal financial fraud.

79.    CEO Barbara Byrd Bennett, the next to last CEO, who served from October 11, 2012 to June 15, 2015, pleaded guilty in October 2015 to criminal fraud that took place under the watch of the Chicago Board.

80.    The schools have been rife with no bid contracts and conflicts of interest with enterprises by Board members, including relationships with enterprises involved with "turnarounds" and charter schools.

81.    Furthermore, the African American student population remains racially segregated, even though there has been a significant drop in the student population that is Black.

82.    Just since 1998, the percentage of Black children in the student population has dropped from 53.2% to 38.9% in 2015.

83.    But while only 38.9% of the total public school population is Black, about 38% of Chicago's public schools have a student population that is more than 90% Black. Almost a third have a population that is less than 10% Black.

84.    Furthermore, since 2001, the Board has closed over 100 neighborhood schools, nearly all of them serving almost exclusively African American children.

85.    The schools attending these shuttered schools were around 90 percent African American.

86.     In nearly all of the school closings, the displaced African American students were moved to equally "all Black" schools, often further away from gentrifying areas or areas where real estate prices were increasing.

## Count I
### Section 1983: Denial of Equal Right to Vote and Participate in Political Process for All Illinois Citizens Living in Chicago

87.     As set forth above, the 1995 Act eliminates the right of plaintiffs to have the same equal right as other Illinois citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment and the First Amendment of the United States Constitution.

88.     As further set forth above, the 1995 Act also eliminates the right of plaintiffs even to have a legislative body or other body of elected officials like the City Council confirm the appointed members of the Board of Education or exercise any review or oversight of the Board's use of its power of taxation.

89.      After over twenty years of experience, the 1995 Act has also failed to improve the management of the Chicago public schools, or demonstrate the superiority of an appointed over an elected board.

90.     To the contrary, the 1995 Act has led to significant corruption and mismanagement, and a succession of appointed Boards not subject to or accountable to the plaintiffs and other citizens have brought the city's public school system to the brink of bankruptcy.

91.     The material conditions in the public schools are worse than at the time the 1995 Act went into effect.

92.     Due to years of neglect, many children in Chicago public schools go without books and other basic supplies that were once available, and are still available in school districts with elected boards.

14

93.    While there have been increases in graduation rates overall, there has been no significant increase in the graduation rate of the Black students who made up nearly all of the student population at the time of the 1995 Act.

94.    Furthermore, in light of this twenty years of mismanagement, there is no substantial or even slight justification for the severe and destructive impact of Section 34-3 on plaintiffs' right to vote and to hold accountable the members of the Chicago Board.

95.    There are many other school districts where the quality of education and student achievement are not better or even worse, but the right to vote of Illinois citizens living in those districts is unimpaired. In this respect, the denial of the right to vote to citizens of Chicago is arbitrary, capricious, and pretextual, including for reasons set forth in Counts III and IV below.

96.    Accordingly, in violation of 42 U.S.C. § 1983 and by virtue of maintaining this unconstitutional deprivation of the right to vote, the defendants have deprived the plaintiffs of their right to vote and participate in the political process under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, and have also deprived them of their right to have the same equal right to vote as other Illinois citizens have.

WHEREFORE plaintiffs pray this Court to:

A.    Declare that in violation of 42 U.S.C. § 1983, Section 34-3 of the Illinois School Code unlawfully deprives the plaintiffs and other citizens living in Chicago of their right to vote and participate in the political process as guaranteed by the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, and of their equal right to the same vote and right of participation given to other citizens under the same Illinois School Code;

B. Issue preliminary and permanent injunctive relief barring the defendant officers from enforcing Section 34-3 to deprive plaintiffs and other citizens of their equal constitutional right to vote and participate in the processes leading up to the nomination and selection of the members of the Board of Education, as set forth in paragraph A of this prayer for relief;

C. Require that the defendant officers prepare and submit a plan providing a constitutionally adequate remedy for the violations of the rights of plaintiffs under the Equal Protection Clause and the Fourteenth Amendment, including a plan for the direct election of the members of the Board of Education of the City of Chicago to be held as soon as possible; and

D. Grant plaintiffs their legal fees under 42 U.S.C. § 1988, and such other injunctive relief as may be appropriate in the implementation of a remedy for the constitutional violations set forth in this Count.

## Count II
**Section 1983: Denial of Right to Due Process, Equal Protection, and Republican Form of Government**

97.     As set forth above, and by virtue of Section 34-3 of the Illinois School Code, the 1995 Act unlawfully permits the Board of Education of the Chicago to impose or levy a tax on property in its sole discretion—without any accountability to a legislative body or body of elected officials or the citizens upon whom the tax is imposed.

98.     The Mayor of Chicago is not a legislative body or entity that may constitutionally impose such a property tax unilaterally.

99.     Furthermore, the Mayor of Chicago has no statutory power under the Illinois School Code to impose or levy any property tax unilaterally or exercise any power of the Board of Education.

16

100. Consequently, rather than being an administrative body that is accountable to an executive or legislature for its tax and expenditure decisions, the Chicago Board of Education is an independent unit of government whether in formal name or in effect and unlawfully exercises the power of taxation without any representation of the citizens of Chicago in the process.

101. In violation of 42 U.S.C. § 1983, and by virtue of Section 34-3 of the Illinois School Code and other provisions, the defendants are depriving the plaintiffs and other Illinois citizens living in Chicago of their rights under both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, as well as their rights under Article IV, section 4 of the United States Constitution, to some form of accountability to a legislative body or voters for the deprivation by the Board of Education of their property and income.

WHEREFORE, plaintiffs pray this Court to:

A. Declare that in violation of 42 U.S.C. § 1983, Section 34-3 of the Illinois School Code unlawfully deprives the plaintiffs and other citizens living in Chicago of their right to vote and participate in the political process as guaranteed by the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, and of their equal right to the same vote and right of participation given to other Illinois citizens under the same Illinois School Code;

B. Issue preliminary and permanent injunctive relief barring the defendant officers from enforcing Section 34-3 to deprive plaintiffs and other citizens of their equal constitutional right to vote and participate in the processes leading up to the nomination and selection of the members of the Board of Education, as set forth in paragraph A of this prayer for relief;

C. Order the defendant officers to prepare and submit a plan providing a constitutionally adequate remedy for the violations of the rights of plaintiffs under the Equal Protection Clause and the Fourteenth Amendment, including a plan for the direct election of the members of the Board of Education of the City of Chicago to be held as soon as possible;

D. Grant plaintiffs their legal fees under 42 U.S.C. § 1988, and such other injunctive relief as may be appropriate in the implementation of a remedy for the constitutional violations set forth in this Count.

**Count III**
**Violation of Section 2 of the Voting Rights Act**

102. As set forth above, the 1995 Act amending and revising Section 34-3 of the Illinois School Code has the effect of disqualifying, disenfranchising, and denying a higher percent of minority race Illinois citizens than white Illinois citizens from the right to vote or participate in the political process otherwise given to Illinois citizens outside of Chicago.

103. According to the U.S. Census American Community Survey, in 2014, about one-third of Chicago's population was Black. About 32% of Chicago's population is non-Hispanic white. In other words, more than two-thirds of Chicago's residents are people of color.

104. According to the same data set, about 15% of the population of Illinois is Black and about 63% of the population of Illinois is non-Hispanic white. In other words, just over a third of the Illinois residents are people of color.

105. However, because Chicago's African American population makes up about 45% of the total African American population in Illinois, and its Latino population makes up about 37% of the State's total, the percentages of people of color in Illinois outside of Chicago are even lower.

18

106.    Outside of Chicago, only 10.6% of the State's population is Black and 71% of the population is non-Hispanic white. Thus, about 29% of Illinois residents that live outside of Chicago are people of color.

107.    The 1995 Act amending and revising Section 34-3 of the Illinois School Code provides disparate treatment of the right to vote based on race or color when a school district educates almost entirely minority race children but the property wealth of such district is largely owned by white persons or white-owned commercial and business enterprises.

108.    One motivating factor in the disparate treatment based on color pursuant to the 1995 Act is to limit the ability of minority race voters in electing representatives of their own choosing in decisions as to how much of the City's property wealth which is largely owned by white persons or white-owned businesses should be used for the education of minority race children.

109.    In addition to this discriminatory impact and treatment, other factors justify an inference of racially discriminatory intent with respect to the 1995 Act.

110.    First, there is a long historical practice of racial segregation and neglect of the education of African American children.

111.    The United States Department of Justice filed suit challenging the racial segregation and neglect of African American children and entered a consent decree based on such claim of unlawful segregation.

112.    Second, the sequence of events leading up to the 1995 Act establish a racially discriminatory motive in limiting the right to vote.

113.    During the 1980s, African American voters ceased to vote according to the wishes of the white-run Democratic party organization and displayed a new independence.

114.    By the late 1980s, there was a pattern of racially polarized voting in Chicago, as evidenced in local elections and in the stand-off between white aldermen and Black aldermen during the administration of Harold Washington.

115.    Furthermore, as set forth above, the Chicago School Reform Act of 1988 gave African American citizens and other citizens substantial voting rights and rights of participation in the political process leading up to the nomination and selection of members of the Board of Education.

116.    The express purpose of the 1995 Act was to eliminate those voting and participation rights, which African American citizens were exercising to a greater degree than white citizens, especially in connection with Local School Council elections.

117.    Furthermore, the 1995 Act was a substantial deviation from the normal and prior type of appointed Board because the 1995 Act removed any role for the City Council in the confirmation of the Board members.

118.    This substantial deviation from a normal appointed board had the effect of eliminating any minority race elected aldermen from any of the fifty wards from having any influence in the selection of the Board members who would make decisions about the taxation of the City's property wealth.

119.    Furthermore, in the late 1980s prominent figures in the country such as William Bennett were using overheated rhetoric to describe the Chicago public school system as the "worst in the country."

120.    Many individuals, white and minority race, regarded this rhetoric as coded race language since the Chicago public schools at this time overwhelmingly educated African American children.

121. Finally, the system of exclusive control by the Mayor has in fact resulted in the selection of Board members over a twenty-year period exclusively by a single elected official, who throughout this period has been a white person.

122. Under this system that denies any right to vote or influence the political process to African American and other minority race voters who have children in the public schools, the plaintiffs and other minority race citizens have suffered repeated administrative actions that discriminate against them because of race or color.

123. In particular, the system of mayoral control has led to underfunding of education and the irresponsible accumulation of debt that now threatens or imperils the rights of minority race children to an adequate education.

124. In addition, the system of mayoral control has led to the singling out of all Black schools for closing—especially all Black schools in or near the Loop or in gentrifying areas.

125. Furthermore, the system of mayoral control has maintained a high degree of racial segregation even as the African American portion of the student population has dropped.

126. In particular the Black students displaced in these closings are removed to equally all-Black schools, so that the displaced children are equally or more racially and economically isolated than before.

127. At least one high level Board official acknowledged in sworn testimony that the Board does not try to eliminate such segregation—an astonishing statement that no Board official would be likely to make if the Board were accountable to minority race and other voters.

128. Accordingly, in violation of Section 2 of the Voting Rights Act, the defendant State of Illinois uses or maintains a statutory electoral law or scheme that "results in a denial or abridgement of the right of plaintiffs and other citizens to vote on account of race or color."

129.    This electoral law or scheme set out in the 1995 Act interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by Illinois Black and white voters to elect their preferred representatives, since the right to vote is afforded in all other Illinois districts regardless of educational quality is not available in the one district, namely, Chicago where the Black and other minority race citizens constitute a majority of the voters but the substantial property wealth of such district is largely owned by whites or white-owned businesses.

WHEREFORE plaintiffs pray this Court to:

A.  Declare that in violation of Section 2 of the Voting Rights Act, 52 U.S.C. 10301, and by virtue of Section 34-3 and other provisions of the Illinois School Code, the State of Illinois has unlawfully used and continues to use a state electoral scheme that results in a denial or abridgement of the right of the minority race plaintiffs to vote on account of race or color, where minority race citizens are a majority of the eligible voters and the majority of the property wealth is held by white citizens and white owned businesses;

B.  Issue preliminary and permanent injunctive relief barring the State of Illinois from continuing to violate Section 2 of the Voting Rights Act in this manner;

C.  Order the State to promptly prepare and submit for approval by this Court a plan providing a constitutionally adequate remedy for the violations of the rights of plaintiffs under Section 2 of the Voting Rights Act, to provide for the direct election of members of the Chicago Board of Education as soon as possible; and

D. Grant plaintiffs their legal fees and such other injunctive relief as may be appropriate in the implementation of a remedy for the constitutional violations set forth in this Count.

**Count IV**
**Section 1983: Violation of Fourteenth and Fifteenth Amendments Because of Race**

130. As set forth in Count III, and by virtue of Section 34-3 and other provisions of the Illinois School Code, the defendant State of Illinois has denied or abridged the right of the minority race plaintiffs to vote on account of race or color.

131. Likewise, in violation of 42 U.S.C. § 1983, and by virtue of enforcing this unlawful abridgement of the right to vote on account of race or color, the defendant officials have acted under color of law to violate the rights of the minority race plaintiffs under the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment.

132. Furthermore, by such acts, and in violation of Title VI of the Civil Rights Act of 1964, and with willful indifference to the severe racial impact of Section 34-3 of the School Code when minority race parents cannot hold public officials directly accountable for a school system that educates minority race children, defendants have deprived plaintiffs of their right to be free of racially discriminatory practices by programs that receive federal financial assistance.

WHEREFORE plaintiffs pray this Court to:

A. Declare that in violation of 42 U.S.C. § 1983, and by virtue of Section 34-3 and other provisions of the Illinois School Code, the defendants have unlawfully used and continue to use a state electoral scheme that results in a denial or abridgement of the right of the minority race plaintiffs to vote on account of race or color, in violation of the Fourteenth and Fifteenth Amendments, where minority race

23

citizens are a majority of the eligible voters and the property wealth is largely held by white residential owners and largely white-owned businesses;

B.  Declare that in violation of Title VI of the Civil Rights Act of 1964, defendants have deprived plaintiffs of their right to be free of racially discriminatory practices by programs that receive federal financial assistance;

C.  Issue preliminary and permanent injunctive relief barring the defendant officials acting under color of law and in violation of 42 U.S.C. § 1983 from continuing to deprive minority race plaintiffs of their constitutional rights under the Fourteenth and Fifteenth Amendments;

D.  Issue preliminary and permanent injunctive relief barring the defendants from depriving plaintiffs of their rights under Title VI to be free of racially discriminatory policies aided or assisted with federal funds.

E.  Order defendants to promptly prepare and submit for this Court's approval a plan providing an adequate remedy for the violations of these constitutional and statutory rights, to provide for the direct election of members of the Chicago Board of Education as soon as possible; and

F.  Grant plaintiffs their legal fees under 42 U.S.C. § 1988 and such other injunctive relief as may be appropriate in the implementation of a remedy for the constitutional violations set forth in this Count.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury on all issues so triable.

Dated: October 5, 2016

By: _____s/ Sean Morales-Doyle_____
One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511