**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK QUINN, IRENE ROBINSON, ANTWAIN MILLER, MARC KAPLAN, CHRISTOPHER BALL, DANIEL MORALES-DOYLE, and JITU BROWN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 16-cv-9514 |
| | ) | The Honorable Elaine E. Bucklo |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
<u>IN SUPPORT OFTHEIR MOTION FOR PRELIMINARY INJUNCTION</u>**

Dated: November 30, 2016                              Respectfully submitted,

_____s/ Sean Morales-Doyle_____
One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

**Table of Contents**

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

   I.     Statement of Facts ................................................................................................ 2

      A.   Illinois School Boards and Election Procedures ........................................... 2

      B.   Governance of the Chicago Board of Education ........................................... 4

      C.   Continued Racial Segregation Under Appointed Boards ............................... 6

      D.   Racially Discriminatory Intent of the 1995 Act ........................................... 7

      E.   The Failure of the 1995 Act .......................................................................... 9

      F.   Deteriorating Conditions in Chicago Public Schools .................................. 10

      G.   Displacement of Black Children by the Appointed Board .......................... 11

      H.   Disparate Racial Impact on the Right to Vote ............................................. 12

   II.    Argument ........................................................................................................... 13

      A.   Plaintiffs meet the standards for preliminary injunctive relief under Rule 65. ............. 13

      B.   Plaintiffs are not just likely to succeed on the merits but entitled to judgment on the merits under Rule 65(a)(2). ................................................ 14

         1.   In violation of Section 2(b) of the Voting Rights Act, the Illinois School Code allows more white citizens of Illinois than Black or Latino citizens to have representatives of their own choosing. .............................................. 14

         2.   Section 34-3 imposes a "severe" restriction on plaintiffs' right to vote under the First and Fourteenth Amendments, and cannot be justified as "necessary" to a "compelling" state purpose. ........................................... 18

         3.   The Sixth Circuit decision in *Mixon v. Ohio* is in conflict with holdings of the U.S. Supreme Court and law of this Circuit. ....................................... 22

         4.   Plaintiffs are likely to succeed on the merits of their claims of racially discriminatory intent. ................................................................................... 24

      C.   Though they seek to advance the trial on the merits on the two counts at issue here, Plaintiffs meet the other requirements for preliminary injunctive relief. ............................................................................................................ 25

Conclusion ...................................................................................................................... 25

## Table of Authorities

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .............................................................. 19

*Burdick v. Takushi*, 504 U.S. 428 (1992) .............................................................. passim

*Chisom v. Roemer,* 501 U.S. 380 (1991) .................................................... 15, 17, 23

*Frank v. Walker,* 768 F.3d 744 (7th Cir. 2015) ................................................ 15, 24

*Fumarolo v. Board of Education*, 142 Ill.2d 54 (1990) ......................................... 22

*Girl Scouts of Manitou Inc. v. Girl Scouts of the USA Inc.*, 549 F.3d 1079 (7th Cir. 2008) ........................................................................................................................ 13

*Hadley v. Junior College District,* 397 U.S. 50 (1970) ........................................ 22

*Harlan v. Scholz*, No. 16 C 7832, 2016 U.S. Dist. LEXIS 132581 (N.D. Ill. Sep. 27, 2016) ........................................................................................................................ 25

*Hodges v. Public Bldg. Comm'n*, No. 93-C-4328, 1994 U.S. Dist. LEXIS 18419 (N.D. Ill. Dec. 20, 1994) ............................................................................................. 7

*Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989) ....................... 17

*Jackson v. Ogilvie*, 426 F.2d 1333 (7th Cir. 1970) ................................................ 1

*Judge v. Quinn*, 612 F.3d 537, as amended by 387 Fed. Appx. 629 (7th Cir. 2010) .................... 2

*Latham v. Board of Education*, 31 Ill. 2d 178 (1964) ............................................. 4, 19

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 2002) ................................................ 22, 23, 24

*Moore v. Detroit Board of Education*, 293 F.3d 352 (6th Cir. 2002) ......................... 22

*Navarro v. Neal*, 716 F.3d 425 (7th Cir. 2013) ....................................................... 18

*Norman v. Reed*, 502 U.S. 279 (1992) .................................................................... 19

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) ................................. 25

*Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098 (7th Cir. 1995) ............................... 20

*Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir. 1984) ............... 13

*Simmons v. Galvin*, 575 F.3d 24 (1st Cir. 2009) ..................................................... 18

*Thornburg v. Gingles*, 478 U.S. 30 (1980) .................................................................. 18

*Tully v. Edgar*, 171 Ill.2d 297 (1996) ........................................................................ 22

*Ty Inc. v. Jones Group Inc.*, 237 F.3d 891 (7th Cir. 2001) ........................................ 13

*United States v. Bd. of Educ.*, 554 F. Supp. 912 (N.D. Ill. 1983) ............................. 6, 7

*United States v. Bd. of Educ.*, 663 F. Supp. 2d 649 (N.D. Ill. 2009) ........................ 6, 7

*United States v. Carolene Products,* 304 U.S. 144 (1938) ......................................... 18

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977)............................................................................................. 24

*Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) ..................................................... 25

## Statutes

1963 Illinois School Code, Ill. Rev. Stat. 1963, ch. 122...............................................  4

Ill. P.A. 85-1418 (Dec. 12, 1988) ..............................................................................  4, 5

Ill. P.A. 89-15 (May 30, 1995)...............................................................................  5, 6, 10

Illinois Pension Code, 40 ILCS 5/17-129 ................................................................... 10

Illinois School Code, 105 ILCS 5/1-1 *et seq.* ...................................................... passim

Voting Rights Act, 52 U.S.C. § 10301 ........................................................................ 16

## Other Authorities

Frederick M. Hess, "Assessing the Case for Mayoral Control of Urban Schools,"
    4 *Education Outlook* (American Enterprise Institute for Public Policy Research,
    Aug. 2008) (attached as Exhibit F) ..................................................................... 9

James C. Carl, "'Good Politics is Good Government': the Troubling History of
    Mayoral Control of the Public Schools in Twentieth-century Chicago, 115(2)
    *Amer. J. Educ.* 305 (2009) (attached as Exhibit E)........................................... 9

Pauline Lipman, et al., "Should Chicago Have an Elected Representative School
    Board?" (Univ. of Ill. at Chicago, Feb. 2015) (attached as Exhibit D) ............... 9, 10

## Constitutional Provisions

Ill. Const. Art. VII, § 8...............................................................................................  3

Ill. Const. Art. X, § 1 ................................................................................................ 17

**Introduction**

Plaintiffs move for a preliminary injunction on two of the counts of their complaint—Count I and Count III. In Count I plaintiffs contend that in violation of the First and Fourteenth Amendments, the Illinois School Code unlawfully denies to plaintiffs the right to the same equal vote granted to all other Illinois citizens. Under *Burdick v. Takushi*, 504 U.S. 428 (1992), such a "severe" restriction on the right of just part of the State's electorate to vote is subject to strict scrutiny. As set out below, defendants cannot show that such a "severe" restriction on the right to vote is "necessary" to a "compelling" state purpose. In Count III plaintiffs state the obvious racial impact or effect. In violation of Section 2 of the Voting Rights Act, the Illinois School Code allows far more of the State's white citizens than its Black or Latino citizens to have "representatives of their choosing." By denying the right to only vote to the people of Chicago, the Illinois School Code disenfranchises an astonishing *45 percent* of the Black citizens of Illinois and *37 percent* of its Latino citizens, and keeps them from participating in any way in the governance of the public schools.

Plaintiffs seek a preliminary injunction to restrain defendants from protracting this unlawful denial of elected representation—in particular from the delay in proceeding to an election should this Court rule in plaintiffs' favor. Even as plaintiffs seek a final judgment on an expedited basis, plaintiffs also seek to require defendants to draft rules and procedures for a city-wide election while this case is pending. In this way, plaintiffs hope to enable the citizens of Chicago to cast their ballots on April 4, 2017, when all other Illinois citizens under state law will be electing school boards throughout the State. On two notable occasions, this Circuit has ordered emergency injunctive relief to have elections occur—even directing changes in Illinois law to do so. *See Jackson v. Ogilvie*, 426 F.2d 1333, 1337 (7th Cir. 1970) (requiring an election

1

when a Congressional vacancy arose); *Judge v. Quinn*, 612 F.3d 537, 556-57, as amended by 387 Fed. Appx. 629 (7th Cir. 2010) (requiring election to fill a Senate vacancy).

Furthermore, an expedited final judgment on the merits is possible—at least on the two claims raised above. Rule 65(a)(2) provides that before a hearing on a motion for preliminary injunction—such as this one—this Court can "advance the trial on the merits and consolidate it with the hearing." Plaintiffs seek to invoke this procedure under Rule 65(a)(2), to resolve two of their legal claims that raise primarily questions of law. Plaintiffs seek a hearing of no more than an hour for oral argument on these two claims.

Plaintiffs at this time do *not* seek resolution of their additional claim that in denying the right to vote, the State acted with discriminatory intent, in violation not just of Section 2 of the Voting Rights Act but also the Fourteenth and Fifteenth Amendment. Nonetheless the following Statement of Facts will give the basis not just for the two "impact" or "effects" claims described above but also for a claim that the denial of a right to vote had a racially discriminatory intent.

## I. Statement of Facts

### A. Illinois School Boards and Election Procedures

There are 859 public school districts in Illinois, including 373 elementary school districts, 99 high school districts, and 387 unit districts. ISBE Public Information Division, *Annual Report 2015* 19 (2016), with the relevant "School and Districts" section attached as Exhibit A.[1] Under the Illinois School Code, in all but one district, the citizens of Illinois elect the members of school boards that are established under Illinois law to carry out the constitutional obligation of the State of Illinois to provide a system of free public education. 105 ILCS 5/10-1 & 10-10. The one exception, District 299, covers the City of Chicago and is identical in boundary with the City

---

[1] The full report is available at www.isbe.net/reports/annual15/report.pdf.

of Chicago, a home rule entity. District 299—that is, Chicago—does not have an elected school board, and plaintiffs and other citizens living in Chicago do not have the same right to vote given under the Illinois School Code to all other citizens of Illinois. 105 ILCS 5/34-3.

Instead, pursuant to 34-3 of the Illinois School Code, the Mayor of the City of Chicago has the sole and exclusive authority to appoint the members of the Board, at his pleasure, without any oversight. *Id.* at § 34-3(b). The City Council of Chicago has no role in the approval or confirmation of the members of the Board. *Id.*

The Board of Education is not an administrative agency of the City of Chicago but a "unit of local government" as described in Article VII, section 8 of the Illinois Constitution. This appointed Board may levy taxes upon the property of the citizens of Chicago, without approval by the City Council, or the General Assembly, or any other legislative body or body of elected officials. *Id.* at §§ 34-53–54.1. Nor does the Mayor of the City of Chicago, apart from his power to appoint members of the Board, have any right or power under the Illinois School Code to concur or consent to such taxation. *Id.*

Such taxation is a significant burden on the citizens of Chicago. In its fiscal year 2017 budget, the defendant Chicago Board of Education projects that it will receive 2.66 billion dollars in property tax revenue in this fiscal year. In the last five years the Board has levied over 11 billion dollars in property taxes on the citizens of Chicago, with approximate annual levies as follows:

| Fiscal Year | Property Tax Revenue |
|---|---|
| 2016 | $ 2,359,800,000 |
| 2015 | $ 2,289,000,000 |
| 2014 | $ 2,197,000,000 |
| 2013 | $ 2,106,000,000 |
| 2012 | $ 2,106,000,000 |

Chicago Public School Budgets, Fiscal Years 2013-2017 (available online at http://cps.edu/finance/Pages/financialinfo.aspx) (last accessed November 4, 2016).

### B. Governance of the Chicago Board of Education

The City of Chicago has long had an appointed Board of Education but through most of the City's history that Board was either part of the City or subordinate to the City Council—that is, a legislative body elected by the citizens of Chicago. Up through the late twentieth century, the Board of Education of the City of Chicago was an administrative body that was appointed by the Mayor and required approval by the City Council of Chicago as to taxation and budget. *See Latham v. Board of Education*, 31 Ill. 2d 178, 181-82, 184, 187-88 (1964). The former Section 34-55 of the Illinois School Code provided, "This Article does not authorize the board to levy or collect any tax, but the *city council* shall, upon the demand and under the direction of the board, annually levy all school taxes." Ill. Rev. Stat. 1963, ch. 122, ¶¶ 34-55 (emphasis added).

In 1988, the General Assembly increased the direct control of the Board by the citizens of Chicago in the Chicago School Reform Act of 1988 (the "1988 Act"). This greater citizen control of the Board grew out of an educational summit called for by Harold Washington, the first African American mayor of Chicago. Ill. P.A. 85-1418 (Dec. 12, 1988); *see also* 85th Ill. Gen. Assem., Senate Proceedings, Dec. 1, 1988, at 60 (statement of Sen. Berman). For the first time, the General Assembly gave citizens of Chicago the right to elect Local School Councils (LSCs). These new LSCs had authority to appoint and remove the principals and otherwise govern the local neighborhood schools. Ill. P.A. 85-1418 § 1 (adding Ill. Rev. Stat., ch. 122, ¶ 34-2.1, later codified at 105 ILCS 5/34-2.1).

The 1988 Act also abolished the 11-member Board of Education, expanded the Board to 15 members and created a School Board Nominating Commission, composed of 23 parent and community representatives from the LSCs and 5 members appointed by the Mayor. *Id.*

4

(amending Ill. Rev. Stat., ch. 122, ¶ 34-3, later codified at 105 ILCS 5/34-3). Under the 1988 Act, the School Board Nominating Commission gave the Mayor a slate of three candidates only to fill each vacant position on the 15-member Board. *Id.* (adding Ill. Rev. Stat., ch. 122, ¶ 34-3.1). The Mayor then had only 30 days to choose the 15 board members from the lists that the Commission proposed. *Id.* The Mayor's choices then had to be approved by the City Council. *Id.*

The 1988 Act was designed to increase citizen control over the Board of Education, though the Board was still technically appointed. It gave special representation rights to parents of the children served by the Chicago public schools and explicitly aimed at taking the racial and ethnic composition of the student population into account. *Id.* ("The Commission and the mayor shall consider the demographics of the student population served by the district when making nominations and appointments, respectively"); *see also id.* (adding Ill. Rev. Stat., ch. 122, ¶ 34-2.1, later codified at 105 ILCS 5/34-2.1) ("The membership of each local school council shall be encouraged to be reflective of the racial and ethnic composition of the student population of the attendance center served by the local school council").

In 1995, that enhanced control by the citizens of Chicago over the Board was removed. Indeed, because the Mayor vetoed many the candidates recommended by the LSCs, the new system's effect was delayed and limited in the first place. In 1995, the General Assembly passed the Chicago School Reform Amendatory Act (the "1995 Act"). Ill. P.A. 89-15 (May 30, 1995). The 1995 Act eliminated the role of LSCs in the political processes leading up to the appointment of Board members. *Id.* at § 50 (repealing 105 ILCS 5/34-3.1). The 1995 Act eliminated the School Board Nominating Commission and gave the Mayor the exclusive right to select the new School Reform Board of Trustees through 1999 and the reconstituted Board of

Education thereafter. The Mayor also now had the exclusive right to appoint a chief executive officer. *Id.* at §§ 5 & 50 (amending 105 ILCS 5/34-3 and repealing 105 ILCS 5/34-3.1).

Furthermore, the 1995 Act now eliminated any role of the City Council in the confirmation or selection of members of the Board. *Id.* The City Council then as now consisted of 50 aldermen, many of whom were people of color and elected locally from wards that had large minority-race populations. Instead, all authority was now exclusively that of the Mayor, who then—as now—is a white person. In the twenty years since enactment of the 1995 Act, all the members of the Board have been selected by a white Mayor, and no minority-race elected official has had any direct or indirect role in that process.

### C. Continued Racial Segregation Under Appointed Boards

African American children in Chicago public schools historically been subject to racial discrimination by the white leadership of the City, and have been deprived by such segregation of a fair and equal right to an education. *See e.g., United States v. Bd. of Educ.*, 554 F. Supp. 912, 913 n.2 (N.D. Ill. 1983) ("the continuing delinquencies of the City of Chicago's administrations in not taking steps to arrest the growth, let alone change the pattern, of de facto segregation in housing were major contributors to the problem" of school segregation). Until the 1980s, Black voters were subjected to the dominance of the predominantly white Democratic party organization, and were powerless to prevent this neglect of the education of their children.

On September 24, 1980, the United States Department of Justice filed a lawsuit challenging the historic and long-standing racial segregation in the Chicago public schools. *See United States v. Bd. of Educ.*, 663 F. Supp. 2d 649, 651-52 (N.D. Ill. 2009). The same day, the Chicago Board of Education and the Department of Justice entered a consent decree that acknowledged a history of racial segregation and isolation of Black students. *Id.* At the time the Consent Decree was put into place, approximately 82% of the students in Chicago's public

schools were students of color, with approximately 60% being Black and approximately 14% being Latino. *Id.* at 652. Throughout the 1970s and 1980s, the school district had been and was continuing to go through a rapid shift towards serving predominantly students of color. *United States v. Bd. of Educ.*, 554 F. Supp. at 916. By the time the 1995 Act was passed, only 11.9% of the CPS student body was white. *See Hodges v. Public Bldg. Comm'n*, No. 93-C-4328, 1994 U.S. Dist. LEXIS 18419, *2 (N.D. Ill. Dec. 20, 1994). On September 24, 2009, when the consent decree was dissolved, approximately 92 percent of the students attending Chicago public schools were people of color. *United States v. Bd. of Educ.*, 663 F. Supp. 2d at 652.

      **D.**    **Racially Discriminatory Intent of the 1995 Act**

      Unlike other Illinois local school districts where the schools serve all or nearly all children of color, Chicago has retained a significant white population of taxpayers. There is substantial census and other evidence to show that whites or nonminority businesses own the majority of the taxable property wealth of District 299. *See, e.g.,* U.S. Census Bureau, 2010 Census SF 1, General Housing Characteristics: 2010 (Chicago, Illinois), attached as Exhibit B (showing white people own half of all owner-occupied housing units); U.S. Census Bureau, 2012 Survey of Business Owners, Statistics for All U.S. Firms by Race: 2012 (Chicago, Illinois), attached as Exhibit C (showing white people own half of all businesses that can be classified by race, and that the largest firms are not classifiable by race). Meanwhile, and in the years just prior to the 1995 Act, voting in Chicago elections had become racially polarized. Especially in the 1980s—in contrast to prior years—Black voters no longer voted with near unanimity for candidates selected by a white-dominated Democratic party organization. *See, e.g.,* Ben Joravsky & Tom Brune, "Can Washington's victory point the way forward for the next Chicago mayor?" *Chicago Reader* (Mar. 10, 2015) (reprint of article from May 1983), attached as Exhibit L. Turnouts of Black voters were extremely large during the election in which Harold Washington

was elected mayor, making him Chicago's first Black mayor. *Id.* There were also developing alliances between Black and Latino voters in these years, leading to a majority voting bloc of people of color. *Id.* Washington's election marked the beginning of a period of intense racial divide in the City Council widely known as the "Council Wars." *See* Jeff Lyon, "Council Wars: The Battle for City Hall," *Chicago Tribune* (Oct. 31, 1993), attached as Exhibit M.

Furthermore, as a result of the 1988 Act providing for LSCs and the School Board Nominating Commission, Black and Latino voters had an increasing and decisive role in the governance of the schools that their children attended. This led to tension between voters of color and a newly elected white mayor. Pursuant to the terms of Section 34-3 as amended at the time, after being elected in 1989, Mayor Richard M. Daley was authorized to appoint an Interim Board to hold office until the School Board Nominating Commission could provide him with slates of nominees to fill the seats. However, the mayor refused on a number of occasions to appoint nominees provided to him by the School Board Nominating Commission which was accountable to the LSCs. Ben Joravsky, "Thankless task: how the mayor misused the School Board Nominating Commission," *Chicago Reader* (Aug. 16, 1990), attached as Exhibit N.

Against this background, the General Assembly in 1995 eliminated the provisions of the 1988 Act that gave this influence to Black and Latino voters. To further limit the influence of voters of color, the General Assembly also took the unprecedented step of removing the City Council—which had many aldermen of color—from any role in the selection of members of the School Board.

There is coded racial language throughout the debates over the 1995 Act. Legislators in the suburbs and Downstate quoted nationally prominent figures like William Bennett who notoriously described the nearly all-black Chicago public schools as the worst in the nation. The

transcripts of the debates contain this racially volatile language. 89th Ill. Gen. Assem., House Proceedings, May 24, 1995, at 48 (statement of Rep. Murphy) and 55-56 (statement of Rep. Mitchell). In fact many other Illinois local school districts—including districts that served mainly *white* students—had the same or lower levels of educational achievement, and the right to vote in those districts was unimpaired.

### E.    The Failure of the 1995 Act

There has been no ascertainable improvement of the performance of African American children in District 299 relative to that of other comparably large school districts. Generally, from a strictly educational standpoint there has been scant research done on the effectiveness of mayoral-control when compared to elected school boards, and there is no conclusive evidence of any correlation between the particular form or structure of a school board and the academic success of the students. *See* Pauline Lipman, et al., "Should Chicago Have an Elected Representative School Board?" 7-8 (Univ. of Ill. at Chicago, Feb. 2015), attached as Exhibit D; James C. Carl, "'Good Politics is Good Government': the Troubling History of Mayoral Control of the Public Schools in Twentieth-century Chicago, 115(2) *Amer. J. Educ.* 305 at 330 (2009), attached as Exhibit E; Frederick M. Hess, "Assessing the Case for Mayoral Control of Urban Schools," 4 *Education Outlook* 3 (American Enterprise Institute for Public Policy Research, Aug. 2008), attached as Exhibit F[2]. Though student outcomes at Chicago Public Schools have improved recently according to some measures, they largely track national trends for large urban school districts, and in some cases have fallen behind the progress made in these districts nationally. Exhibit D at 14-17. Ultimately, as pointed out by Professor Lipman and her colleagues, significant academic improvement depends on the educational policies that the

---

[2] Also available online at https://www.aei.org/wp-content/uploads/2011/10/20080825_0423422EduOAugust_g.pdf.

board—whether appointed or elected—chooses to adopt. In part because of past financial mismanagement, the Board has failed or has been constrained in adopting polices that are responsible for improvement in education. *Id.* at 23-24.

###### F. Deteriorating Conditions in Chicago Public Schools

The most significant change since adoption of the 1995 Act has been the underfunding of Chicago public schools and the large increase of indebtedness of the Chicago public school system. The Chicago public schools are now in a far worse financial position than in 1995. In its last Comprehensive Annual Financial Report, the Board reported that it was facing "financial crisis," with a "deficit gap of $862 million and a structural deficit of $1.1 billion in the Operating Fund." Cover Letter to 2015 Comprehensive Annual Financial Report (available online at http://cps.edu/About_CPS/Financial_information/Documents/FY15_CAFR.pdf). The teachers' pension plan that was fully funded in the late 1990s was about 52 percent funded in 2015. *Id.* at 6; *see also* Chicago Teachers Pension Fund 1999 Comprehensive Annual Financial Report 29 (available online at http://www.ctpf.org/AnnualReports/cafr1999.pdf). These shortfalls are in large part the result of decisions made by the appointed board regarding contributions to the pension fund that were authorized by the 1995 Act. *See* P.A. 89-15, § 3 (amending 40 ILCS 5/17-129). These shortfalls imperil the right of Chicago children to a public education. The appointed school board and appointed Chief Executive Officer have also been impaired by corruption. For example, last year, the Chief Executive Officer appointed by the Mayor pleaded guilty to wire fraud for steering no-bid contracts as kickbacks to her former employer—no-bid contracts that were approved by the appointed Board. Office of the Inspector General of the Chicago Bd. of Educ. (OIG), *Annual Report FY 2015*, at 6 (available online at http://www.cpsoig.org/uploads/3/6/1/7/3617112/cps_oig_fy_2015_annual_report.pdf); Chicago Bd. of Educ. Action 13-0626-PR51 (unanimous approval of $20.5 million no-bid contract),

10

attached as Exhibit G. As another example, in fiscal year 2012, the OIG objected to the Board's improper proposed residency waiver for a high-ranking CPS official, but the Board approved the waiver nonetheless. OIG, *Annual Report FY 2012*, at 29-32 (available online at http://www.cpsoig.org/uploads/3/6/1/7/3617112/oig_fy_2012_annualreport.pdf). The OIG has also announced investigations into potential conflicts of interest with other no-bid contracts, including contracts that went to companies owned by a Board member.

### G. Displacement of Black Children by the Appointed Board

The African American student population remains racially segregated, even though there has been a significant drop in the student population that is Black. Just since 1998, the percentage of Black children in the student population has dropped from 53.2% to 37.7% in 2016. *Compare* CPS FY00 Racial/Ethnic Survey Comparison Sheet, attached as Exhibit H *with* CPS FY17 Racial/Ethnic Survey Comparison Sheet, attached as Exhibit I. But while only 37.7% of the total public school population is Black, about 37% of Chicago's public schools have a student population that is more than 90% Black. CPS FY17 Racial/Ethnic Survey Schools Sheet, attached as Exhibit J.[3] Almost a third have a population that is less than 10% Black. *Id.* Though the segregation of Latinos may not be as extreme, almost 16% of all of Chicago's public school's have a population that is more than 90% Latino, though Latinos make up about 47% of the total student population. *Id.* Furthermore, since 2001, the Board has closed 121 schools and the student population of those schools was 89% Black. *See* Exhibit O at p. 5, G156.[4] In the massive school closings of 2013, 72% of the "receiving schools" where these students were sent were over 90% Black. *See* Exhibit P at p. 2, F53.

---

[3] For the sake of minimizing the exhibit's volume, it contains an excerpt of the full spreadsheet provided by Chicago Public Schools which is limited to data showing the white, African American, and Latino population numbers.

[4] Exhibits O and P were compiled by counsel using data copied from racial and demographic information published by CPS.

## H.    Disparate Racial Impact on the Right to Vote

The singling out of Black children for large-scale displacement could not have occurred without the disenfranchisement of Black voters by the 1995 Act—and the establishment of an appointed Board that does not have to take account for their views. By any statewide measure, the Illinois School Code strips the right to vote from nearly *half* of the African American citizens of the State. According to the U.S. Census American Community Survey, in 2014, about one-third of Chicago's population was Black. Exhibit K at D34.[5] About 32% of Chicago's population is non-Hispanic white. *Id.* at D48. In other words, more than two-thirds of Chicago's residents are people of color. *Id.* at D57. According to the same data set, about 15% of the population of Illinois is Black and about 63% of the population of Illinois is non-Hispanic white. *Id.* at H34 & H48. Thus, just over one third of the Illinois residents are people of color. *Id.* at H57. However, because Chicago's African American population makes up about 45% of the total African American population in Illinois, and its Latino population makes up about 37% of the State's total, the percentages of people of color in Illinois outside of Chicago are even lower. *Id.* at J34 & J42. Outside of Chicago, only 10.6% of the State's population is Black and 71% of the population is non-Hispanic white. *Id.* at L34 & L48. Thus, about 29% of Illinois residents that live outside of Chicago are people of color. *Id.* at L57. This means that Section 34-3 of the Illinois School Code deprives 45% of all African American people in Illinois of the right to elect the body that taxes them and provides public education where they live, deprives 37% of all Latino people in Illinois of the same, but deprives less than 11% of the white people in Illinois of that right. *Id.* at J34, J42, & J48.

---

[5] Exhibit K is a spreadsheet compiled by counsel from American Community Survey 2014 data. All of the data except columns J, K, and L, and Row 57 are copied directly from U.S. Census tables. The additional columns and row represent simple mathematical conclusions drawn from the data in the other columns.

## II.     Argument

### A.     Plaintiffs meet the standards for preliminary injunctive relief under Rule 65.

Plaintiffs seek an interim order to require defendants to develop plans for direct election of the Board of Education. In a case where plaintiffs are likely to succeed on the merits, such an order will reduce the period in which they are denied elected representation. In particular, if such an order is in place, plaintiffs will have an opportunity for the same equal right to vote for members of the school board by April 4, 2016, the same date that all over Illinois other citizens will go to the polls for their school district elections. As set forth below, this motion meets the standards of the two-step process used in this Circuit for determining whether a preliminary injunction is appropriate. In the first step, plaintiffs will show: (1) that they have "some likelihood of succeeding on the merits," and even a very high probability on Counts I and III, which are briefed below; (2) that absent a preliminary injunction, they will suffer irreparable injury—specifically, the further delay in their right to elected representation given that they are likely to succeed; (3) that traditional legal remedies would be inadequate. *See Girl Scouts of Manitou Inc. v. Girl Scouts of the USA Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Ty Inc. v. Jones Group Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

In the second step, the court must engage in a balancing of the harms, in a sliding scale approach. The more likely plaintiffs are to win, the less heavily does the balance of harms need to weigh in plaintiffs' favor. *Girl Scouts of Manitou*, 549 F.3d at 1087; *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 383 (7th Cir. 1984). As set out below, plaintiffs are likely to prevail, and the balancing of harms as well as the public interest weighs heavily in favor of preliminary injunctive relief.

In the alternative, plaintiffs seek to use this motion to resolve at least two of their legal claims outright on the merits through the expedited procedure set out in Rule 65(a)(2). For this

purpose plaintiffs would press their claim that the Illinois School Code's election scheme has a racially discriminatory *effect* and that such an *effect* on their right to vote or participate in the political process violates Section 2 of the Voting Rights Act, regardless of intent. Plaintiffs also press the constitutional claim that the "severe" restriction on the right of just part of the State electorate—just the voters in Chicago—is subject to "strict scrutiny," and there is no plausible basis to claim that it is necessary to or even in reality promotes a "compelling" purpose, especially in light of the Board's chronic financial mismanagement of Chicago's public schools.

      **B.**    **Plaintiffs are not just likely to succeed on the merits but entitled to judgment on the merits under Rule 65(a)(2).**

          **1.**    **In violation of Section 2(b) of the Voting Rights Act, the Illinois School Code allows more white citizens of Illinois than Black or Latino citizens to have representatives of their own choosing.**

Under Section 2 of the Voting Rights Act, plaintiffs have brought two distinct claims—that in denying the right to vote, the Illinois School Code has discriminatory racial *intent* and that regardless of intent, it has an unlawful discriminatory impact. As set forth in the Statement of Facts, the Chicago School Reform Amendatory Act of 1995 did have a racially discriminatory *intent*. However, for now, plaintiffs do not seek to resolve that claim through an expedited hearing under Rule 65(a)(2). On the basis of the public record alone this Court can rule that the Illinois School Code as amended in 1995 has a racially disparate impact and violates Section 2 of the Voting Rights Act by allowing more of the State's white citizens than its Black and Latino citizens to have representatives of their own choosing. State law bars an astonishing 45 percent of the State's African American citizens and 37 percent of its Latino citizens from voting or participating in the governance of the public schools. By comparison, state law bars only 11 percent of its white citizens from deciding who their representatives will be. Furthermore, as amended in 1995, the Illinois School Code takes the extra step of ensuring that *no* member of the

City Council—which includes many Black and Latino alderman—can have any role in the governance of the public schools. The result is that only a single white elected official, the Mayor, has picked every member of the Board since the passage of the 1995 Act. Plaintiffs contend, but need not prove, that District 299 has one special characteristic that explains this extraordinary disenfranchisement of the State's minority race citizens—unlike any other Illinois district, the public schools of Chicago serve nearly entirely children of color while the property wealth is largely owned or controlled by white people.

Section 2 of the Voting Rights Act is a remedial statute—and "it should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer,* 501 U.S. 380, 403 (1991). In 1982 Congress amended Section 2 to prohibit any voting law or practice—without regard to its intent—that had a racially discriminatory effect. *Id.* It is true that some Circuits have held that a mere *effect* is not enough, and that under Section 2 the challenged practice must have a connection to race discrimination in the past. *See Frank v. Walker,* 768 F.3d 744, 754-55 (7th Cir. 2015) (quoting *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014). But the Seventh Circuit has been skeptical of adding such a gloss. *Id.* Opting for a plainer reading of Section 2, *Frank* makes clear that Section 2 applies to a complete *denial* of the right to vote—not just the "dilution" of it, which had been the concern in racial gerrymandering cases. Where a denial is alleged, *Frank* holds that the central issue is "causation"—whether it is really a state law that is causing a racially disparate denial. While the *Frank* decision was skeptical that the Wisconsin voter ID laws did cause such a racially disparate effect, the cause and effect are easy to see here. Literally, the Illinois School Code is a state law—or "standard, practice or procedure…*imposed by a State*"—that stops more of the State's Black citizens than white citizens from having

"representatives of their choosing." The claim here tracks the literal language of Sections 2(a) and (b) of the Voting Rights Act, which is as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [52 USCS § 10303(f)(2)], as provided in subsection (b).

> (b) A violation of subsection (a) is established if, *based on the totality of circumstances*, it is shown that the political processes leading to nomination or election *in the State* or political subdivision are not *equally open* to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice….

52 U.S.C. § 10301 (emphasis added).

Under the language quoted above, the Illinois School Code is a "standard, practice or procedure…imposed by the State"—and not by a "political subdivision." It is a State law that applies to the entire "electorate" of the State. Article 9 of the School Code, 105 ILCS 5/9-1.1 *et seq.*, entitled "Elections," sets forth the "political processes leading to nomination and election *in the State*" for the governance of the public schools. These elections take place under the general election law, and the State determines the date of these State elections—including the State-wide elections that will occur on April 4, 2017. 105 ILCS 5/9-1. Notwithstanding the generality of Article 9, Section 3 of Article 34 of the School Code excludes one part of that electorate—with the largest absolute number and roughly 39% of the State's citizens of color—from having any right to vote or participate at all.

Article 10 of the School Code, 105 ILCS 5/10-1.1 *et seq.*, describes the powers and functions of these Board members, who are clearly serving as "representatives" of the people

16

within the meaning of the Voting Rights Act. There is no distinction between the state-imposed duties of the "representatives" who are elected directly by the people of Illinois and the duties of the "representatives" who serve on the Chicago Board of Education. Nor could the defendants plausibly deny that the members of the Board are representatives of the people of Chicago just as the members of other boards are representatives of the people. That is, those who hold these state-created offices are not only representatives of the people, but in that capacity they carry out the State's constitutional responsibility—not a local responsibility—for providing free public education throughout Illinois. *See* Ill. Const. Art. X, § 1.

In short, the plain language of the School Code, a state law, which includes Articles 9, 10, and 34, sets up "representatives" of the people state-wide to carry out a state constitutional function. Only the people of Chicago, most of whom are people of color, are denied the right to vote for these representatives. Either under a plain language reading or a broader or liberal reading called for by *Chisom*, Section 2 should bar a state from denying so many of its minority race citizens from voting for these "representatives." The State itself may not divide up its own "electorate" in this racially disparate way. If Section 34-3 were not a state but a local law, or if the citizens of District 299 themselves gave up the right to vote without imposition by the State —then such a *local* law originating at the *local* level would not violate Section 2. As a local law disenfranchising a local electorate, a local government is barring everyone equally. Likewise, the General Assembly would not run afoul Section 2 of the Voting Rights Act if it took away the right to vote from its entire electorate—every citizen equally. For instance, when states like Virginia uniformly maintain appointed school boards, and every citizen is equally denied the right to vote, there is no violation of Section 2. *See Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989). Illinois is free to eliminate elected school boards if Illinois prefers

17

appointed ones. But under Section 2, Illinois is not free to give out the right to vote in a racially disparate manner—ever—whether acting in good faith or not.

Since this is not a case about "vote dilution," there is no particular need to consider the so-called "*Gingles* factors," which apply in gerrymandering cases. *See Thornburg v. Gingles*, 478 U.S. 30 (1980). *Gingles* is of little use in vote-denial cases, where courts are still developing an analytical framework. *See, e.g., Simmons v. Galvin*, 575 F.3d 24, 41-42 n.24 (1st Cir. 2009). The framework proposed here is a literal reading of the state. Still it is especially important to read the statute literally when it serves one of the main purposes of judicial review, as set out long ago in the famous footnote 4 of *United States v. Carolene Products,* 304 U.S. 144, 152 n.4 (1938). "Footnote 4" commits the federal courts to strike down state laws that target "discrete and insular" minorities within a state. Regardless of intent, this is exactly what Section 34-3 of the Illinois School Code does.

> **2.     Section 34-3 imposes a "severe" restriction on plaintiffs' right to vote under the First and Fourteenth Amendments, and cannot be justified as "necessary" to a "compelling" state purpose.**

Unlike state laws which only indirectly impede the right to vote, Section 34-3 is   an outright direct denial. To determine when a state election law like Section 34-3 is subject to strict scrutiny, the federal courts apply the analytic framework set out in *Burdick v. Takushi*, 504 U.S. 428 (1992). *See, e.g., Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013). Generally, *Burdick* holds that "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." 504 U.S. at 434. "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into

18

consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)) If the burden on the right to vote is "severe" and "discriminatory," *Burdick* calls for strict scrutiny, and "the regulation must be 'narrowly drawn to advance a state interested of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Alternatively, when a state like Illinois "imposes only 'reasonable, nondiscriminatory restrictions' on the rights of its citizens, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788 and 788-89 n.9).

On a 1-to-10 scale for evaluating whether a burden is "severe" or "discriminatory," Section 34-3 is a perfect 10. It is a complete denial of the plaintiffs' right to self-government, even indirectly through the City Council. It is based necessarily on a legislative judgment that people of Chicago—mostly people of color—are not capable as other voters of governing the public schools. It is a legislative judgment for which there is no evidence because citizens of Chicago have *never had the right to vote*. Furthermore, as shown by the studies cited above, there is no evidence that appointed boards are superior to elected boards in terms of academic achievement. Indeed, if it were otherwise, one would expect that the General Assembly would have appointed boards throughout the State.

Section 34-3 denies not just a direct right to vote but the right to hold the Board accountable to any government that plaintiffs might elect. Section 34-3 denies self-government even it existed in *Latham v. Board of Education*, 31 Ill. 2d 178 (1964). In that long ago case, the Illinois Supreme Court upheld the right of an appointed Board to impose taxes only because the City Council was required to approve the Board's budget. Under Section 34-3, even that indirect electoral check is gone. The members of the Chicago Board of Education do not "represent" the

19

City of Chicago, or the City Council of Chicago, or the voters of Chicago. In that sense, it is quite different from entities like the Regional Transportation Authority (RTA), which may impose taxes but is directly accountable to units of government that citizens of Illinois elect. And of course in the case of the RTA, there is no "disparate" treatment; there are no other regional transportation agencies that other citizens do elect.

Section 34-3 then is a double disenfranchisement. First, plaintiffs have no control over the education of their children. Second, they have no say in the billions of dollars in taxes that they may have to pay. *See Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1102-03 (7th Cir. 1995) (upholding limited dilution of vote in LSC elections because they lacked power to tax, noting "[t]axation without representation is abhorrent to Americans").

Under strict or even a moderate degree of scrutiny, it is implausible that the denial of the right to vote is serving a "compelling" purpose or—for that matter—even a "precise" interest. While the 1995 act does indeed claim there was "educational crisis," there is no evidence the denial of the right to vote has done anything to address it. Indeed, this educational "crisis" cited by the General Assembly arose under an appointed board, not an elected board. *Illinois has never had an elected school board in districts of over 500,000*, and there is no evidence of any kind as to how such an elected board might perform. Over the past twenty years, as pointed out by the studies cited above, while graduation rates have increased, those rates have merely tracked a national trend in comparable big city districts. Otherwise, Chicago public schools lag as far behind the median performance of these districts as much as they did twenty years ago. Furthermore, the scholarly research shows that far more important than the *type* of board, elected or appointed, is the particular kind of policies that are adopted. For example, limiting class size in the early grades makes a significant difference in academic achievement. But the Chicago

Board has not limited class size in the early grades, and there is no reason to think an appointed or elected board has any bearing on this question. In other words, if the General Assembly really wished to address an educational crisis, it could limit class size and require other proven policies—rather than implement a blanket denial of the right to vote. The denial of the right to vote is not serving any "compelling" purpose. Furthermore, there are "less restrictive means" to achieve these gains—or serve this "precise" interest—other than a discriminatory denial of the right to vote. *See* Exhibits D-F.

Furthermore, there is good reason to think that over the last twenty years, an appointed board accountable to no one but a white Mayor has brought the public schools to the brink of bankruptcy. The financial crisis imperils the very right of Chicago children to an adequate education. In many schools there is no money for books or even toilet paper. The CEO who is the immediate predecessor to the present one pleaded guilty to financial corruption. A teachers' fund that was fully funded in 1995 now faces a deficit of over $\_ *billion*. One argument for an appointed board—better financial management—can hardly be invoked here.

In demanding a connection to a "precise" interest, *Burdick* also requires more than rhetorical cant about the "special problems" of school districts over 500,000. This is an utterly non-specific, opaque excuse for the denial of the right to vote. Nor is it in good faith. It requires an explanation as to why Illinois not just permits but requires an elected school board in 800-plus other districts to carry out the State's constitutional function but refuses to permit it in Chicago. It is impossible for the Court to weigh the "magnitude" of the burden on plaintiff's rights against the "precise" interest being served here, or take into "consideration" why this interest makes it "necessary" to burden plaintiffs' rights. It is impossible because no one knows what the General Assembly is even talking about.

21

> 3.     The Sixth Circuit decision in *Mixon v. Ohio* is in conflict with holdings
>         of the U.S. Supreme Court and law of this Circuit.

While it is true that the Sixth Circuit upheld a denial of the right to vote in two big city school districts—involving Cleveland and Detroit—this case law is in conflict with the holdings of the Supreme Court. In *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 2002), the Sixth Circuit upheld an Ohio law which stripped the largely minority-race citizens of Cleveland of their right to elect a school board—while all other Ohio citizens retained the right to vote. *See also Moore v. Detroit Board of Education*, 293 F.3d 352 (6th Cir. 2002) (relying on *Mixon* to dismiss the same claims). In *Mixon*, as to the constitutional claim, the Sixth Circuit (1) used a "two-tier" analysis instead of the *Burdick* framework, (2) found there was no "fundamental" right to elect an "administrative body," and (3) reviewed an outright denial of the right to vote on minimal rationality grounds. First of all, *Mixon* sets out a straw-man argument that no one is making: no one claims that there is a "fundamental right" to elect a school board. Rather the challenge in this case as in *Mixon* is to a state law that is denying an *equal* right to vote given to all other citizens of the state. Furthermore, at issue here is not the right to elect an "administrative" body, but an independent unit of government—one not accountable to any other government plaintiffs might elect. Finally, the Supreme Court and the Illinois Supreme Court have held that the right to vote in school board elections is in fact a "fundamental" right, or at least that there is a right to have the same equal vote as others. *See Hadley v. Junior College District,* 397 U.S. 50 (1970) (fundamental right to vote in school elections); *Tully v. Edgar*, 171 Ill.2d 297 (1996) (fundamental right to vote in university trustee elections); *Fumarolo v. Board of Education*, 142 Ill.2d 54 (1990) (fundamental right to vote in LSC elections).

In particular conflict with this Circuit, *Mixon* uses a two-tier analysis instead of a sliding scale as required in *Burdick*. Furthermore, *Burdick* gives no basis for the Sixth Circuit's decision

22

to uphold the Ohio law on "minimal rationality" grounds—total deference, in effect. That standard is appropriate at best only when the state law has a slight, "non-discriminatory" effect on the ability to vote—not a draconian denial. In effect, *Mixon* starts out assuming that a complete denial has only a slight and non-discriminatory effect, and *then* applies minimal rationality. No fair-minded person could claim—either in the Ohio case or here—that a complete and discriminatory denial of a right to vote given to everyone else has only an incidental or slight effect on the right to vote.

Likewise, *Mixon* is wrong—even spectacularly wrong—in its dismissal of the claim of a disparate racial impact under Section 2 of the Voting Rights. Yes, like here, the Ohio election law targeted only the largely minority-race citizens of Cleveland, but according to the Sixth Circuit, the U.S. Supreme Court in *Chisom*, held that Section 2 does not apply to removal of the right to vote altogether, so there was no Section 2 claim. This is preposterous. The majority opinion in *Chisom*, authored by Justice Stevens, holds no such thing.

The question in *Chisom* was whether Section 2 applied to the election of judges as "representatives" within the meaning of the Act. The Court narrowly held that it did apply to the election of judges, but noted in *dictum* that "of course" Louisiana could adopt a system of *appointed* judges without violation of the Act. But here one might say that "of course" the Court was assuming that Louisiana would have appointed judges in every parish of Louisiana—not that Louisiana could enforce a law that allowed white-majority parishes to go on electing judges while black-majority parishes would have judges appointed by the State. Yet the Sixth Circuit in *Mixon* strains credulity to assume the opposite. It is even more ironic that in sustaining a racially disparate denial of the right to vote with a strained reading of Section 2, the Sixth Circuit relies on *Chisom*, which states that Section 2 has to be read in the broadest possible way. Not only is

23

*Mixon* at odds with Supreme Court precedent but also with this Circuit's decision in *Frank,* which holds that Section 2 *does* apply to a denial of the right to vote.

### 4. Plaintiffs are likely to succeed on the merits of their claims of racially discriminatory intent.

While plaintiffs do not raise the claim of intentional race discrimination for an expedited decision, that claim meets *all* the factors for finding racially discriminatory intent as set out by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). *First,* the mayoral control put in place by Section 34-3 had a severe racially disparate impact. *Second,* the "historical background" supports the claim as well. An appointed board had long been responsible for deliberate segregation of the Chicago public schools. In 1995, the Board was under a consent decree to desegregate the schools. The switch to an even less democratic or accountable board has kept in place that same racial segregation, even as Black students become a minority of the population. *Third,* the "specific sequence of events" leading up to Section 34-3 also supports a finding of intent. Just as African Americans became independent of white political control while Harold Washington was mayor, and just after a Democratic-controlled General Assembly in 1988 had given more control to African American voters through LSCs, a different and hostile General Assembly in 1995 adopted Section 34-3 which stripped African Americans of these new rights. *Fourth,* the legislative history, which contains racially-charged remarks about Chicago's schools, supports a finding of intent.

Plaintiffs contend that this sweeping disenfranchisement is due to the unique characteristics of District 299. In no other district is the racial disparity between those attending public schools and those who hold the property wealth so extreme. Accordingly, in the twenty years since the adoption of Section 34-3, the tax rate or financial effort to support the education of children of color in this enormously wealthy district has usually been the *lowest* in the six-

24

county Chicago area. Moreover, due to its size, it is the only majority-minority school district subject to disenfranchisement by facially race-neutral legislation. By passing a law ostensibly based on Chicago's large population, the General Assembly disenfranchised almost half of all African Americans and more than a third of all Latinos in Illinois.

### C. Though they seek to advance the trial on the merits on the two counts at issue here, Plaintiffs meet the other requirements for preliminary injunctive relief.

The outright denial of the right to vote constitutes irreparable injury that cannot be remedied through the award of damages. *See Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Harlan v. Scholz*, No. 16 C 7832, 2016 U.S. Dist. LEXIS 132581, *5-*6 (N.D. Ill. Sep. 27, 2016). Of course, with each day that passes, the plaintiffs suffer this injury because they are governed and taxed by an unelected school board. That harm will be especially pronounced on April 4, 2017, when every citizen of Illinois living outside Chicago has the opportunity to exercise their right to vote and the plaintiffs and other Chicago residents do not.

While plaintiffs—and the voting public at large—face continued irreparable injury, the defendants face slight or no harm if the Court grants an injunction requiring them merely to *plan* for an April election. As preliminary relief, the plaintiffs request only that the defendants draft the procedures necessary to allow for an April election while the Court considers the merits of the case. Plaintiffs seek to protect against the possibility that, if they prevail, it will be impossible to hold an election in a timely fashion.

### Conclusion

For all the above reasons, plaintiffs respectfully move the Court grant their motion for preliminary injunction and advance "the trial on the merits" pursuant to Rule 65(a)(2) for the two claims specifically raised in this motion.