Case: 1:16-cv-09514 Document #: 33-6 Filed: 12/08/16 Page 1 of 9 PageID #:220

American Enterprise Institute for Public Policy Research



No. 4 • August 2008

Education Outlook

# Assessing the Case for Mayoral Control of Urban Schools

By Frederick M. Hess

*Education reformers have long questioned whether school boards have become an anachronism. Pointing to promising efforts in Boston and New York City, some have argued for handing over control of school districts to mayors. A review of the research suggests that advocates overstate the evidence and underestimate the pitfalls, but, on balance, mayoral control is sensible for troubled, urban school systems. More important, however, there are clear design principles that must be adopted if this reform is to work as intended.*

Are elected school boards equal to the challenges of twenty-first-century urban school governance? Eli Broad, founder of the Broad Prize for Urban Education, believes in "mayoral control of school boards or . . . no school board at all."[1] Chester E. Finn Jr., president of the Thomas B. Fordham Institute, has called school boards "an aberration, an anachronism, an educational sinkhole," urging, "put this dysfunctional arrangement out of its misery."[2]

Aberration or not, the nation's nearly fifteen thousand school boards are still charged with providing the leadership, policy direction, and oversight to drive school improvement. Nationally, 96 percent of districts have elected boards, including more than two-thirds of the twenty-five largest districts.[3] After decades of largely ineffectual reform, however, it is far from clear that school boards are equal to the challenge. The most popular alternative is replacing today's boards with some form of mayoral control. Cities with a variation of this arrangement today include Baltimore, Boston, Chicago, New York, Philadelphia, and Washington, D.C. The take-no-prisoners leadership styles of school chancellors in New York City and Washington, D.C., have drawn particular interest.

## Where It All Began

The irony is that today's school boards took their contemporary shape about a century ago, when Progressive Era reformers launched a concerted effort to expunge "politics" from schooling in the name of efficiency, equity, and accountability. As James Cibulka, president of the National Council for Accreditation of Teacher Education, has noted, K–12 governance was "designed by political Progressives early in the twentieth century to give professional educators authority and insulate them from political abuses."[4] Consequently, even strong mayors had little influence over the local schools.

Early nineteenth-century school boards had been local and informal, justified by the presumption that they kept schools connected to their neighborhoods. By the dawn of the twentieth century, however, Progressives—in language that sounds more than a little familiar—thought it necessary to "clean out" boards plagued by patronage and politics. In 1885, Boston reformer John Philbrick asserted that "unscrupulous politicians" had seized "every opportunity to sacrifice the interests of the schools to the purposes of the political machine."[5]

Frederick M. Hess (rhess@aei.org) is a resident scholar and the director of education policy studies at AEI. A longer version of this *Outlook* appeared in the *American Journal of Education* in May 2008.

1150 Seventeenth Street, N.W., Washington, D.C. 20036    202.862.5800    www.aei.org

As the twentieth century dawned, Progressives worked to streamline boards and render them more professional and accountable. University of Chicago political scientist William Howell explains: "The order of the day put rational control and expertise in the service of objectivity and efficiency; the result was the birth of the civil service, the exaltation of meritocracy and modernity, and the rise of Taylorism, the scientific management of industries and businesses."[6] Seeking to insulate board politics from rough-and-tumble state and national elections, Progressives moved board elections "off-cycle" and made them nonpartisan.

Efforts to separate education from politics gave rise to concerns that school systems were not apolitical but rather consumed by undisciplined, petty, and ineffectual politics. Assessing Progressive Era reforms more than thirty years ago, historian Charles Beard observed, "Cities change from one [approach] to the other in the hope—usually vain—of taking the school affairs out of the spoils system."[7]

Today, reformers worry that excising politics from school governance has also removed coherence and accountability. One popular solution: put the politics back in education by handing control of the schools to the mayor or empowering mayors to appoint local school boards. This is primarily debated in the nation's large, urban school systems—those cities where educational challenges are more daunting, politics are especially complex, and the need for coherence is particularly pressing. Is it a promising idea? What does the research suggest?

## Some Success Stories

Interest in mayoral control has grown primarily because it has been credited with working in some high-profile locations. When Los Angeles debated mayoral control in 2006, the *Los Angeles Times* opined, "Nearly fifteen years after the mayor and an appointed school board took charge of the Boston schools, the changes are obvious and sometimes remarkable. . . . Boston's experience is valuable for reasons that go beyond vote counts or test scores. . . . The city was one of the first to adopt mayoral control, and it shows what the governance change can achieve."[8]

Dissatisfaction with Boston's thirteen-member elected school committee had reached a crescendo by the early 1990s, when it was savagely criticized for opportunism, ineptitude, and fiscal irresponsibility. A *Boston Globe* editorial described the committee as a "disaster," and a report issued by the city dryly observed, "Boston is unique. The buck does not appear to stop anywhere."[9] In 1991, the city council replaced the elected committee with a seven-person board appointed by the mayor. Several years of tension between the sitting superintendent and the new board followed before Thomas Payzant, a federal Department of Education official, was named superintendent in 1995.

Between 1995 and 2006, Payzant and Boston's mayor, Thomas M. Menino, forged a strong working relationship, yielding an extended period of stable leadership for the city's schools. In place of contentious debates, racial divisions, and divided votes, mayoral control helped advance an ambitious reform agenda. Payzant's efforts included a 1996 comprehensive district reform strategy, "Focus on the Children"; a reorganization of the district's bureaucracy; the creation of charter-like "contract" schools; and the implementation of citywide learning standards aligned with state standards.

Payzant's eleven-year tenure was capped in 2006 when Boston was awarded the Broad Prize for Urban Education. The district was cited for large gains by African American students, raising fourth- and eighth-grade reading and math scores at a faster rate than other districts nationwide, and sharply increasing the number of Advanced Placement mathematics and English exams taken by minority students.[10]

A similarly happy tale has been told about New York City's experiment with mayoral control. In June 2002, New York State transferred full control of the New York City school system to Mayor Michael Bloomberg, along with authority to appoint the schools chancellor and its entire school board. The results, which included the appointment of former Justice Department official and private sector attorney Joel I. Klein as chancellor, have been widely hailed. U.S. Secretary of Education Margaret Spellings has singled out the gains by New York's minority students as evidence of progress in big cities nationwide. "We have proof now that high standards and accountability are paying off. . . . Data show that urban districts are helping urban students achieve."[11] Chancellor Klein has declared, "Since 2002 New York City has outperformed other urban districts and made better progress than the state as a whole."[12] In 2007, New York City followed Boston in claiming the Broad Prize.

But gains in cities like Boston and New York have not come without controversy and concerns about the adverse impact of mayoral control. Although high-profile successes have fueled renewed interest in this reform strategy, the story is not so simple; much of the research

on mayoral control is ambiguous and inconclusive. As Kenneth Wong and Francis Shen have noted, "No general consensus is emerging about the overall effectiveness of mayoral takeover."[13]

## What the Research Shows

For all the optimism that Boston and New York City have engendered, there is remarkably little evidence that mayors or appointed boards are more effective at governing schools than elected boards. While researchers have demonstrated some evidence that mayoral control may be linked to improved performance, the systematic evidence is only modestly illuminating.[14] Caution is recommended when making strong claims about the merits of appointed boards.

A survey of twenty-five years of research on the effectiveness of school boards, published in the *Review of Educational Research*, found few empirical studies, prompting its author to conclude that there is "not yet convincing evidence that appointment of school board members produces effective governance or greater academic achievement."[15] The Center for the Study of Social Policy surveyed what is known about various governance reforms and concluded that there is no clear evidence that mayoral takeovers improve student achievement or fiscal efficiency.[16] The inconclusiveness is due in part to the fact that few researchers have systematically examined the effects of governance reforms on academic achievement or other outcomes.

Despite more than four hundred published books, articles, and studies on board appointment and mayoral control, fewer than a dozen explicitly examine their impact on school reform in more than a cursory fashion. And most of the research is the work of a small group of scholars replicating and repackaging a limited number of case studies. Not even a handful of rigorous, systematic studies have examined the effect of school governance. It is instructive, however, that the debate over the relative virtues of election and appointment is not unique to education; findings in other areas of public policy also suggest that election and appointment have mixed results.

An influential study of the policy outcomes produced by regulatory commissions, which tracked mean electricity prices in forty states over a thirty-seven-year period, concluded that "elected regulators are more proconsumer" and "residential [electricity] prices are significantly lower in states that elect their regulators."[17] In an observation relevant to school governance, the authors wrote, "When regulators are appointed, regulatory policy becomes *bundled* with other policy issues the appointing politicians are responsible for. Because voters have only one vote to cast and regulatory issues are not salient for most voters, there are electoral incentives [for appointed officials] to respond to stakeholder interests."[18] Single-purpose, elected boards (like school boards) are more likely to respond to the immediate desires of the most invested parties, while mayors or appointed boards make decisions using a broader political calculus.

> We would be wise to reject the notion that there is a single best model of school governance.

Research suggests that elected regulatory commissions do a better job than appointed commissions of keeping prices down and appeasing public appetites, but at some cost to fiscal discipline. This is good if the aim is to protect the public from predatory corporations, but less so if it means that hard decisions are being rejected in favor of popular short-term decisions. Seen in this light, the merits of election and appointment may depend on striking an appropriate balance between responsiveness and responsibility. Given evidence that today's urban boards may be insufficiently resolute when improvement demands unpopular short-term measures, the appeal of appointed boards is easy to comprehend.

## The Critique of Elected Boards

Support for appointed boards to date has been based more on theoretical considerations and selected experiences than on evidence demonstrating their merits. Elected boards are particularly criticized on five points—all to some degree legacies of the Progressive Era effort to separate politics from school governance.

First, critics have argued, as in the case of public utility regulation, that a lack of attention and electoral involvement makes it difficult for voters to hold their representatives even loosely accountable. Finn and former Arizona schools superintendent Lisa Graham Keegan have observed that "the romantic notion that local school boards are elected by local citizens has been replaced with the reality that these elections are essentially rigged. They are held at odd times, when practically

nobody votes except those with a special reason to do so. For example, in 2002, just 4 percent of registered voters in Dallas turned out to participate in July elections that replaced six school board members."[19] Public Agenda reports that 63 percent of adults and 50 percent of parents cannot name their local superintendent, and 62 percent of adults and 48 percent of parents cannot name a member of their local school board.[20]

Second, electoral apathy allows mobilized constituencies, especially public employee unions (i.e., teachers unions), to exert disproportionate influence. A national survey of more than five hundred school districts revealed that teachers unions are the leading interest group in local school board politics, and union influence is greater in larger, urbanized districts.[21] Stanford political scientist Terry Moe has documented union success in electing school board candidates in California, finding that union-endorsed candidates win 76 percent of the time, while others win just 31 percent of the time.[22] Because school boards govern districts and oversee contract negotiations, teachers unions are effectively helping to select their bosses. This has been blamed for lethargic district leadership, a failure to challenge union positions, and problematic personnel practices.

Third, elected boards have been blamed for a lack of continuity and coherence. Shifting membership, concern with public perception, and the desire to placate restive communities by showing rapid improvement all create tremendous pressure for superintendents to produce short-term results and undertake an abundance of reforms all at once in order to earn their keep. With more than a quarter of board members serving their first term, no party ties to unite members, and the need to assemble enough free agents to create a stable board majority after each election, it is not surprising that the hiring and firing of superintendents has become something akin to a ritual—a vicious cycle that causes constant direction change and inattention to implementation. Meanwhile, since mayoral terms typically last four years and many mayors serve two terms or more, mayoral appointment is an attractive way to provide stability in urban systems in which most superintendents do not even last four years.

Fourth, school boards have been faulted for a lack of discipline, a tendency to micromanage, and an inability to handle the essential tasks of governance. Ron Ottinger, former San Diego board president, has explained the board practices that had become endemic prior to the hiring of Alan Bersin as superintendent: "[Board members] had become alternate superintendents. . . . Some submitted hundreds of requests for information or directives to fix issues at particular schools. Chasing these requests ate up significant management time. . . . District culture was so dysfunctional that it became normal for principals to bypass the superintendent and go directly to board members if they did not get their way."[23]

Finally, school boards operate in isolation from the mayor and the city's political and civic leadership. Two decades ago, the Institute for Educational Leadership fretted that school boards had ceased to attract members with political influence and lacked strong links to local leaders or city government.[24] Mayors, on the other hand, generally enjoy substantial influence with local civic, business, and state governmental communities and are positioned to coordinate schooling with other city services (like policing, libraries, youth services, and health care).

## Why Might Appointed Boards Not Deliver?

While the arguments for mayoral appointment are sensible ones, a variety of skeptics raise important concerns. New York University professor Joseph Viteritti has cautioned that mayors and governors "are not beyond the reach of the same organized interests that have retarded reform on local school boards."[25] Scholar Clarence Stone has cautioned that it is "not clear that most mayors possess the combined will and skill needed to lead a far-reaching process of change."[26] These doubts reflect five major criticisms of mayoral control of school boards.

The first is a concern about a loss of transparency. Malfeasance in recent years at private firms like Enron and Tyco has shown how an overly familiar board and governance culture can enable management to take shortcuts, cook the books, or adopt practices that do not effectively serve the interests of customers or shareholders. The most recent wave of corporate accounting and governance reforms has sought to increase the presence of independent voices and ensure that boards are not rubber-stamping the machinations of headstrong executives. Appointed school boards could well make it easier for politically ambitious mayors and superintendents to control access and data.

Second, some voices are likely to be silenced or marginalized under an appointed board. Elected board members too often violate the norms of effective governing, but they are frequently doing so in an attempt to address real concerns (whether about service provision, school leadership, or neighborhood interests). Personal conflicts

or accusations of micromanagement often reflect tensions over resource allocation or real disagreement about the district's direction. Appointed officials, buffered from constituent concerns, are more likely to leave significant value-laden issues unaddressed.

Third, there is a risk that appointed boards will work well initially only later to "go native"—similar to the concern in regulated industries that regulators tend, over time, to become dominated by those they are supposed to regulate. Los Angeles provides an illuminating example, as reflected in the *Education Week* headline "Mayor, Union Team Up to Push Plan Some Fear Would Turn Back Clock."[27] When Los Angeles mayor Antonio Villaraigosa's plans for mayoral control stalled in 2006, he struck a deal with the United Teachers of Los Angeles and its parent California Teachers Association that would deliver union members unprecedented power. The plan was ultimately struck down in the state courts, but it suggests that it may be naive to imagine that mayors will necessarily or consistently face down unions or other powerful interests—especially given the political acumen and ambitions of big city mayors.

Fourth, mayors can surely politicize schools for self-interest. Moreover, making education a component of a mayor's portfolio leaves schools vulnerable to shifts in mayoral focus. For instance, reformers in Washington, D.C., witnessed former mayor Anthony Williams twice announce his intention to tackle the city's education problems aggressively only to move on to other pressing concerns. For all the depredations of Detroit's school system, local parents and teachers are probably content that district improvement is not in the hands of their mayor, who has spent the last year under charges of corruption and criminal conduct and is fighting for his political life. The Education Commission of the States (ECS) has observed: "The major difficulty with [mayoral control] is that education risks becoming just another departmental function in the mayor's office. . . . The decision maker is not going to be judged solely for the quality of the education system. Without a school board, the school system loses viability and a strong public advocate."[28]

Finally, despite widespread complaints about board dysfunction, it is not clear that superintendents see school boards as the hindrance that popular critiques suggest. For instance, superintendents describe their relationships with their local boards as "mostly cooperative" rather than "mostly contentious" by 87 percent to 6 percent in private polling. Similarly, board members describe their relationships with superintendents as cooperative (by a 77 percent to 10 percent margin) and relations among board members as mostly cooperative. In addition, more than 70 percent of superintendents and board members report that no more than one or two board members tend to "represent the interests of specific, narrow constituencies."[29]

> While the existing evidence provides no conclusive argument for mayoral control of troubled urban school districts, it does provide good reason to think that replacing an elected board with one appointed by a strong and accountable mayor is a promising way to jump-start school improvement.

Skeptics acknowledge that urban school governance is troubled but argue that mayoral control is unlikely to help and may bring unwelcome side effects. As ECS has expressed, "the response to a weak school board . . . should not be to disenfranchise the community by eliminating school boards altogether or transforming them into something other than a community representative body."[30] Such cautions prove reasonable when we acknowledge that school boards have not worked out quite as the Progressives intended.

## Principles for Effective Board Governance

Governance reform is not a strategy to improve education directly; instead, it seeks to provide the effective leadership that makes school improvement more likely. Altering governing arrangements clearly can make a difference in how school systems operate, but much depends on how it is done. Fortunately, there is agreement about what effective governance looks like. Scholars of educational governance largely agree on the commonsense principles required—not surprisingly, these reflect principles recommended to corporate and nonprofit boards in other sectors.

First, a clear division of authority and responsibilities is critical. Governance must provide accountability and oversight that establish expectations, provide clear procedures and business approaches, and then use data to monitor performance. More than a decade ago, three

leading governance scholars recommended that boards be refashioned as "local education policy boards" and get out of the business of presiding over student and employee grievances; hiring, firing, and promoting personnel, except for the superintendent and a few high-level administrators; and approving details like staff development activities and bus routes.[31]

Second, effective governance requires developing a coherent strategy, understanding its implications, pursuing it systematically, and being patient for its results. Donald McAdams, former school board member and president of the Center for Reform of School Systems, has argued that boards must have a clear theory of action that drives redesign through the implementation and oversight of aligned policies.[32] Paul Hill of the Center for Reinventing Public Education has elaborated: "Every systemwide reform strategy must have . . . incentives for school performance, ways of increasing school capabilities, and opportunities for school staff to change how they serve students."[33]

Third, transparency is essential. Mayoral accountability only works when public officials are prepared to ask hard questions and insist on verifiable measures of performance.

Finally, effective governance engages civic leadership and overcomes the resistance of narrow constituencies that find their interests threatened. Winning the active support of business and community leaders and keeping them involved in reform is critical to sustaining focus and maintaining a coherent strategy. Equally important is building and educating broad electoral coalitions in order to allow time for the mayor and district leaders to make a difference.

## Both Appointed and Elected Boards Could Embrace These Principles

In theory, elected school boards should be fully capable of acting on these principles. Well-run boards of directors of all kinds—of corporations, universities, and nonprofits—exhibit these same behaviors.

Urban school districts, however, are so hidebound, so prone to distractions, and so lacking in organizational coherence and patience that handing the reins to an engaged and accountable mayor may be the better option for igniting a tough-minded reform agenda. In Houston in the 1990s, an elected board struggled to push its reform agenda until a state audit found improprieties in the district. It took that opening for then-superintendent Rod Paige to solidify board and community support for change; when he departed, the board fragmented and the district quickly lost energy and focus. In San Diego, operating as a lone sheriff, then-superintendent Alan Bersin spent seven years pushing on the system with one hand while trying to retain his board majority with the other. After finally losing the swing vote on the five-member board, he was pushed out, and significant elements of his improvement strategy were unwound or reversed.

At the same time, early experiences with mayoral control should be regarded cautiously. The overhauls in Chicago, New York, and Washington, D.C., have been championed by atypical, strong, and visible mayors who wanted control over education and chose to put their political capital on the line. Their scattered successes will not necessarily be replicated by subsequent mayors—or by less-powerful and less-focused mayors elsewhere.

Ultimately, we would be wise to reject the notion that there is a single best model of school governance. Appointed boards can provide coherence, focus, and insulation from atomistic politics, especially compared to elected boards chosen in low-turnout elections in which a few interests wield great control. Such rules, however, are neither hard nor fast. Mayors not infrequently prove susceptible to short-term, self-interested pressures; elected boards can provide coherent leadership. There are reasonable concerns about appointed boards; they may be less transparent or less responsive to community concerns. Meanwhile, reform-oriented mayors may be replaced by lesser lights, and school boards may be allowed to become a musty backwater. Rather than clamoring for mayoral control and then hoping for the best, reformers should seek institutions and arrangements that will increase the likelihood that the arrangement will work as intended.

## Not Just Whether, but How

Ultimately, how a city pursues mayoral control may well matter more than whether it does. Governance reform will disappoint unless it is accompanied by sensible attention to style of leadership; to the "invisible infrastructure" of finances, professional development, and staffing; and to the broader coalition supporting school improvement. Some suggest that mayoral control will make a difference only where mayors have the resources and wherewithal to tackle fractured accounting systems, opaque central office spending, inequitable resource distribution, and unfunded pensions costs.[34]

Indeed, mayoral control can yield a structure more likely to facilitate responsible governance, coherence,

continuity, and strong civic support. But design and detail matter enormously. If Boston has illustrated mayoral control working as intended, Los Angeles's and the District of Columbia's first attempt (which preceded the 2006 takeover by Washington's current mayor, Adrian Fenty) have provided examples of how poor design can yield ineffectual arrangements.

In 2001, the D.C. school board was altered to include four mayoral appointees and five publicly elected members. This "hybrid" model was hailed as a superior alternative to straight mayoral control, and its backers included then-mayor Anthony Williams, the *Washington Post*, the Greater Washington Board of Trade, and the Federal City Council. Six years later, the hybrid design was widely regarded as ineffectual, especially with leadership from a mayor whose attention to schools was fleeting and whose energies were spent on other city problems. Mayor Williams eventually dismissed his partial authority over the school board, likening it to "trying to drive a car with one pedal."[35]

Mayor Villaraigosa's deal with the United Teachers of Los Angeles, which was eventually ruled a violation of the state constitution, is an example that stands as a flashing yellow light to those who romanticize mayoral control. An early backer of the proposal said of the final deal: "The mayor wanted something so he accepted this ridiculous patchwork. It blows the chance to really address the school board and could leave the district worse off than it was. The fragmentation baked into this deal means there is probably going to be even less accountability and less coherence in L.A. going forward."[36] The urge to do "something," unless it is sensibly designed and implemented, can yield arrangements that aggravate existing problems or prove to be merely a distraction.

## Conclusion

While the existing evidence provides no conclusive argument for mayoral control of troubled urban school districts, it does provide good reason to think that replacing an elected board with one appointed by a strong and accountable mayor is a promising way to jump-start school improvement. Experiences in Boston and New York suggest that sustained mayoral leadership can make a difference. Appointed boards may be less susceptible to narrow demands and better able to stand behind tough-minded reform. Moreover, replacing an ineffective board atop a dysfunctional system offers an opportunity to reshuffle the deck, upend routines and politics that hinder improvement, and create opportunity for responsible governance.

In the case of dysfunctional urban districts, mayoral control seems to offer clear advantages for coherence, political leadership, and accountability. Cautions and concerns still apply, but their significance is mitigated by the degree to which ineffectual governance undermines the board's oversight, constituent service, and transparency. Any proposal for mayoral control must be accompanied by a clear division of management authority, a coherent and well-ordered strategy, an appreciation for the importance of patience and focus, and the mayor's willingness to provide civic leadership. If pursued accordingly, mayoral control will provide a more likely path to school improvement than continued board governance.

> In the case of dysfunctional urban districts, mayoral control seems to offer clear advantages for coherence, political leadership, and accountability.

Whether a board is elected or appointed, long-term success requires that the leadership understands the nature of governance, resists the temptation to micromanage, adopts a clear and coherent strategy, and has access to quality staff and data. Mayoral control can help foster these conditions, but it is not a shortcut around them; it is only promising as a means to provide them.

Transforming any sprawling, underachieving organization is an enormous challenge under even the best of conditions; it may well be impossible with fragmented or indecisive leadership. Mayoral control, however, can do no more than offer a heightened opportunity for effective leadership—with the proviso that any benefits may well diminish with time as mayors turn over, attentions shift elsewhere, or interested parties reconcile themselves to the new structure.

A century ago, Progressives pushed nonpolitical control and rigid management routines as the proper and "scientific" way to improve education. They sacrificed flexibility to advance efficiency, uniformity, and professionalism. Those twin legacies—the nonpolitical governance of school systems and the rigidity of school operations—have been with us for the past century. It is valuable that we are now recognizing that urban districts are inevitably political entities and that governance

must address this reality. Equally crippling, however, has been their legacy of rigidity and uniformity that infuses management, staffing, compensation, and the educational enterprise. Proposals for mayoral control are frequently removed from any deeper call to rethink the structure of urban education, leaving these thornier organizational problems untouched. If simply pursued as an alternative to tackling larger imbedded challenges, mayoral control will serve primarily as a distraction.

Today's problems with board governance are largely the legacy of a poorly conceived and incoherently executed reform agenda advanced a century ago. The penalties for slapdash efforts to remake political structures are large and enduring. Before abandoning a poorly designed arrangement for a headfirst plunge into mayoral control, would-be reformers should first ensure that the proposal is sensibly designed, the mayor is equal to the task, and its strategy stretches beyond the next mayoral election. It would be a sad irony if we simply abandoned one dysfunctional and ill-conceived school governance arrangement for another.

## Notes

1. Eli Broad (address, National Governors Association Education Policy Advisors Institute, Marina del Rey, CA, April 4, 2003), available at www.nga.org/cda/files/041703gepabroad.pdf (accessed August 20, 2008).

2. Quoted in Jane Elizabeth, "School Boards' Worth in Doubt: Some Think Members Are in Over Their Heads Due to Complex Duties," *Pittsburgh Post-Gazette*, November 30, 2006.

3. Frederick M. Hess, *School Boards at the Dawn of the 21st Century: Conditions and Challenges of District Governance* (Alexandria, VA: National School Boards Association, 2002), available at www.aei.org/publication23957/.

4. James G. Cibulka, "Educational Bankruptcy, Takeover, and Reconstitution," in *American Educational Governance on Trial: Change and Challenges*, ed. William L. Boyd and Debra Miretzky (Chicago: University of Chicago Press, 2003), 251.

5. Quoted in David B. Tyack, *The One Best System: A History of American Urban Education* (Cambridge: Harvard University Press, 1974), 89.

6. William G. Howell, ed., *Besieged: School Boards and the Future of Education Politics* (Washington, DC: Brookings Institution Press, 2005), 3.

7. Charles Beard, *American City Government: A Survey of Newer Tendencies* (New York: Arno, 1970), 314.

8. "Learning from Boston: A Tale of Two Cities' Schools," *Los Angeles Times*, August 6, 2006.

9. John Portz, "Boston: Agenda Setting and School Reform in a Mayor-Centric System," in *Mayors in the Middle: Politics, Race, and Mayoral Control of Urban Schools*, ed. Jeffrey R. Henig and Wilbur C. Rich (Princeton, NJ: Princeton University Press, 2003), 98.

10. The Broad Foundation, "$1 Million Broad Prize for Urban Education Awarded to Boston Public Schools, Four Finalist Districts," news release, September 19, 2006.

11. David Herszenhorn, "City Schools Cut Racial Gap in Test Scores," *New York Times*, December 2, 2005.

12. Quoted in David Herszenhorn, "English Scores Drop Sharply in 6th Grade," *New York Times*, September 22, 2006.

13. Kenneth K. Wong and Francis X. Shen, "When Mayors Lead Urban Schools: Assessing the Effects of Mayoral Takeover," in *Besieged: School Boards and the Future of Education Politics*, 86.

14. Kenneth K. Wong, Francis X. Shen, Dorothea Anagnostopoulos, and Stacey Rutledge, *The Education Mayor: Improving America's Schools* (Washington, DC: Georgetown University Press, 2007).

15. Deborah Land, "Local School Boards Under Review: Their Role and Effectiveness in Relation to Students' Academic Achievement," *Review of Educational Research* 72, no. 2 (2002): 239.

16. Center for the Study of Social Policy, "Options for School Governance Reform in South Carolina," report to the South Carolina Education Oversight Committee, August 15, 2005, 14.

17. Timothy Besley and Stephen Coate, "Elected versus Appointed Regulators: Theory and Evidence," *Journal of the European Economic Association* 1, no. 5 (2003): 1177–78.

18. Ibid., 1176.

19. Chester E. Finn Jr. and Lisa Graham Keegan, "Lost at Sea," *Education Next* 4, no. 3 (2004): 15.

20. Steve Farkas, Patrick Foley, and Ann Duffett, *Just Waiting to Be Asked: A Fresh Look at Attitudes on Public Engagement* (New York: Public Agenda, 2001), 15.

21. Frederick M. Hess and David Leal, "School House Politics: Expenditures, Interests, and Competition in School Board Elections," in *Besieged: School Boards and the Future of Education Politics*, 249.

22. Terry Moe, "Teacher Unions and School Board Elections," in *Besieged: School Boards and the Future of Education Politics*.

23. Quoted in Donald R. McAdams, *What School Boards Can Do: Reform Governance for Urban Schools* (New York: Teachers College Press, 2006), 74–75.

24. Jacqueline P. Danzberger, Michael D. Usdan, Luvern Cunningham, Lila N. Carol, Michael W. Kirst, and Barbara McCloud, *School Boards: Strengthening Grass Roots Leadership* (Washington, DC: Institute for Educational Leadership, 1986).

25. Joseph P. Viteritti, "The End of Local Politics?" in *Besieged: School Boards and the Future of Education Politics*, 321.

26. Clarence N. Stone, "Mayors and the Challenge of Modernization," in *Mayors in the Middle: Politics, Race, and Mayoral Control of Urban Schools*, 245.

27. Lesli A. Maxwell, "Mayor, Union Team Up to Push Plan Some Fear Would Turn Back Clock," *Education Week*, July 26, 2006.

28. Michael A. Resnick, *Effective School Governance: A Look at Today's Practice and Tomorrow's Promise* (Denver: Education Commission of the States, 1999), vii.

29. Steve Farkas, Patrick Foley, and Ann Duffett, *Just Waiting to Be Asked: A Fresh Look at Attitudes on Public Engagement*, 11.

30. Michael A. Resnick, *Effective School Governance: A Look at Today's Practice and Tomorrow's Promise*, v.

31. Jacqueline P. Danzberger, Michael W. Kirst, and Michael D. Usdan, *Governing Public Schools: New Times, New Requirements* (Washington, DC: Institute for Educational Leadership, 1992).

32. Donald R. McAdams, *What School Boards Can Do: Reform Governance for Urban Schools*.

33. Paul T. Hill, Christine Campbell, and James Harvey, *It Takes a City: Getting Serious about Urban School Reform* (Washington, DC: Brookings Institution Press, 2000), 24.

34. Paul T. Hill, "Getting Hold of District Finances: A Make-or-Break Issue for Mayoral Involvement in Education," *Harvard Educational Review* 76, no. 2 (2006): 178–89.

35. Karen MacPherson, "D.C. Schools Still Struggling after Starting 'Hybrid' Board," *Pittsburgh Post-Gazette*, April 28, 2003.

36. Personal communication with high-ranking California Department of Education official, September 26, 2006.

## Also by Frederick M. Hess:

AEI Press book:

### *No Remedy Left Behind: Lessons from a Half-Decade of NCLB*
Edited by Frederick M. Hess and Chester E. Finn Jr.
6" x 9" • 334 pages • September 2007
Paperback • ISBN: 978-0-8447-4255-7 • $25.00

Editors Frederick M. Hess and Chester E. Finn Jr. pull no punches. In *No Remedy Left Behind*, seventeen education experts rigorously assess—across the nation's states and school districts—the law's public school choice requirement (which offers students enrolled in schools in need of improvement the opportunity to attend another school), its complex supplemental educational services provision (that is, free tutoring services offered to low-income students who attend failing schools), and its controversial "restructuring" mandate (which forces low-performing schools to plan and implement significant reforms).

Throughout the volume, contributors inform us whether big-city school districts are complying with the law, whether low-performing schools are informing parents of their options, and whether reported problems are due to flawed federal implementation or a fundamentally flawed statute.

As American public education continues to languish, policymakers continue to disagree and do nothing. Officials may not like what this book has to tell them, but the status quo is no longer acceptable. Both Hess and Finn encourage legislators to act and embrace some of the muscular, hardy recommendations offered in *No Remedy Left Behind*.

Order the book at www.aei.org/book902/.

#23422