# Exhibit A

ELECTRONICALLY FILED
10/5/2016 1:19 PM
2016-CH-13159
CALENDAR: 08
PAGE 1 of 12
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
CHANCERY DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| PATRICK QUINN, IRENE ROBINSON, ANTWAIN MILLER, MARC KAPLAN, CHRISTOPHER BALL, DANIEL MORALES-DOYLE, and JITU BROWN, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF EDUCATION OF THE CITY OF CHICAGO, ILLINOIS STATE BOARD OF EDUCATION, and STATE OF ILLINOIS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT

### Introduction

1. Plaintiffs Patrick Quinn and other citizens of Chicago bring this action challenging the denial of their right to vote for the members of the defendant Board of Education of the City of Chicago, in violation of their right to equal protection of the laws under Article I, section 1 of the Illinois Constitution and their right under Article III, section 3 to an equal right to vote or "equal elections" with other Illinois citizens who reside outside of Chicago. In violation of these constitutional rights of the plaintiffs, the Chicago School Reform Amendatory Act of 1995 gives the Mayor of the City of Chicago the exclusive and absolute right to select the members of the Chicago Board, without the advice or consent of the City Council or any other legislative body. After twenty years of experience with mayoral appointment, there is no substantial basis to believe that an appointed Chicago Board of Education has done a better job of managing the public schools than an elected one could or would have done. Accordingly, there is no substantial justification for the severe and drastic impact on the plaintiffs' right to vote, and—likewise—no substantial reason in fact for the disparate treatment of the right to vote

for Illinois citizens living in Chicago, either under the Equal Protection Clause as set out in Article I, section 2, or the requirement for equal elections under Article III, section 3. The experiment in "mayoral control" has been a failure or has failed to bring about the kind of improvement that might justify the 1995 Act's severe and destructive impact on the constitutional right to vote. In particular, through years of mismanagement by the appointed Board, the Chicago public schools are on the verge of bankruptcy, and there is a looming financial catastrophe that imperils the right of Chicago children to a public education. Furthermore, the denial of the right to vote is arbitrary and capricious and pretextual, since there are other local school districts that perform worse than Chicago but where the right to vote is unimpaired.

2. In addition, plaintiffs challenge the authority or power of the Board of Education of the City of Chicago, or any other school district or unit of local government, to levy taxes upon their property absent the approval or authorization of the City Council of Chicago, or the General Assembly, or other legislative body. While such taxation may be legitimate for an administrative body connected to or part of or subject to or accountable to a unit of government headed by a body of elected representatives, the Board of Education is not accountable to any legislative body of any kind in its tax and expenditure decisions.

3. Finally, by imposing a unique form of government upon the City of Chicago--in which special powers are conferred on the mayor of a home rule unit to oversee another unit of government—the General Assembly unlawfully interfered with the City's form of government under its home rule authority, without the consent or approval of either the City Council or the voters of the City. Such an unlawful imposition of new or additional powers to be exercised by a home rule unit and the interference of the 1995 Act with the form of government enjoyed by

other home rule units exceeded the powers of the General Assembly under Article VII, section 6 of the Illinois Constitution.

## Parties

4. Plaintiff Patrick Quinn is a resident of Chicago, a registered voter, an owner of real property in Chicago. He served as a Local School Council member during the first term that LSCs existed.

5. Plaintiff Irene Robinson is a resident of Chicago, a Chicago Public Schools grandparent, a registered voter, and a former LSC member.

6. Plaintiff Antwain Miller is a resident of Chicago, a Chicago Public Schools parent, and a registered voter.

7. Plaintiff Marc Kaplan is a resident of Chicago, a Chicago Public Schools grandparent, a registered voter, and a long-time LSC member.

8. Plaintiff Daniel Morales-Doyle is a resident of Chicago, a Chicago Public Schools parent, a long-time LSC member, a registered voter, and an owner of real property in Chicago.

9. Plaintiff Christopher Ball is a resident of Chicago, a Chicago Public Schools parent, and a registered voter.

10. Plaintiff Jitu Brown is a resident of Chicago, a Chicago Public Schools parent, a registered voter, and an owner of real property in Chicago.

11. Defendant Board of Education of the City of Chicago is a school district of the State of Illinois, and a body politic and corporate.

12. Defendant Illinois State Board of Education is primarily responsible for administering the Illinois School Code.

13. Defendant State of Illinois is responsible under the Illinois Constitution for providing free schools to its residents and for ensuring free and equal elections.

## Facts

14. There are 859 public school districts in Illinois, including 373 elementary school districts, 99 high school districts, and 387 unit districts.

15. In all cases but one, Illinois citizens have the right to vote for the members of the board of education that oversees the public education of children in these districts.

16. The one exception, District 299, is co-extensive with the City of Chicago.

17. Section 34-3 of the Illinois School Code denies to plaintiffs the same equal right to vote that it grants to all other Illinois citizens outside of Chicago.

18. Pursuant to 34-3 of the Illinois School Code, the Mayor of the City of Chicago has the sole exclusive authority to appoint the members of the Board, at his pleasure, without any oversight, or advice and consent of the City Council.

19. The Chicago Board of Education has the power to levy property taxes upon plaintiffs and other citizens of Chicago, without review or approval by the City Council, or the General Assembly, or any other legislative body or body of elected officials.

20. The Mayor as an official of the City of Chicago has no statutory power under the Illinois School Code to make such decisions or to interfere with the independent decision making of the Board.

21. Nonetheless, the Board does not make these taxing decisions independently but only at the direction of the Mayor.

22. In the last five years without the approval of the City Council or any other legislative body—and at the direction of the Mayor acting without any statutory authority in this respect—the Board has levied over 11 billion dollars in property taxes, with approximate annual levies as follows:

| Fiscal Year | Property Tax Revenue |
|---|---|

4

| 2016 | $ 2,359,800,000 |
| --- | --- |
| 2015 | $ 2,289,000,000 |
| 2014 | $ 2,197,000,000 |
| 2013 | $ 2,106,000,000 |
| 2012 | $ 2,106,000,000 |

23. For the support of public education, all plaintiffs have paid property taxes that have been levied in this manner.

A.  **Administrative History and Selection Process of the Board**

24. Formerly the Board of Education was an administrative body that was appointed by the Mayor with the advice and consent of the City Council and accountable to the City Council of Chicago for tax and expenditure decisions.

25. The first such Board of Education was established by the General Assembly in 1872.

26. Accordingly, while the Board was not directly elected, it was accountable in such decisions to a body of legislators elected by the people of Chicago.

27. In 1980, however, the General Assembly placed the financial management of the Chicago public schools under the Chicago School Finance Authority.

28. During the mayoral administration of Harold Washington, the first African American mayor, there was an effort to increase the role of voters in the selection of the members of the Chicago Board.

29. In 1988, the General Assembly enacted the Chicago School Reform Act of 1988 (1988 Act).

30. In the 1988 Act, the General Assembly gave citizens of Chicago the right to elect Local School Councils (LSCs) which had authority to appoint and remove the principals and otherwise govern the local neighborhood schools.

5

31. The 1988 Act also abolished the 11 member Board of Education, expanded the Board to 15 members and created a School Board Nominating Commission, composed of 23 parent and community representatives from the Local School Councils and 5 member appointed by the Mayor.

32. Under the 1988 Act, the School Board Nominating Commission gave the Mayor a slate of three candidates only to fill each vacant position on the 15-member Board.

33. The Mayor then had only 30 days to choose the 15 board members from the list that the Commission proposed.

34. The Mayor's choices then had to be approved by the 50-member City Council.

35. The 1988 Act was designed to increase voter control over the operation of the Chicago public schools, although the Board of Education was still technically appointed.

36. The 1988 Act was designed to give special representation rights to parents of the children served by the Chicago public schools.

37. These parents were overwhelmingly non-white or minority race.

38. In 1988, over 87% of the Chicago Public Schools student population was non-white.

39. The 1988 Act did in fact increase the participation of African American and Latino voters in the governance of the schools and the process leading up to appointment of the members of the Board.

40. African American citizens voted in LSC elections in greater numbers and at a higher rate than white citizens.

41. Shortly after the 1988 Act was passed, Chicago elected a white mayor after two successive African American mayors.

42. Chicago's newly-elected Mayor Richard M. Daley appointed an Interim Board to hold office until the School Board Nominating Commission could provide nominees to fill the Board.

43. In the years that followed, Mayor Daley refused on a number of occasions to appoint any of the nominees provided by the School Board Nominating Commission for certain seats on the Board.

44. In 1995, the General Assembly passed the Chicago School Reform Amendatory Act (1995 Act).

45. The 1995 Act eliminated the role of Local School Councils in the political processes leading up to the appointment of Board members.

46. The 1995 Act eliminated the School Board Nominating Commission and gave the Mayor the exclusive right to select the new School Reform Board of Trustees through 1999 and the reconstituted Board of Education thereafter.

47. The 1995 Act also excluded any role of the City Council in the confirmation or selection of members of the Board.

48. The 1995 Act gave unprecedented control over the public schools to just a single elected official, the Mayor, who then—as now—was a white person.

**B.  Experience under the 1995 Act**

49. In the twenty years since enactment of the 1995 Act, the Chicago public schools are now on the verge of bankruptcy—and in a far worse financial position than in 1995.

50. The teachers' pension plan which was fully funded when the voters had a say in the selection of the Board was about 52 percent funded in 2015 and Chicago public schools operated at a deficit in fiscal year 2016.

51. These shortfalls imperil the right of Chicago children to a public education.

7

52. Based on national data of big city school districts, the composition of a school board—that is, whether appointed or elected—has no correlation to academic achievement.

53. Significant academic improvement depends on the educational policies that the board, whether appointed or elected, chooses to adopt.

54. In part because of past financial mismanagement, the Board has failed or has been constrained in adopting polices that are responsible for improvement in education.

55. In particular the Board has not adopted smaller class sizes in elementary school, ensured a full range of education experiences (such as art, music and gym), or put in place a rigorous curriculum.

56. Furthermore, the students in Chicago public schools are without high quality resources—and in many cases without even books.

57. Financial mismanagement over twenty years has meant that children in the Chicago public schools have not had an opportunity to increase their achievement levels relative to children in other big city school districts.

58. Among school districts in the six-county area of metropolitan Chicago, the defendant Board has made the lowest financial effort.

59. Furthermore, the management of the Chicago public schools has been rife with corruption and the awarding of no-bid contracts and conflicts of interest.

60. The corruption is so severe that the next-to-last Chief Executive Officer put in place by the Board engaged in fraud and financial corruption and is now facing a seven-year federal prison sentence.

8

## Count I
### (Denial of Right to Equal Protection and Right to Equal Elections)

61. By the aforesaid acts, in violation of plaintiffs' right to equal protection of the laws under Article I, section 2 of the Illinois Constitution, and their right to equal elections under Article III, section 3, the defendant State of Illinois and other defendants have unlawfully deprived plaintiffs and other Illinois citizens living in Chicago of the right to vote for their local school board.

62. After twenty years of experience with an appointed Board of Education, there is no substantial evidence to justify why the defendants should continue to deny the right to vote only of the State's citizens living in Chicago—or otherwise limit their political participation.

63. Accordingly, plaintiffs seek an order requiring that the defendants submit a plan for giving plaintiffs and other Chicago citizens the same and equal right to vote that other Illinois citizens enjoy.

WHEREFORE, plaintiffs pray this Court to:

A. Declare that by the aforesaid acts, and the continued denial of the right to vote under Section 34-3 of the Illinois School Code, the defendants have violated the plaintiffs' rights to equal protection of the laws under article I, section 16 of the Illinois Constitution;

B. Declare that by the aforesaid acts, and the continued denial of the right to vote only to Illinois citizens living in Chicago pursuant to Section 34-3 of the Illinois School Code, the defendants have violated the plaintiffs rights to "equal elections" in every school district or governmental unit under article III, section 3 of the Illinois Constitution;

C. Grant preliminary and permanent injunctive relief ordering the defendants to confer with the Chicago Board of Elections to develop a plan for holding elections for the Board of Education as soon as practicable, and no later than required to hold an election by April 2017 or soon thereafter; and

D. Grant plaintiffs their legal fees under Section 5 of the Illinois Civil Rights Act and such other relief as may be appropriate.

### Count II
### (Denial of Due Process)

64. By the aforesaid acts, and by continued enforcement of Section 34-3 of the Illinois School Code, and by levying taxes on plaintiffs and other taxpayers of Chicago and depriving them of their right to taxation approved by a body of legislators or other elected representatives, the defendants have denied plaintiffs due process of law under Article I, section 2 of the Illinois Constitution.

WHEREFORE plaintiffs pray this Court to:

A. Declare that by the aforesaid acts, and by continued enforcement of Section 34-3 of the Illinois School Code, and by a system of taxation without any elected representation at any level, the defendants have denied the plaintiffs' right to be free of such taxation without the due process of law required by Article I, section 2 of the Illinois Constitution and of their inherent and fundamental right under the Illinois Constitution to a republican form of government;

B. Grant preliminary and permanent injunctive relief to allow the defendants to continue to collect such taxation on the condition that in the interim the General Assembly will put in place or substitute by law an elected school board or other

10

minimum of legislative accountability for the levy of taxes in a manner consistent with the plaintiffs' constitutional rights; and

C. Grant plaintiffs their legal fees under Section 5 of the Illinois Civil Rights Act and such other relief as may be appropriate

### Count III
### (Violation of Home Rule Autonomy)

65. Article VII, section 6(a) of the Illinois Constitution provides that "a home rule unit" like the City of Chicago "may exercise any power and perform any function pertaining to *its government and affairs...*" Ill. Const. art. VII, § 6(a) (emphasis added).

66. Article VII, section 6(h) states that the General Assembly may "deny or limit" one or other power pertaining to its own government, but does not confer any authority on the General Assembly to require a home rule unit to assume any power or duty with respect to a school district.

67. Furthermore, to the extent that a home rule unit may change its form of government to acquire such a power, Article VII, section 6(f) says that such an action must take place by "referendum."

68. The adoption of Section 34-3 of the Illinois School Code constituted a major change in the form of the government of the City of Chicago, and gave the Mayor the unilateral authority to operate a school district without confirmation by the City Council of Chicago.

69. No such referendum approving such a change as required by Article VII, section 6(f) took place at the time of its adoption, or at any time since.

70. Accordingly, by the continued enforcement of Section 34-3 of the Illinois School Code, which constituted a major alteration in the form of government of a home rule unit without any authorizing referendum, the defendants are in violation of plaintiffs' rights under Article VII,

section 6(f), to have such a change imposed upon them only with the consent of the people of Chicago in such a referendum.

WHEREFORE plaintiffs pray this Court to:

A. Declare that the enforcement of the scheme of appointment in Section 34-3 of the Illinois School Code is illegal and in violation of Article VII, section 6(f), unless and until the defendants conduct a referendum vote of the people of Chicago;

B. Grant preliminary and permanent injunctive relief requiring the defendants to conduct such a referendum approving Section 34-3 of the Illinois School Code as soon as practicable unless and until the General Assembly creates an independent school district or other unit of government in which residents of that district have the same right to vote as other citizens of the State; and

C. Grant plaintiffs their legal fees and such other relief as may be appropriate.

Dated: October 5, 2016                    By:    s/ Sean Morales-Doyle
                                                                         One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
smoralesdoyle@dsgchicago.com
Cook County Attorney No. 70814