**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PATRICK QUINN, IRENE ROBINSON, )
ANTWAIN MILLER, MARC KAPLAN, )
CHRISTOPHER BALL, DANIEL )
MORALES-DOYLE, and JITU BROWN, )
                               )
     Plaintiffs, )
                               )     No. 16-cv-9514
         v. )
                               )     The Honorable Elaine E. Bucklo
BOARD OF EDUCATION OF THE CITY )
OF CHICAGO, *et al.*, )
                               )
     Defendants. )

**PLAINTIFFS' COMBINED MEMORANDUM
IN RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND
<u>REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION</u>**

Dated: January 6, 2017                 Respectfully submitted,

                                           <u>    s/ Sean Morales-Doyle    </u>
                                           One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

**Table of Contents**

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction ......................................................................................................................... 1

   I.   Plaintiffs' claims should not be dismissed, nor should the Court abstain from hearing them. ........................................................................................................... 4

      A.   In arguing that the Equal Protection Clause has no application to the right to an equal vote at the local government level, defendants rely on a case, *Sailors v. Board of Education of Kent* County, 387 U.S. 105 (1967), which has been largely superseded if not formally overruled. .................................................... 4

      B.   By creating racially disparate voting rights for "elections in the State," the Illinois School Code constitutes a *per se* or even *de jure* violation of Section 2 of the Voting Rights Act. ....................................................................................... 10

      C.   Seventh Circuit case law and *Latham* support plaintiffs' claim that mayoral appointment violates due process. .................................................................... 15

      D.   Plaintiffs have stated a claim for intentional discrimination under Title VI and, as parents and grandparents, they have standing to assert that claim. ................ 18

      E.   The Court should not abstain from hearing this case, as the State is unable to point to "exceptional circumstances" that justify abstention. ....................... 19

  II.   Plaintiffs are entitled to preliminary injunctive relief. ..................................... 22

  III.   Plaintiffs' request for advancing a trial on permanent injunctive relief is appropriate, as it is based entirely on undisputed facts gleaned from the public record. ......................................................................................................... 24

Conclusion ......................................................................................................................... 25

# Table of Authorities

## Cases

*African-American Cit. for Change v. Robbins,* 825 F.Supp. 885 (1993), *aff'd sub nom. African-American Cit. for Change v. St. Louis Bd. of Police Comm'rs*, 24 F.2d 1052 (8th Cir. 1994) .................................................................................... 4, 14

*Anderson v. Celebrezze*, 460 U.S. 780 (1982) .............................................................. 7

*Avery v. Midland County*, 390 U.S. 474 (1968)................................................... 4, 5, 6, 9

*Barnett v. Daley*, 32 F.3d 1196 (7th Cir. 1994) ........................................................ 25

*Burdick v. Takushi*, 504 U.S. 428 (1992)......................................................... 2, 7, 8, 9

*Chisom v. Roemer*, 501 U.S. 380 (1991) ............................................................... 3, 13

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).................................................................................................... 20, 21, 22

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)...................................... 18

*Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir. 1987) .................................... 15

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) ......................................................... 18

*Doe v. Woodridge Elem. Sch. Dist. No. 68 Bd. of Educ.*, No. 04 C 8250, 2005 U.S. Dist. LEXIS 7023 (N.D. Ill. Apr. 13, 2005) ........................................................ 19

*Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010).................... 20

*Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010) (en banc)................................. 12

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2015) ("*Frank I*").................................... 10, 12

*Frank v. Walker,* 819 F.3d 384 (7th Cir. 2016) ("*Frank II*")...................................... 12

*Fumarolo v. Board of Education*, 142 Ill.2d 54 (1990) .......................................... 9, 17

*Hadley v. Junior College Dist.*, 397 U.S 50 (1970)........................................... passim

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ................................ 23

*Hearne v. Board of Education*, 185 F.3d 770 (7th Cir. 1999) ................................ 10, 11

*Holley v. Roanoke*, 162 F. Supp. 2d 1335 (M.D. Ala. 2001)...................................... 14

*Hoogasian v. Regional Transportation Authority*, 58 Ill. 2d 117 (1974) ................... 17, 18

ii

*Irby v. Virginia State Board of Elections*, 889 F.2d 1352 (4th Cir. 1989) .................................. 13

*Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293 (S.D. Tex. 1996) ...................................... 19

*Kramer v. Union Free School District No. 15*, 395 U.S. 621 (1969) ........................................ 8, 9

*Latham v. Board of Education,* 31 Ill.2d 178 (1964) .................................... 9, 15, 16, 17

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999) ..................................................... passim

*Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002) ........................................ passim

*Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1 (1983) .............................................................................................................. 21

*Norman v. Reed*, 502 U.S. 279, 289 (1992) ................................................................ 8

*Pittman v. Chicago Board of* Education, 64 F.3d 1098 (7th Cir. 1995) .......................... 4, 8, 9, 16

*Reynolds v. Sims*, 377 U.S. 33 (1964) .................................................................. 5, 6, 7

*Sailors v. Board of Education of Kent* County, 387 U.S. 105 (1967) .................................. passim

*Searcy v. Williams*, 656 F.2d 1003 (5th Cir. 1981), *aff'd without opinion sub nom. Hightower v. Searcy*, 455 U.S. 984 (1982) ......................................................... 4, 14

*Sverdrup Corp. v. Edwardsville Community Unit Sch. Dist. No. 7*, 125 F.3d 546 (7th Cir. 1997)............................................................................................. 20, 21

*Tully v. Edgar* 171 Ill. 2d 297 (1996) ................................................................ 9, 17

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977)......................................................................................................... 2, 11

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................ 23

**Statutes**

105 ILCS 5/34-3 ....................................................................................... 1, 10, 11

105 ILCS 5/34-53 .......................................................................................... 18

105 ILCS 5/34-53.5 ....................................................................................... 18

20 U.S.C. § 1400(d) ....................................................................................... 19

20 U.S.C. § 1407(a)(1)..................................................................................... 19

20 U.S.C. § 6311(a)(1)..................................................................................... 19

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ................................................... 20

Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA) ...................... 19

Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ......................................... passim

Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301
    *et seq.* ................................................................................................................. 19

**Rules**

Fed. R. Civ. P. 19 ...................................................................................................... 24

Fed. R. Civ. P. 65 ............................................................................................ 1, 23, 25

Fed. R. Evid. 801(d)(2) .............................................................................................. 24

**Constitutional Provisions**

Ill. Const. Art. IX, § 1 .............................................................................................. 15

U.S. Const., Amend. I ............................................................................................. 2, 7

U.S. Const., Amend. XIV ..................................................................................... passim

U.S. Const., Amend. XV ..................................................................................... 1, 21

**Introduction**

Plaintiffs are filing just one brief in response to the motions to dismiss and briefs filed by defendants in opposition to plaintiffs' motion for a preliminary injunction. To restate the case: plaintiffs seek a preliminary injunction to require defendants to put in place rules and regulations for a direct election of members of the Board in April 2017, the same date that all other Illinois citizens have the right to elect members of these important local government bodies. In the alternative, under Rule 65(a)(2), Fed. R. Civ. P., plaintiffs seek to advance this case for a hearing on the merits of two of their three principal legal claims.

First, the Illinois School Code, including Section 34-3, is a *per se* violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, literally read, because under this general state law, defendant State of Illinois allows far more of its white citizens than Black or Latino citizens to have "representatives of their own choosing." Section 2 specifically forbids such a *racial* disparity in the right to vote for elections "*in* the State." *Id.* (emphasis added). In addition to this *per se* violation, the Chicago School Reform Amendatory Act ("1995 Act") violated Section 2 by removing or diminishing the existing rights of citizens of color to participate in the political process with respect to the selection of Board members. That is, as part of the way of disenfranchising the minority race voters of Illinois, the 1995 Act not only stripped the right of the elected Local School Councils (LSCs), including parent representatives, to screen nominees to the Board but removed the power of the City Council which had minority race members to confirm the Mayor's appointments or exercise any other oversight. Second, plaintiffs also contend that the 1995 Act had the intent of discriminating on the basis of race, in violation of Section 2 of the Voting Rights Act, Title VI of the Civil Rights Act, and the Fourteenth and Fifteenth Amendments. While plaintiffs do *not* seek a hearing at this time on this claim that the 1995 Act was purposeful racial discrimination, plaintiffs have set out in detail the facts allowing

this Court to infer discriminatory intent as set out in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

Third and finally, in violation of the Fourteenth Amendment, and even apart from purposeful race discrimination, the Illinois School Code violates the rights of *all* Chicago plaintiffs, white and minority race, to the same equal right to vote enjoyed under Illinois law by all other citizens of the State. Under *Burdick v. Takushi*, 504 U.S. 428 (1992), the School Code is not a slight but severe burden on their *equal* right to vote under the First and Fourteenth Amendment—indeed, there is no "equal" right. Accordingly, it is subject either to strict scrutiny or at least a showing that such denial of an equal right is "necessary" to serve a "precise" State interest. *Id.* at 434. Significantly, the defendants do not even attempt to make such a showing, but just argue in effect that this Court should disregard *Burdick*. Since the burden on the Fourteenth Amendment right is severe, and the purpose of the exemption is vague—and there is no evidence that this denial is actually serving a "precise" and legitimate interest identified by the State—plaintiffs should be entitled to summary judgment on this claim. Plaintiffs deny that there is any purpose except racial discrimination, with a particular desire to protect largely white-owned property wealth to be used for the education of minority race children. Consequently, the denial of the equal right to vote is all the worse when the "precise interest" being served is to ensure that on a statewide basis, the Chicago public schools end up making the least financial effort for the education of the largely minority race children. Defendants do not deny that in six-county region, Chicago public schools have in fact made the least financial effort, to the point that in this immensely wealthy city children do not have books, experienced teachers, and in some cases even toilet paper.

The claim of purposeful discrimination and certain other claims quite clearly cannot be decided on a Rule 12(b)(6) motion to dismiss. With respect to the Section 2 claim, plaintiffs respectfully submit that apart from other circumstances that might be appropriate to consider in a Section 2 claim—including the impact of the 1995 Act on the rights of political participation through the LSCs—the very structure of the School Code creates a *per se* racial disparity in the voting rights in elections held in the State. There is a *per se* violation of Section 2. Defendants cannot seriously dispute the existence of such a disparity, which can be drawn from Census data of which the Court can take judicial notice.

Defendants reply that there is a need for "creativity" in how the right to vote is distributed among Illinois citizens. Put simply, Section 2 is a limit placed by Congress on the ability of the State to be "creative" *when the result is racial disparity in the right to vote*. While there is no affirmative right under Section 2 for citizens of color in *every State* to have the right to elect a school board, and while the State of Illinois *could* have a uniformly appointive system, Section 2 prohibits the State from privileging white citizens over black citizens in allocating the right to vote, and giving that right to more of its white citizens than its Black or Latino citizens. As made clear in *Chisom v. Roemer*, 501 U.S. 380 (1991), there is nothing inherently appointive or elective about many offices to which Section 2 might apply. In this case, the decision to make them appointive or elective ultimately reflects a judgment as to which citizens in Illinois should have "representatives of their own choosing" and which citizens should not. Those decisions violate Section 2 if they create significant racial disparities.

Most of the Section 2 cases cited by defendants refer to claims where the African American plaintiffs are not challenging appointive systems, or seeking the right to vote, but using Section 2, inappropriately, to challenge racial discrimination in particular appointments.

*See e.g., Searcy v. Williams*, 656 F.2d 1003 (5th Cir. 1981), *aff'd without opinion sub nom. Hightower v. Searcy*, 455 U.S. 984 (1982). Or the plaintiffs seek a different system for appointments. *See, e.g., African-American Cit. for Change v. Robbins,* 825 F.Supp. 885 (1993), *aff'd sub nom. African-American Cit. for Change v. St. Louis Bd. of Police Comm'rs*, 24 F.2d 1052 (8th Cir. 1994). By contrast to these particular cases, the gist of the claim here is that a state law creates a racial disparity in the right to vote. No one questions that under Section 2(a) of the Voting Rights Act, the Illinois General Assembly could not intend such a racial disparity, even covertly, and there is no reason why Section 2(b)—designed as an "effects" statute, regardless of intent—should not apply to such a racial disparity as well.

Plaintiffs will first turn to the arguments to dismiss the Fourteenth Amendment claim in Count I and then address the Section 2 "effects" claim in Count III. Plaintiffs conclude with arguments regarding standing, abstention, and their request for injunctive relief.

**I.**     **Plaintiffs' claims should not be dismissed, nor should the Court abstain from hearing them.**

**A.**     **In arguing that the Equal Protection Clause has no application to the right to an equal vote at the local government level, defendants rely on a case, *Sailors v. Board of Education of Kent* County, 387 U.S. 105 (1967), which has been largely superseded if not formally overruled.**

Relying on *Sailors v. Board of Education of Kent County*, 387 U.S. 105 (1967), defendants build their motion to dismiss the Equal Protection claim in Count I on a case that just a few years later, was all but formally overruled. *See Hadley v. Junior College Dist.*, 397 U.S 50 (1970); *Avery v. Midland County*, 390 U.S. 474 (1968); *see also Pittman v. Chicago Board of* Education, 64 F.3d 1098, 1102 (7th Cir. 1995) (discussing generally when there is heightened scrutiny under the Fourteenth Amendment of election arrangements for school districts and other units of local governments). The holding of *Sailors*—that local units of government are exempt from the principle of one-person, one-vote—is no longer good law. The case cannot be cited as a

4

general license to have any kind of electoral structure that the State chooses to have regardless of the Fourteenth Amendment. Furthermore, *Sailors* was not a challenge to an "appointed" board of education. In *Sailors*, the plaintiffs were challenging not the indirect election of the county board by local elected boards, but the weighting of the votes in making that selection. *Sailors* held that the principle of one-person, one-vote did not apply either to local or county school boards, or indeed to any local unit of government, under any arrangement.

Without question, *Hadley* was a near complete reversal of course, where the Supreme Court made clear that the principle of one-person, one-vote set out in *Reynolds v. Sims*, 377 U.S. 33 (1964), definitely applied to units of local government—the exact opposite of the ruling in *Sailors*. While not formally overruling it, *Hadley* did no more than cursorily note its existence. 397 U.S. at 58 (expressly holding out possibility that a State's choice "to select members of an official body by appointment rather than election" may "itself offend the Constitution"). The *Hadley* Court makes clear that states like Illinois cannot be creative in designing whatever kind of system they want, stating:

> Appellants in this case argue that the junior college trustees exercised general governmental powers over the entire district and that under *Avery* the State was thus required to apportion the trustees according to population on an equal basis, as far as practicable. Appellants argue that since the trustees can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college, their powers are equivalent, for apportionment purposes, to those exercised by the county commissioners in *Avery*. We feel that these powers, while not fully as broad as those of the Midland County Commissioners, certainly show that the trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in *Avery* should also be applied here.

*Id.* at 53-54. Significantly, the Supreme Court rejects the legislative and "administrative" distinction put forward in *Sailors,* and adopted in *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999), and *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002):

> It has also been urged that we distinguish for apportionment purposes between elections for "legislative" officials and those for "administrative" officers. Such a suggestion would leave courts with an equally unmanageable principle since governmental activities "cannot easily be classified in the neat categories favored by civics texts," and it must also be rejected. We therefore hold today that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials. It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds*…might not be required, but certainly we see nothing in the present case that indicates that the activities of these trustees fit in that category. *Education has traditionally been a vital governmental function…*"

*Id.* at 55-56 (quoting *Avery*, 390 U.S. at 482) (internal citation omitted, emphasis added); *see also id.* at 61-62 (Harlan, J., dissenting) (noting direct conflict with *Sailors*).

To be sure, there are differences between one-person, one-vote cases that the Court addresses in *Hadley* and *Sailors* and the denial of the equal right to vote in State elections for local government, but Illinois had "decide[d] to select persons by popular election to perform governmental functions" and, contrary to *Hadley*, it has not allowed "each qualified voter…an equal opportunity to participate." *Id.* Accordingly, it is just wrong that "anything goes" as set forth in *Sailors* and that there is no heightened review ever under the Fourteenth Amendment. No such principle can be extracted from *Hadley'*s near-reversal of *Sailors* and later cases that uphold

the equal right to vote for local offices. While it may not technically an issue of one-person, one-vote within the meaning of *Reynolds v. Sims*, it is a restriction on a right to vote generally extended to all Illinois voters. And since *Sailors* is now superseded in its central holding, that arrangement should be judged under the standard of *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), and *Anderson v. Celebrezze*, 460 U.S. 780 (1982), like any other statewide burden on the right to vote.

As plaintiffs see it, if Illinois wishes to have appointed boards on a statewide basis, there is no equal protection issue: all citizens are equally denied the right to vote. If Illinois wishes to empower some citizens to vote and some not to vote, it *may* do so, but it has to offer a reason why it is "necessary" to serve a "precise" State interest, and show that this is the least restrictive way. Or to quote *Burdick*:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.

504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89) (internal quotations omitted).

Yes, under this standard, there *may* be in some instances it may be *possible* to justify an appointed board, at least temporarily—perhaps, for example, in the case of a bankruptcy or an emergency State takeover. But as a blanket denial of the right to vote, to be in place permanently, there must be some showing that such a burden is "necessary" to serve a "precise" interest. *Id.*; *cf. Sailors*, 387 U.S. at 107 n.2 (1967) (voters could change to an elective system by

referendum); *Moore*, 293 F.3d at 355 (same after a sunset period of five years); *Mixon*, 193 F.3d at 396 (same after a sunset period of four years). Indeed, Plaintiffs contend that such a "severe" restriction must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But defendants cannot cite any "precise" interest at all, much less a compelling one. And they do not attempt to show that the denial of the right to vote is "necessary" to serve that interest, let alone that it is narrowly drawn to do so. In the motions to dismiss, they do not even try to meet the *Burdick* standard, at any level of scrutiny. Nor could they, because the General Assembly has never given any explanation, in any law, whether the 1995 Act or the 1988 Act or any prior law, why this denial of the right to vote is "necessary" or what "precise interest" it is supposed to serve.

Surely, there can be no question that the Illinois School Code imposes a significant and not a slight burden on the right to vote, in light of the statement of this Circuit in *Pittman*:

> The line between a general-purpose governmental body and a special-purpose (or, as it is sometimes called, a "proprietary") one is wavering and indistinct. We are not even certain that it is the correct line….But there is an important distinction between *Kramer* [*v. Union Free School District No. 15*, 395 U.S. 621 (1969)] and *Hadley* on the one hand and our case on the other hand. The school board in *Kramer* and the board of trustees of the junior college district in *Hadley* had the power to tax. The local school councils in our case do not. Taxation without representation is *abhorrent* to Americans…

64 F.3d at 1102-03 (emphasis added). That is the burden defendants must justify: the denial of an equal right to vote for members of a Board of Education that will levy *almost $3 billion in property taxes* this year. While such a burden is "abhorrent" in this Circuit, it is evidently not so in the Sixth Circuit. However, it requires a justification that defendants have chosen not to give and have no ability to give.

If the central holding of *Sailors* is superseded, then it follows that the Sixth Circuit cases of *Mixon* and *Moore* relying so heavily on *Sailors* are wrong too. The Sixth Circuit relies on the *Sailors* for its utter judicial deference for *any* allocation of the right to vote at the local government level. *See Mixon*, 193 F.3d 389; *Moore*, 293 F.3d 352. Furthermore, it is especially significant that in both *Mixon* and *Moore* the Sixth Circuit relied on the claimed distinction—*contra Hadley, Kramer,* and *Pittman*—that school districts like the Board are *not* general purpose governments but "administrative" bodies that exercise "non-legislative" functions. The Seventh Circuit in *Pittman* and the Sixth Circuit in *Moore* flatly disagree as to whether a school district is a general-purpose government. In other words, *Mixon* and *Moore* base deferential review on a classification rejected by the Supreme Court and this Circuit. *Hadley*, *Avery*, *Pittman*, and a host of other cases say otherwise. Neither *Mixon* nor *Moore* even mention *Burdick*, much less apply it, or explain why it does not apply. And because *Burdick* and not *Sailors* is the only applicable standard, the motion to dismiss of the defendants must be denied.

Finally, an even weaker authority for a motion to dismiss an equal protection claim is *Latham v. Board of Education,* 31 Ill.2d 178 (1964). While the Illinois Supreme Court did apply minimal rationality to uphold the denial of an equal right to vote for the Chicago Board, the holding preceded *Hadley* and other Supreme Court cases cited above. Even more important, the Illinois Supreme Court now regards the right to vote as a fundamental constitutional right, so that any variation in distribution of such a fundamental right to the people of the State is subject to strict scrutiny. *See Tully v. Edgar* 171 Ill. 2d 297, 306 (1996); *Fumarolo v. Board of Education*, 142 Ill.2d 54, 73 & 89-90 (1990).

For these reasons, the motion to dismiss the Equal Protection claim should be denied and plaintiffs are entitled to a finding that they are likely to succeed on the merits for purposes of their motion for a preliminary injunction.

**B.    By creating racially disparate voting rights for "elections in the State," the Illinois School Code constitutes a *per se* or even *de jure* violation of Section 2 of the Voting Rights Act.**

Plaintiffs' "effects" claim under Section 2 of the Voting Rights Act—which does not require proof of racial intent—sets out a *per se* violation of the Act. The Illinois School Code, of which Section 34-3 is one part, is a State law that creates statewide processes to fill offices by elections "in the State." All citizens can have "representatives of their own choosing," except the largely minority race citizens in Chicago. Under *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2015) (hereinafter "*Frank I*"), where plaintiffs complain that state law denies their right to vote, all that they must show is a state-law "cause" and a racially disparate "effect." Here the largely minority-race citizens of Chicago are the only Illinois citizens denied the right to have "representatives of their own choosing." If the members of the Board of Education are not "representatives" of plaintiffs within the meaning of Section 2, then who do they represent? Plaintiffs are not entitled to "choose" these "representatives," even by indirect election through the City Council.

In the complaint and motion for preliminary injunction, plaintiffs set out in detail why that exclusion of these mostly minority race Illinois citizens is racially motivated and intentional. These allegations are far more numerous and specific than those in *Hearne v. Board of Education*, 185 F.3d 770 (7th Cir. 1999), which found no particular racial animus in a state law with different tenure rules for Chicago teachers. The *sole* evidence for the claim in *Hearne* of racially motivated legislative intent was the mere fact that the City of Chicago has many African Americans—nothing more. In other words, the plaintiffs in *Hearne* attempted to prove racial intent by alleging disparate impact. The Court pointed out that other school districts in Illinois

have large numbers of African Americans, too. Of course, it would be difficult if not impossible for the General Assembly to single out every majority-minority district in Illinois through by employing facially neutral criteria. But, more importantly, plaintiffs' complaint explains why Chicago was singled out in this case, even as the General Assembly did not disenfranchise other minority-race districts. Here the General Assembly denies the right to vote to the only Illinois school district where the public schools serve near exclusively minority race children *but where the property wealth to be taxed is both massive in character and largely owned by whites*. By comparison to other school districts that are largely minority race, such as Harvey, or Riverdale, or East St. Louis, the City of Chicago is a kind of treasure island. The General Assembly was not motivated by a concern that people of color would be taxed to pay for their own children's education. It was motivated by the concern that the massive property wealth of Chicago, relatively little of which is owned by people of color, would be taxed to pay for the education of children of color. At any rate, as set out in the complaint and opening brief, and unlike *Hearne,* plaintiffs allege far more than just this distinction—indeed, they set forth specific facts that meet all five of the guidelines in *Village of Arlington Heights* for showing racially discriminatory intent.

Nonetheless, even without racial intent, which plaintiffs allege, this Court can decide even at this early stage that the Illinois School Code is a *per se*—or one might say, *de jure*— violation of Section 2. *Mixon* and *Moore* both say that Section 2 applies to interference with an existing right to vote under state law. If voters do not have the right to vote, on the other hand, then they can have no claim under the Voting Rights Act. But this is circular reasoning. Section 2 applies to a state law that disqualifies people from voting and that has a disparate effect. Section 34-3 is such a law.

It is difficult if not impossible to square the circular reasoning in *Mixon* with this Circuit's framework for a Section 2 violation in *Frank*. In that case, the Seventh Circuit *did* find Section 2 to apply to a state law that completely *completely denies the right to vote*, rather than simply abridging or diluting an existing right. The *Frank* plaintiffs challenged a Wisconsin ID law that stripped them of their legal right to vote if they could not produce proper identification. Even *Frank I, supra*, was willing to apply Section 2 to a *state law* that would strip many of their very *legal* right to vote, not just cause some factual dilution or dimunition of it. In a later decision in that case, the Court found that Section 2 would bar such a state law denial of the right to vote if the citizen could not obtain an ID with reasonable effort if there was a disparate racial impact on Wisconsin citizens. *See Frank v. Walker,* 819 F.3d 384 (7th Cir. 2016) (hereinafter "*Frank II*"). In contrast to *Frank*, the Sixth Circuit finds that Section 2 simply does not apply at all to *any* state law that removes the legal right to vote. The court does not say so in so many words, framing its decision instead as a question of whether a State can decide to make an office appointive rather than elected. But, because the court deliberately ignored the fact that the State had actually decided to make school boards *elected*, and was denying the right to vote for such elective offices only to some people, that is the import of the decision. If Ohio had diluted Clevelanders' right to vote as compared to the rest of the state, they would have a claim. But because it denied them the right to vote altogether, they are left helpless.

Other Circuits that have not taken *Mixon*'s approach—namely, that Section 2 cannot apply to a state law that formally denies the right to vote. *See e.g., Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010) (en banc); *see also Frank I*, 768 F.3d at 752 & 754-55 (collecting cases). In cases challenging restrictions on ex-felons, those Circuits have upheld such laws principally on the ground that the Fourteenth Amendment expressly permits the

disenfranchisement of ex-felons. But no court denied that Section 2 even applies—that because they never had a right to vote under state law, they cannot even bring a Section 2 claim. Only *Mixon* and *Moore* engage in this circular reasoning.

There is nothing inconsistent between the claim here and the decision of the Fourth Circuit in *Irby v. Virginia State Board of Elections*, 889 F.2d 1352 (4th Cir. 1989). The Fourth Circuit found that Virginia's appointive system could not be actionable under Section 2 because it led to no racially disparate effect. As that Circuit pointed out, such an appointive system would disenfranchise everyone, black and white. It is unclear what the Fourth Circuit would do in the present case. But the Court did note that even the movement from an elected to an appointed system *statewide*—with no racially disparate effect—would require preclearance in certain States under Section 5. *Id.* at 1357. *Irby* also took note that in the legislative history, members of Congress expressed concern with *any* change from an elected to an appointed system. *Id.* However, *Irby* pointed out that Section 2 is not as broad in its coverage as Section 5—and indeed, plaintiffs would agree that it requires showing of a racially disparate effect. *See id.* But there is such a disparate effect here, and *Chisom*, 501 U.S. 380, which was decided two years after *Irby*, states that Section 2 should be interpreted as broadly as possible. *Chisom* itself did so even when it (arguably) strained the meaning of the word "representatives" as used in Section 2. But here there is no need to strain: plaintiffs seek to apply Section 2 as written. And it is important to keep in mind *Irby*'s recognition—more or less denied in *Mixon*—that in amending Section 2, members of Congress were concerned about the use of appointed boards to undermine the rights of minority race citizens to have "representatives of their own choosing." Where the effect is a gross racial disparity in the right to vote, Section 2 should bar this kind of "creativity" in structuring local government.

Section 2(b) does not impede the State from being "creative" in the structure of local government. Rather, it bars State "creativity" when "the political processes leading to nomination or election *in the State…are not equally* open" to minority race citizens within the State. In this case, within the meaning of Section 2(b), Article 9 of the Illinois School Code does have "political processes leading to nomination or election *in the State.*" And those processes are *not* "equally open" to the minority race citizens of Illinois. Indeed, they are deliberately closed off to 45 percent of the State's African American citizens and 37 percent of its Latino citizens, but only 11 percent of white citizens. And that is all that *Frank* requires for a finding of an unequal denial of the right to vote under Section 2.

Most of the cases cited by defendants do *not* involve racial disparities in the right to vote or "have representatives of their own choosing." In *Searcy v. Williams*, 656 F.2d 1003 (5th Cir. 1981), the African American plaintiffs did not seek a right to direct election. Rather, plaintiffs claimed that there was race discrimination in the particular board appointments, and that such discrimination in making appointments violated Section 2. The case is far removed from one where the plaintiffs seek a right to vote—as the plaintiffs in *Searcy* did not. Likewise, in *Holley v. Roanoke*, 162 F. Supp. 2d 1335 (M.D. Ala. 2001), the African American plaintiffs were seeking not the right to elect board members but just claimed that particular appointments were discriminatory. Here, by contrast, plaintiffs are not saying that the appointments to the Board of Education are racially discriminatory, as in *Holley* and *Searcy,* or that the Mayor is appointing too many whites. Because the citizens in *Holley* and *Searcy* were not alleging a disparity in voting rights, the courts sensibly observed that the Voting Rights Act did not apply.

Equally off point is *African-American Citizens v. Robbins*, 825 F. Supp. 885 (1993), *aff'd* 24 F.3d 1052 (8th Cir. 1994). Here again, the African American voters were not seeking a right

to choose the members of the St. Louis Police Board. Rather, they were seeking to maintain the appointive system, but change the body that did the appointing. In other words, seeking to have the Mayor and not the Governor make the appointments, the plaintiffs sought to change in the way appointments were made. The citation to *Dillard v. Crenshaw County*, 831 F.2d 246, 251 n.12 (11th Cir. 1987), is mysterious. The decision simply has a footnote noting the bare fact that the county board's appointment of a county manager is not an elective office. But no one was claiming that it was. Plaintiffs in this case are not seeking to elect the school superintendent— indeed, no district in Illinois does so. In general, defendants can cite no appellate authority that is in accord with *Mixon* or *Moore*.

To sum up: the parties in this case agree that there is no inherent affirmative right of any citizen, black or white, to vote for members of the school board. The State can make the offices elective or appointive. But where these offices have been made elective and not appointive on a statewide basis, Section 2 prohibits the use of appointment as a means or device that creates a disparity in the same equal right to vote—just as much as it prohibits the intentional use of appointment to cause discrimination. It is not the use of an appointed board, but the inconsistency in the use that is the gist of the Section 2 violation. Significantly defendants are happy to say throughout their briefs that there is no *affirmative* right to vote—a point on which plaintiffs agree—even defendants cannot bring themselves to say that the State of Illinois can deny an *equal* right to vote.

### C. Seventh Circuit case law and *Latham* support plaintiffs' claim that mayoral appointment violates due process.

Plaintiffs claim that by delegating the power to tax, which is vested by the Illinois Constitution in the General Assembly, Ill. Const. Art. IX, § 1, to a body that is not only unelected but that is not even appointed by or in any way accountable to a legislative or otherwise elected

and representative body, the Illinois School Code deprives them of due process. Defendants offer no federal case law that rejects such a claim, but instead cite again to *Sailors*, which refused to apply the one-person, one-vote principle to an appointed school board. As Plaintiffs have explained above, however, the *Sailors* Court relied on a distinction between school boards as "administrative" as opposed to "legislative" bodies to justify its decision. Shortly thereafter, the Court invalidated this distinction in *Hadley*, when it found that a junior college district was a government of such general powers as to be covered by the one-person, one-vote principle. Since then, interpreting *Hadley*, the Seventh Circuit has been more emphatic in stating that taxation without representation by a school board is "abhorrent" to Americans. *See Pittman v. Chicago Board of Education*, 64 F.3d at 1102. Whatever *Sailors* had to say about the application of the "one-person, one-vote" principle to school boards in 1967, the Seventh Circuit clearly interprets intervening Supreme Court case law to prohibit this type of arrangement.

As there is no federal case law in support of their argument, the defendants rely principally on *Latham v. Board of Education*, 31 Ill. 2d 178 (1964), a case which actually provides strong support for plaintiffs' claim that Illinois courts insist on some kind of accountability to a legislative body before such taxation can be imposed. It is true that the Illinois Supreme Court dismissed a similar claim that the General Assembly had engaged in an unconstitutional delegation of the taxing power to the unelected Chicago Board of Education, and that such delegation violated due process. However, the Court was clear that its ruling was contingent on the fact that the Illinois School Code at the time, did *not* vest the power to levy taxes in the Board, but rather in the City Council. *Id.* at 181-82. Moreover, at the time, the Board was accountable to the City Council in another way because the mayor's appointments to the Board were subject to approval by the City Council. *Id.* at 184.

Defendants ignore these statements by the *Latham* court and instead focus on its statement that the legislature may "create any conceivable kind of a corporation it sees fit for the more efficient administration of public affairs and endow such corporation with such powers and functions as it deems necessary and proper for the administration of such corporate powers and affairs." *Id.* at 186-87. However, as set forth above in the arguments concerning the Equal Protection Clause, whatever truth there was to that statement under the Constitution of 1870, it is no longer true that the legislature has such freedom. At least when it comes to the right to vote, the current constitution requires courts to strictly scrutinize the General Assembly's structuring of bodies that engage in the governance of schools. *See Fumarolo; Tully.* Moreover, the *Latham* court's statement was made in the context of its earlier holding that the Board had not actually been delegated the power to tax. *Latham*, 31 Ill. 2d at 187 (noting that the "Board's powers are not absolute" and referencing "what we have said with reference to" the Count concerning the delegation of the tax authority).

The State Defendants also cite another state court case, *Hoogasian v. Regional Transportation Authority*, 58 Ill. 2d 117, 130 (1974), which allowed a very limited and restricted delegation of the tax authority to the Regional Transportation Authority (RTA). Of course *Hoogasian* is not binding on this court, but it is also inapposite. The RTA, like the school board in *Latham*, is appointed by members of legislative, representative bodies, subject to the one-person, one-vote principle. And while the school board's taxing power is capped like the RTA's, this cap was not imposed with any reference to the problems facing the Board today. There is no finding that the 4 percent cap has any relation to the financial needs of the public schools twenty years later. Indeed, within the cap, the rate could be 1.0, 3.0, or 3.99, and there is no "intelligible" standard as to which levy this body should use, as the state court required in

*Hoogasian*. (As a side note, Plaintiffs add that the Board is not correct when it states that it is limited to taxing "for educational purposes" and only up to a cap of 3.07%. In fact, its authority to tax "for educational purposes" is capped at 4%, 105 ILCS 5/34-53, and it also has the authority to levy capital improvement taxes, which are subject to a separate cap, *id.* at § 34-53.5.)

The Illinois School Code subjects plaintiffs and other Chicago residents to taxation without representation, a concept that the Seventh Circuit has derided as "abhorrent." The only cases that defendants cite to justify the legality of this abhorrent system are outdated, non-binding, and distinguishable. The Board should not be able to levy billions of dollars against the property of Chicagoans without any accountability at all. By allowing it do so, the General Assembly has deprived them of due process. It did not evade this violation by imposing an inflexible cap over twenty years ago without any reference to the needs of the school district.

> **D.** **Plaintiffs have stated a claim for intentional discrimination under Title VI and, as parents and grandparents, they have standing to assert that claim.**

The State Defendants move to dismiss plaintiffs' claims under Title VI on two grounds. First, they argue again that plaintiffs have failed to allege intentional discrimination. For all of the reasons set forth above, plaintiffs have sufficiently alleged intent. Moreover, under Title VI, plaintiffs may prove intent by a showing that the government has notice that beneficiaries of a program are experiencing discrimination and acting with "deliberate indifference" to that fact. *See Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643 (1999)). Plaintiffs have certainly pleaded at least that much.

Second, the State Defendants argue that Plaintiffs lack standing under Title VI because they are not the intended beneficiaries of the federal programs at issue. While some courts have held that parents do not have standing to sue regarding race discrimination in public schools in their own right under Title VI, they have nonetheless allowed parents to proceed in these suits on

their children's behalf. *See, e.g., Doe v. Woodridge Elem. Sch. Dist. No. 68 Bd. of Educ.*, No. 04 C 8250, 2005 U.S. Dist. LEXIS 7023, *5-*6 (N.D. Ill. Apr. 13, 2005) (citing *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996)). Furthermore, these cases contain little analysis and are not persuasive, as the statutes governing the federal programs that provide funding to public schools explicitly list parents and families of students as intended beneficiaries. The primary source of federal funding for CPS is Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301 *et seq.* Title I funds for improving the academic achievement of the disadvantaged are explicitly contingent on the local school district "implement[ing] programs, activities, and procedures for the involvement of parents and family members" and doing so "with meaningful consultation with parents of participating children." *Id.* at § 6311(a)(1). CPS also receives funding under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA). The express purposes of IDEA include "ensur[ing] that the rights of children with disabilities *and parents of such children* are protected" and "ensur[ing] that educators *and parents* have the necessary tools to improve educational results for children with disabilities," and state funding is contingent on the State ensuring that it conforms to these purposes. *Id.* at §§ 1400(d) (emphasis added) & 1407(a)(1). All of the plaintiff parents in this case therefore have standing to sue individually and on behalf of their children and all of the plaintiff grandparents have standing to sue individually.

E.    **The Court should not abstain from hearing this case, as the State is unable to point to "exceptional circumstances" that justify abstention.**

The State Defendants also urge this Court to abstain from hearing any claims that it does not dismiss, arguing that the Court may do so under either the *Colorado River* or the *Wilton-Brillhart* doctrines. Abstention would be inappropriate under either doctrine.

To begin with, the *Wilton-Brillhart* doctrine is plainly inapplicable to this case, as it is not a suit solely for declaratory relief and it does not arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. As the State Defendants acknowledge in their brief, the *Wilton-Brillhart* doctrine "arises from the Declaratory Judgment Act itself, which provides that district courts '*may* declare the rights and other legal relations of any interested party seeking such declaration.'" *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 (7th Cir. 2010) (quoting 28 U.S.C. § 2201(a)) (internal citations omitted). The plaintiffs in this case seek injunctive relief to compel the defendants to hold an election.

Secondly, abstention under the "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" recognized in *Colorado River Water Conservation District v. United* States, 424 U.S. 800, 813 (1976), would also be inappropriate as this case does not present the "exceptional circumstances" that justify abstention under the doctrine. As the Seventh Circuit has stated, only exceptional circumstances justify abstention because

> …the Supreme Court took, as the starting point of its analysis [in *Colorado River*], the general proposition that federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred on them by Congress. "Only the clearest of justifications" warrants abstention in favor of a concurrent state proceeding.

*Sverdrup Corp. v. Edwardsville Community Unit Sch. Dist. No. 7*, 125 F.3d 546, 549 (7th Cir. 1997) (quoting *Colorado River*). Or, as the Supreme Court later put it, the Court's "task…is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction."

*Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 25-26 (1983) (emphasis in original) (internal quotation marks omitted).

In the Seventh Circuit, district courts are to examine ten factors in order to determine whether the "clearest of justifications" exist for an exception to this "virtually unflagging obligation" to exercise jurisdiction. *Sverdrup*, 125 F.3d at 550. The State Defendants argue that half of these factors are either neutral or inapplicable. That concession alone is telling. They argue that the others counsel in favor of abstention. But, not only are they wrong, they overlook that "district courts ought not regard [these factors] as a mere checklist." *Id.* at 549 (citing *Moses H. Cone*). Rather, courts should engage in a "careful balancing…with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16. "Particular weight must be given to the presence of a federal question in the case; that factor weighs heavily against abstention." *Sverdrup*, 125 F.3d at 549 (citing *Moses H. Cone*). The State Defendants oddly and wrongly argue that this important factor "weighs slightly in favor of abstention" because even in the state suit the court will likely look to federal law for guidance. State Defs. Br. (Doc. 35) at 22.

Not only does this case present federal questions, the questions it presents stand in stark contrast to those at issue in *Colorado River*. That case concerned the McCarran Amendment, which evinced a "clear federal policy" of "avoidance of piecemeal adjudication of water rights," which were subject to "comprehensive state systems for adjudication" and which were of particular concern in the Southwestern States. 424 U.S. at 804, 819. This case presents questions arising under the Fourteenth and Fifteenth Amendments and the Voting Rights Act, all of which were intended to place restrictions on the States. Indeed, the Voting Rights Act is a relatively

unique piece of legislation in our federalist scheme, requiring preclearance of certain State actions by executive or judicial branches of the federal government.

For this same reason, Plaintiffs vehemently disagree with the State Defendants' suggestion that their federal claims are "vexatious or contrived." Plaintiffs filed separate suits in this case because their claims present novel issues under both Illinois and federal law, and they believed it was appropriate to give the Illinois and federal courts, respectively, the first opportunity to rule on these issues. While this will require decisions on different legal questions regarding the same matter to be made by both courts, "the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River*, 424 U.S. at 817 (internal quotation omitted). Nor will these cases require a great deal of piecemeal litigation moving forward in each jurisdiction. Both cases present almost entirely legal questions. Plaintiffs submit that this case is the only case that presents the potential for fact disputes, as they have not raised claims of intentional race discrimination (or race discrimination of any type) in State court. Finally, given that Plaintiffs seek preliminary relief to avoid further irreparable injury, it is imperative that this Court not surrender its jurisdiction in the hope that these issues will be fully resolved in State court.

## II.    Plaintiffs are entitled to preliminary injunctive relief.

As plaintiffs set out in their original brief, they have met each of the requirements for a preliminary injunction. As there is substantial overlap between their arguments about their likelihood of success on the merits and their arguments regarding the defendants' motions to dismiss above, they will not rehash these arguments here. Defendants offer little argument regarding the other factors.

The Chicago Board of Education offers nothing of substance regarding plaintiffs' claim of irreparable injury or that they lack an adequate legal remedy other than to restate its belief that

plaintiffs do not have a right to vote. The State Defendants argue that plaintiffs cannot be suffering irreparable harm because the 1995 Act has been in effect for over 20 years. Of course, the question at issue is not whether plaintiffs are suffering a new harm, but whether it is irreparable. The defendants cannot and do not truly dispute the notion that if plaintiffs have a right to vote for the school board, that harm cannot be retroactively repaired or remedied at the conclusion of this litigation.

Neither do the defendants point to any specific or substantial harm that will result to them from the granting of a preliminary injunction. The State Defendants simply offer the general proposition, without support, that "requiring the State to draft procedures for an April 2017 election…will certainly interfere with the State's operations in other areas of government which require immediate action and attention, and thus will harm the public." While some effort would be required of the State, this unsupported general statement is insufficient to establish that the harm to the State outweighs the ongoing deprivation of the right to vote, which is the "preservative of all rights." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). The Chicago Board of Education offers a parade of horribles that will supposed result from the issuance of a preliminary injunction, suggesting it will "destabilize the governance of Chicago's school system, disrupt the Board's ongoing operations, compromise its financial stability, and erode its ability to ensure that critical labor relations remain stable," and thereby "imperil almost 400,000 school children, as well as teachers and parents." Yet the Board offers absolutely nothing to explain how merely requiring the drafting of election procedures would cause such immense upheaval.

Finally, the Chicago Board of Education suggests that plaintiffs' motion is insufficient under Rule 65 for two additional reasons. First, the Board argues that plaintiffs must join or give

notice to the officials that would carry out an election. Plaintiffs disagree that these parties must be party to an order that the State draft procedures for holding an election. They assume that if defendants are ordered to develop plans for holding an election as soon as possible, and find it useful to consult these officials, they will do so. This argument seems directed more to the question of whether these parties would be necessary to effect full relief if a permanent injunction requiring an election is issued. Plaintiffs assume these officials will comply with the State's plans for holding an election. But, should their joinder become necessary under Rule 19 of the Federal Rules of Civil Procedure or otherwise, plaintiffs do not object to joining them.

Second, the Board argues that plaintiffs must post a bond to cover the "enormous" costs and damages that will be sustained by the Board if the preliminary injunction is wrongly granted. Again, the Board seems to be confusing the preliminary relief requested by plaintiffs—the drafting of election procedures—with the permanent relief sought. As noted above, the Board has offered no support for its claim that it will sustain any damages at all if a preliminary injunction issues.

### III. Plaintiffs' request for advancing a trial on permanent injunctive relief is appropriate, as it is based entirely on undisputed facts gleaned from the public record.

In response to plaintiffs' motion for preliminary or permanent injunctive relief, the defendants do not dispute *any* of the facts plaintiffs. Nor could they, as the facts that form the basis of plaintiffs' motion—which does not seek relief on plaintiffs' claims of intentional race discrimination—are all based on the public record. Many of them, in fact, are taken directly from reports issued by the defendants and are therefore not only public record, but admissible as statements by an opposing party. *See* Fed. R. Evid. 801(d)(2). Nonetheless, without any evidence to support their claim, the State Defendants state that a trial on the merits of the claims at issue in plaintiffs' motion "would involve numerous disputed factual issues." They suggest that they

would require discovery and the opportunity to introduce expert testimony regarding the statistics showing a disparate racial impact. Of course, in the face of plaintiffs' evidence in support of their motion, it is incumbent on Defendants to present some evidence to the contrary if they wish to dispute any of plaintiffs' allegations. But it is absurd anyway to propose that either party needs an expert to offer the Court an opinion on whether depriving only Chicago of the right to vote causes a disparate racial impact. The Court may take judicial notice of the U.S. Census figures offered by plaintiffs, *see e.g., Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir. 1994), which show that fully 45% of the State's African American population and 37% of the State's Latino population reside in Chicago, while only 11% of the State's white population resides in the city. It is difficult to imagine a situation where the disparate racial impact of a State law could be more obvious. As there are no fact disputes at issue with regard to plaintiffs' motion, plaintiffs request advancement of the trial of these claims and submit that these briefs and oral argument will suffice.

### Conclusion

For all the above reasons, plaintiffs respectfully request that the Court deny defendants' motions to dismiss, grant plaintiffs' motion for preliminary injunction, and advance "the trial on the merits" pursuant to Rule 65(a)(2) for the two claims specifically raised in that motion.