IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Patrick Quinn, Irene Robinson, )
Antwain Miller, Marc Kaplan, )
Christopher Ball, Daniel )
Morales-Doyle, and Jitu Brown, )
                                )
            Plaintiffs,          )
                                )
      v.                         )   No. 16 C 9514
                                )
Board of Education of the City   )
of Chicago, et al.,              )
                                )
            Defendants.          )
                                )


Memorandum Opinion and Order

     In this action, a group of registered voters in the
City of Chicago, several of whom are parents or grandparents
of Chicago Public Schools students and/or have served on
Local School Councils ("LSCs"), challenge Section 34-3 of
the Illinois School Code, 105 ILCS 5/34-3, also known as the
Chicago School Reform Amendatory Act of 1995. Plaintiffs
allege that the appointive process Section 34-3 establishes
for selecting members of Chicago's Board of Education (the
"Board") violates their constitutional due process rights
and equal protection guarantees, and also violates Section 2
of the Voting Rights Act and Title VI of the Civil Rights
Act of 1964. Before me are plaintiffs' motion for a

preliminary injunction and two motions to dismiss, one by the Board and the City of Chicago (the "City defendants"), and the other by the individual members of the Illinois State Board of Education ("ISBE members") and the State of Illinois (together, the "State defendants"). The State defendants' motion also seeks, as an alternative to dismissal, a stay on abstention grounds. For the reasons that follow, defendants' motions to dismiss are granted and plaintiffs' motion for preliminary injunction is denied as moot.

I.

Plaintiffs' complaint states that of the 859 public school districts in Illinois, only one—the district coextensive with Chicago's city limits—has a school board whose members are appointed, rather than elected. They assert that unlike citizens residing in every other Illinois school district, who "have an unimpaired right to elect the members of school boards," Chicago's citizens are deprived of this right because "the Mayor of the City of Chicago has the sole and exclusive authority to appoint the members of the Board, at his pleasure, without any oversight." Cmplt. at ¶¶ 18-22. Plaintiffs claim that under this system of unfettered mayoral control of the Board, corruption and mismanagement of Chicago's public schools have flourished.

They highlight year-to-year financial crises and the Chicago Public Schools' looming bankruptcy; the criminal fraud of a recent Board CEO; contracts plagued by Board member conflicts of interest; and chronic underfunding of education, among other problems. *Id*. at ¶¶ 76-80.

Plaintiffs situate their claims in a historical context dating back to 1872, when the Illinois General Assembly first created the Board of Education. Beginning at that time, and for more than the century that followed, Board members were appointed by the mayor, but they had to be confirmed by Chicago's City Council, which also had to approve the Board's budget. Cmplt. at ¶¶ 31-33. Then, in 1988, the General Assembly enacted the Chicago School Reform Act of 1988, which enhanced Chicago citizens' ability to influence the selection of Board Members, as well as to participate in local school governance. In particular, the 1988 Act authorized the election of Local School Councils to oversee certain aspects of local school administration, and it also created a School Board Nominating Commission that included parent and community representatives from the LSCs and was responsible for providing the mayor with a slate of candidates for appointment to the Board. *Id*. at ¶¶ 34-39. Plaintiffs allege that the 1988 Act was designed to, and did, increase the ability of parents whose children were

served by the Chicago Public Schools—the vast majority of whom were non-white—to control the operation of those schools. *Id.* at ¶¶ 42-46.

In 1995, however, following the increased electoral activity of minority race voters, the General Assembly passed the Chicago School Reform Amendatory Act, which included the challenged mayoral appointment provisions of Section 34-3. Although the purported objective of the 1995 Act was to address Chicago's "alleged educational crisis," plaintiffs state that prominent commentators at the time used "wild and overheated language" including "racially charged statements" that incorrectly impugned the "all-black Chicago public schools as the worst in the nation," which statements were "expressed or believed by white legislators." *Id.* at ¶¶ 67-68, 70. The 1995 Act also eliminated the School Board Nominating Commission, thus extinguishing the role of LSC representatives in the appointment of Board members, and it further eliminated the requirement that the mayor's school board appointments be confirmed by the City Council. In this fashion, the 1995 Act gave the mayor—who then and at all times since has been a white person—unprecedented control over the public schools. Cmplt. at ¶¶ 47-51, 53.

Plaintiffs highlight Chicago's modern history of racial discrimination and segregation in its public schools, pointing to a desegregation order and consent decree entered as a result of litigation filed in 1980. Cmplt. at ¶¶ 58-59. They assert that since Section 34-3 was enacted, there has been "no significant increase in the educational achievement of the Black student population," who "remain racially isolated and segregated at least in part because [of] indifference to racial segregation by the appointed Board." *Id*. at ¶¶ 71-72. In this connection, plaintiffs allege demographic statistics, including that in 2015, while 38.9% of Chicago's public school students were Black, the student population of about 38% of the City's public schools was over 90% Black, while in almost a third of the schools, the student population was less than 10% Black. *Id*. at ¶ 83. Plaintiffs also note that the mayorally-appointed Board has closed over 100 neighborhood schools since 2001, nearly all of which served almost exclusively African-American students. *Id*. at ¶ 84. Meanwhile, since Section 34-3 was enacted, the tax rates on Chicago's predominantly white-owned property have fallen to among the lowest in the six-county Chicagoland area, and at times have been among the lowest in the state. *Id*. at ¶ 75.

Plaintiffs' complaint includes four counts. Count I alleges discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and the First Amendment on the ground that Section 34-3 deprives Chicago residents of the right enjoyed by Illinois citizens living outside of Chicago to vote for members of their district's board of education. Count II asserts that pursuant to Section 34-3's mayoral appointment system, the Board unlawfully exercises the power of taxation without representation in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment and of Article IV, section 4 of the Constitution. Count III asserts that Section 34-3 amounts to an electoral scheme resulting in the denial of the right to vote on account of race or color in violation of Section 2 of the Voting Rights Act. Finally, Count IV asserts claims under 42 U.S.C § 1983 for the denial of the right to vote on account of race or color in violation of the Fourteenth and Fifteenth Amendments and in violation of Title VI of the Civil Rights Act of 1964. Plaintiffs seek declaratory and injunctive relief, including an order that defendants must prepare a plan for the direct election of the Board, and for an adequate remedy for the alleged violations.

II.

All defendants argue that the complaint fails to state a claim on which relief may be granted, and they move to dismiss the complaint on that basis under Fed. R. Civ. P. 12(b)(6). In evaluating this ground for dismissal, I accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiffs' favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Plaintiffs need not allege detailed facts, but they must do more than speculate. Taken as true, their allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555.

The City defendants also seek to dismiss the complaint under Rule 12(b)(1) on the ground that plaintiffs lack standing, and the State defendants seek to dismiss the individual members of the ISBE, sued in their official capacities, based on Eleventh Amendment immunity. Finally, as an alternative to dismissal, the State defendants ask me to abstain from adjudicating the case under either *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) or the *Wilton-Brillhart* doctrine, named for *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995), and *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942).

A. Standing

Because a plaintiff's constitutional standing is a prerequisite to the exercise of federal subject-matter jurisdiction, it is normally a threshold question that must be resolved before proceeding to the merits. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88 (1998). In this case, however, the City defendants treat the issue as an afterthought to their argument that plaintiffs fail to state an actionable claim. Indeed, the eight lines they devote to standing at the end of their eleven page brief reveal that the two arguments are essentially coextensive. *See* City Def.'s Mot. at 11, DN 38 ("Here, the Plaintiffs do not establish standing because, as articulated above, they possess no "right" to an elected school board."). As the Court explained in *Steel Co.*, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is so insubstantial, implausible, or foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." 523 U.S. at 89 (internal quotation marks and citation omitted). The City does not argue, nor do I conclude, that that standard has

been met. Accordingly, I am satisfied that federal subject-matter jurisdiction is secure.[1]

## B. Eleventh Amendment Immunity

Resolution of State defendants' argument that the ISBE members are immune from suit under the Eleventh Amendment is facilitated by plaintiffs' apparent acquiescence to the view that the IBSE members lack a sufficiently close connection to the enforcement or implementation of Section 34-3 to be sued for injunctive relief under *Ex parte Young*, 209 U.S. 123, 159-160 (1908). Indeed, plaintiffs did not respond to this argument in their opposition brief, and at the hearing on December 5, 2016, after defense counsel asserted that "the members of the state board of education are really not proper parties to be involved," plaintiffs' counsel responded, "[f]rankly, Judge, if it's the State of Illinois

---

[1] I note in this connection that while the State defendants move for dismissal only under Rule 12(b)(6), they argue in reply that that plaintiffs lack "standing" to bring their Title VI claim. It is clear from their arguments and authorities, however, that the issue they raise is one of statutory standing, i.e., "whether a particular plaintiff has been granted a right to sue by the specific statute under which he or she brings suit," and does not implicate the court's subject-matter jurisdiction. *AlohaCare v. Hawaii Dept. of Human Servs.*, 567 F. Supp. 2d 1238, 1246 (D. Haw. 2008) (citation omitted); *see also Miller v. Phelan,* 845 F. Supp. 1201, 1207 (N.D. Ill. 1993) (dismissing Title VI claim for failing to state a claim on the ground that the plaintiff was not within the statute's scope). Because I conclude that plaintiffs fail to state an actionable Title VI claim for other reasons, I need not reach the question of whether they are proper plaintiffs under the statute.

defending it or the state board of education defending it, it's not that important to us." Tr. of 12/05/16 H'rg. Because plaintiffs have not articulated any basis for disputing the ISBE members' assertion of immunity, they have conceded the argument. *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010).

### C. Equal Protection and Voting Rights Act

In the main, plaintiffs' claims and legal theories under the Equal Protection Clause and the Voting Rights Act are not novel. To the contrary, they cover well-trodden ground, having been examined, on materially similar facts, in *Mixon v. State of Ohio*, 193 F.3d 389 (6th Cir. 1999), and *Moore v. Detroit School Reform Bd.*, 293 F.3d 352 (6th Cir. 2002). As discussed below, the court in each case soundly rejected claims that legislation providing for mayoral appointment of the board of the state's largest urban school district violated the Constitution and Section 2 of the Voting Rights Act.

### 1. Equal Protection and First Amendment

Plaintiffs' complaint articulates several species of equal protection violations. In Count I, plaintiffs allege that Section 34-3 violates the Equal Protection Clause (as well as the First Amendment) by denying Chicago citizens the same right as other Illinois citizens to vote for members of

10

the Board. In Count II, they claim that the statute violates the Equal Protection Clause (and the Due Process Clause, addressed in a later section) because it authorizes an unelected Board to levy taxes. And in Count IV, plaintiffs assert that Section 34-3 discriminates against African-Americans by denying them the right to vote on account of their race in violation of the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment. A threshold issue in evaluating each of plaintiffs' equal protection claims is the level of scrutiny to which Section 34-3 is subject.

"Under the Equal Protection Clause of the Fourteenth Amendment, courts apply strict scrutiny to statutes that involve suspect classifications or infringe upon fundamental rights." *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002). That means that the legislation must be "narrowly tailored to serve a compelling state interest." *Id.* (citation omitted). By contrast, legislation that involves neither a suspect class nor a fundamental right is subject to "rational basis" review, meaning that it will be upheld if the legislative classification is "rationally related to a legitimate state interest." *Id.*

On its face, Section 34-3 applies to "cities with more than 500,000 inhabitants." Legislative classifications that

are based on geographical or population criteria do not involve inherently suspect classes, and thus are generally subject to rational basis review. *See Hearne v. Bd. of Ed. of City of Chicago*, 185 F.3d 770, 774 (7th Cir. 1999) (applying rational basis test to claim that Article 34 violated Equal Protection Clause due to "geographical discrimination").

In *Mixon* and *Moore*, the Sixth Circuit applied the rational basis test to state statutes providing for mayoral appointment of school board members in the cities of Cleveland and Detroit, respectively. Like the plaintiffs in this case, the *Mixon* plaintiffs argued that the legislation violated the Equal Protection Clause because it denied residents of Cleveland school districts the right to elect their school boards, while residents of other school districts enjoyed that right. The court determined that rational basis review was appropriate because "there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so." *Mixon*, 193 F.3d at 403 (*citing Sailors v. Bd. of Educ.*, 387 U.S. 105, 108 (1967)). The court further explained:

> When determining which standard applies in cases that address educational policy, the very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally

permissible method of solving them, and that,
within the limits of rationality, the legislatures
efforts to tackle the problems should be entitled
to respect.

*Id.* at 402 (citation, internal quotation marks, and alterations omitted). The court noted that the Ohio Legislature had considered evidence that the Cleveland School District's "financial and operational woes" made an appointive system desirable because "the elected school board members were often inadequately qualified and there was a high turnover rate," and because "appointed school boards had proven successful in other large cities around the country." *Id.* at 403. The court went on to conclude that the statute did not violate equal protection because "[s]tate legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test. *Id.* (citing *Sailors*, 387 U.S. at 110–11).

In *Moore*, the court examined a Michigan statute providing for the appointment of a school reform board in any school district serving over 100,000 students—a classification that applied exclusively to the Detroit school district. 293 F.3d at 354. The court again applied rational basis review to the plaintiffs' constitutional challenges and upheld the statute, explaining, "[t]he

Michigan Legislature was entitled to believe that the MSRA would address the problems that the legislators perceived to exist in the DPS. Indeed, the very size of the Detroit school district as compared to other districts—180,000 students versus 27,000 students for the next largest system—provides a rational basis for adopting a different approach to governance." *Id*. at 371.

As these cases illustrate, the Equal Protection Clause "does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70–71 (1978). Indeed, the Seventh Circuit has observed that "the Illinois statute books are riddled with laws" that treat Chicago differently from Illinois' smaller cities. *Hearne* 185 F.3d at 774. Applying the rational basis test, the *Hearne* court rejected the plaintiffs' equal protection challenges to another "Chicago-only" provision of the Illinois School Code, explaining that "[w]ith respect to public schools, it was entirely rational for the legislature to believe that the logistics of running a school system designed to serve 431,085 students (the number of students enrolled in Chicago's public schools for the 1997–98 school year) were far different from those implicated in systems serving less

than a tenth of that number." *Id*. at 774-75. These same considerations rationally relate to the Illinois General Assembly's determination, in 1995, that streamlining the Board appointment process (for, unlike in *Mixon* and *Moore*, the effect of Section 34-3 was not to transition from an elected to an appointed school board, but rather to eliminate the City Council confirmation step of an already-appointive process) was desirable for the effective administration of Chicago's massive school system.

Plaintiffs concede that "there is no inherent affirmative right of any citizen, black or white, to vote for members of the school board," echoing a cornerstone of the *Mixon/Moore* equal protection analysis. *See Mixon*, 193 F.3d at 403 (*citing Sailors* 387 U.S. at 108); *Moore*, 293 F.3d at 365 (same). Nevertheless, they urge me to apply heightened scrutiny and to reject the Sixth Circuit's conclusion in those cases that a statute establishing a mayoral appointment scheme for a large, urban school board is consistent with the Equal Protection Clause.

Plaintiffs' lead argument is that *Sailors* "is no longer good law" and should not be followed. *Sailors* concerned a challenge brought by registered voters in Kent County, Michigan to the "basically appointive rather than elective" process for selecting the county's school board. 387 U.S. at

109. The Court described the question before it as "whether Michigan may allow its county school boards to be appointed." *Id*. It answered this question affirmatively, noting the broad latitude states and their political subdivisions enjoy in devising mechanisms for carrying out governmental functions: "Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." *Id*. at 110-11.

Plaintiffs argue that *Sailors* has been "superseded in its central holding," which they describe as setting forth an "anything goes" regime in which "local units of government are exempt from the principle of one-person, one-vote." Pl.'s Opp. at 6, 4. Plaintiffs point to *Hadley v. Junior College Dist*., 397 U.S 50 (1970), and *Avery v. Midland County*, 390 U.S. 474 (1968), as reflecting the Court's "near complete reversal of course" from *Sailors*, and they argue that these cases, as well as *Pittman v. Chicago Bd. of Educ*., 64 F3d 1098, 1103 (7th Cir. 1995), confirm that *Sailors* has been "rejected" by the Court's later decisions and by the Seventh Circuit. There are several flaws in their argument.

To begin, *Sailors* does not stand for the proposition that "local units of government are exempt from the principle of one-person, one-vote." Indeed, the Court "assume[d] arguendo that where a State provides for an election of a local official or agency—whether administrative, legislative, or judicial—the requirements of *Gray v. Sanders* and *Reynolds v. Sims* must be met." 387 U.S. at 111. The basis for the Court's conclusion that Michigan's system for selecting its school board did not violate the one-person, one-vote principle was not that the school board was a "local unit of government," but instead that the principle did not apply to the State's "basically appointive" process. *Id.* at 109; *Cohanim v. New York City Bd. of Educ.*, 204 F. Supp. 2d 452, 454 (E.D.N.Y. 2002) ("An accurate reading of [*Sailors*] reveals that it held that 'one person, one vote' was inapplicable not because the board was administrative, but because the board was appointed.").

Nevertheless, plaintiffs seize on the *Sailors* Court's observation that the county school board performed "essentially administrative" functions to argue that *Hadley* implicitly overruled *Sailors*. It is true that in *Hadley,* the Court rejected a rule that distinguished, for apportionment purposes, between elections for "legislative" officers and elections for "administrative" officers. *Hadley* held that

"as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election." 397 U.S. at 56. In other words, *Hadley* affirmatively establishes the rule that the *Sailors* Court assumed for purposes of argument, i.e., that the one-person, one-vote principle applies to local elections. But it decidedly does not stand for the proposition that all local government officers must be elected, nor does it suggest that if a state authorizes elections for a particular office in some jurisdictions, it must do so in all of them. In all respects relevant to this case, *Hadley* and *Sailors* are in harmony.[2]

Plaintiffs next argue that *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780 (1982), not *Sailors*, establish the correct analytical framework for their claims. *Anderson* concerned a challenge to Ohio's early

---

[2] Even if the *Sailors* Court's observation about the "essentially administrative" functions of the county school board were central to its holding, the Court enumerated the school board's functions, which included the "preparation of an annual budget and levy of taxes"—the very functions plaintiffs attribute to the Board in this case. Accordingly, *Sailors* would continue to control this case on the facts alleged.

filing deadline for Presidential candidates. The Court explained that although voting implicated fundamental rights enshrined in the First and Fourteenth Amendments, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." 460 U.S. at 787-88. The Court thus established a flexible framework for weighing "the character and magnitude" of the asserted injury against the "precise interests put forward by the State." *Id*. at 789.

In *Burdick*, the Court considered a claim by a Hawaii voter that the state's prohibition on write-in voting unreasonably infringed his freedom of expression and association in violation of the First and Fourteenth Amendments. The Court reiterated that not every case involving voting rights is subject to strict scrutiny and applied *Anderson*'s "more flexible standard" to conclude that the state's ballot access laws did not unreasonably burden voters' "rights to make free choices and to associate politically through the vote." *Id*. at 439.

Plaintiffs argue that under the standard articulated in *Anderson* and *Burdick*, their complaint adequately pleads equal protection and First Amendment violations on the theory that Section 34-3 amounts to a "severe burden on

their *equal* right to vote." Pl.'s Opp. at 2 (original emphasis). As noted above, however, plaintiffs have no fundamental right to vote in school board elections as a matter of law, and the fact that residents of other Illinois jurisdictions have the privilege of voting in such elections in *their* districts does not confer such a right upon residents of Chicago. Nothing in *Burdick* or *Anderson* is to the contrary. Indeed, none of plaintiffs' cited authorities supports the theory that the First or Fourteenth Amendment is violated when different classes of individuals have different rights with respect to *different* school board selection processes.

Moreover, there is no dispute that Section 34-3 applies equally to all individuals falling within its scope: none has the right to vote for Board members. Accordingly, it is not a law that "grants the right to vote to some residents while denying the vote to others." *Mixon*, 193 F.3d at 402. Indeed, it is unlike the legislation at issue in cases such as *Kramer v. Union Free School Dist. No.* 15, 395 U.S. 621 (1969), that excluded "some district residents who are otherwise qualified by age and citizenship" from participating in school board elections in certain school districts, *id*. at 625-26, and *Fumarolo v. Chicago Bd. of Educ.*, 566 N.E. 2d 1283 (7th Cir. 1990), which gave "unequal

weight" to different categories of voters participating in local school council elections. *Id*. at 1291. In these cases, the court applied strict scrutiny and determined that the statutes violated Equal Protection because they treated different classes of voters differently in the elections before them. Section 34-3 does not have a comparable effect.

For these reasons, I am satisfied that rational basis review is appropriate and that Section 34-3 easily satisfies that standard. The Illinois legislature's stated objective in providing for special treatment of Chicago's schools was to "achieve the primary purpose of schooling in elementary and secondary schools...in cities of over 500,000 inhabitants." 105 ILCS 5/34-1.01. Numerous courts, including the Seventh Circuit and the Supreme Court of Illinois, have examined the propriety of education statutes that apply specifically to large, urban school districts and have uniformly acknowledged that the particular needs of these districts justifies a population-based legislative classification. *See Hearne*, 185 F.3d at 774 (finding it "entirely rational for the legislature to believe that the logistics of running a school system designed to serve" Chicago's student population "were far different from those implicated in systems serving less than a tenth" the size of Chicago's); *Moore*, 293 F.3d at 371 ("the very size of the

Detroit school district as compared to other districts—
180,000 students versus 27,000 students for the next largest
system—provides a rational basis for adopting a different
approach to governance"); *Latham v. Bd. of Educ. of City of
Chicago*, 201 N.E. 2d 111, 115 ("this court takes judicial
notice that the problems inherent in the supervision and
management of a school system in a metropolitan area of
500,000 or more, and particularly, in the city of Chicago,
are far more complex and may well require different modes of
operation than a system in an average-size district").

## 2. Voting Rights Act

In Count III of the complaint, plaintiffs allege that
Section 34-3 violates Section 2 of the Voting Rights Act,
both because it was motivated by a discriminatory intent,
and because it has a discriminatory effect. They argue that
the mayoral appointment process for the Board "is a *per se*
violation of Section 2 of the Voting Rights Act…because
under this general state law, defendant State of Illinois
allows far more of its white citizens than Black or Latino
citizens to have 'representatives of their own choosing.'"
Pl.'s Opp. at 1. *Mixon* and *Moore* again provide the rationale
for disposing of this claim.

Like Section 34-3, the legislation at issue in *Mixon*
was directed to a school district with a long history of

race discrimination and racial segregation. Indeed, like Chicago, Cleveland had been subject to a consent decree requiring it to implement a judicial order of desegregation in the period leading up to the enactment of the challenged state. Compare Cmplt. at ¶¶ 58, 59, 111 (Chicago consent decree) with 193 F.3d at 394 (Cleveland). It was in this context that the *Mixon* plaintiffs claimed that the extinguishment of Cleveland residents' right to vote in school board elections violated Section 2 of the Voting Rights Act.

The court examined the plaintiffs' Section 2 claim and concluded that it failed on the ground that Section 2 had no applicability at all in the context of an appointive selection process. Indeed, the court observed that "all federal courts that have addressed this issue have determined that Section 2 only applies to elective, not appointive, systems." *Id*. at 406 (citing *African-American Citizens for Change v. St. Louis Bd. of Police Comm'r*, 24 F.3d 1052, 1053 (8th Cir. 1994); *Irby v. Virginia State Bd. of Elections*, 889 F.2d, 1352, 1357 (4th Cir. 1989); *Dillard v. Crenshaw County*, 831 F.2d 246, 251 (11th Cir. 1987); *Searcy v. Williams*, 656 F.2d 1003, 1010 (5th Cir. 1981), *aff'd*, *Hightower v. Searcy*, 455 U.S. 984, 102 S. Ct. 1605 (1982); *African-American Legal Defense Fund, Inc. v. New*

*York*, 8 F. Supp. 2d 330, 339 n. 14 (S.D.N.Y. 1998); *African-American Voting Rights Legal Defense Fund, Inc. v. Missouri*, 994 F. Supp. 1105, 1122 (E.D. Mo. 1997), *aff'd. per curiam*, 133 F.3d 921 (8th Cir. 1998); *Prewitt v. Moore*, 840 F. Supp. 436, 440 (N.D. Miss. 1993); *Williams v. State Bd. of Elections*, 696 F. Supp. 1563, 1568-69 (N.D. Ill. 1988)). *See also Moore*, 293 F.3d at 364-65. Joining its "sister circuits and all of the district courts that have addressed the issue," the *Mixon* court concluded:

> The plain language of Section 2 refers to the nomination of "representatives," whom the Supreme Court has defined as "winners of representative, popular elections" or "someone who has prevailed in a popular election." *Chisom* [*v. Roemer*, 501 U.S. 380, 404, 399-400 (1991)]. We fail to see how appointed school board members fall under this definition.

193 F.3d at 407.

Plaintiffs try, using broad brush strokes, to distinguish the ample authority defendants cite, pointing out differences either in the nature of the violations asserted or in the type of relief requested. Those issues, however, do not bear on the threshold requirement that an "elective" system be at issue. Plaintiffs cite *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014), and *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016), which concerned a Section 2 challenge to a Wisconsin voter identification law alleged to

have a disparate effect on minorities, and *Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010), which concerned a state felon disenfranchisement law similarly alleged to have a disproportionate impact on minorities. But these cases, which addressed voting requirements or restrictions that interfered with the plaintiffs' ability to exercise their right to vote in elections before them, do not suggest that Section 2 of the Voting Rights Act can be used as a vehicle to compel elections for offices that the state legislature has determined would be filled through an appointive process, and which do not implicate fundamental voting rights.

### D. Due Process

In Count II of the complaint, plaintiffs claim that Section 34-3, together with unspecified "other provisions" of Article 34 authorizing the Board to levy taxes, violate constitutional due process by delegating the power to tax to an unelected entity. They acknowledge that in *Latham*, the Supreme Court of Illinois "dismissed a similar claim that the General Assembly had engaged in an unconstitutional delegation of the taxing power to the unelected Chicago Board of Education," but argue that the court's decision in that case turned on the fact that at the time, the Board's taxing power was "not absolute," as it was subject to

approval by the City Council. Pl.'s Opp. at 16-17 (citing *Latham*, 201 N.E. 2d at 113). In plaintiffs' view, Section 34-3 authorizes the kind of taxation without representation that the Seventh Circuit characterized as "abhorrent" in *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1102 (7th Cir. 1995).

While plaintiffs may be correct that the 1995 Act expanded the Board's taxing authority by eliminating the requirement of City Council approval, their suggestion that the Board now enjoys plenary taxing authority "without any accountability at all," ignores the constraints that still exist under the current School Code. Indeed, the statute establishes a statutory cap on the tax rate and further provides that any increase in annual rates "must be submitted to the voters of such district at any general or special election." 105 ILCS 5/34-53. Moreover, the Board remains indirectly accountable to Chicago residents and taxpayers for all of its actions through the popularly-elected mayor. Plaintiffs offer no persuasive reason to distinguish, for due process purposes, between taxation by a Board accountable to the City Council and taxation by a Board accountable to the mayor. Certainly nothing in *Pittman*—which held that the one-person, one-vote principle did not apply to LSCs and rejected all of the plaintiffs'

constitutional challenges to the 1995 Act—supports such a distinction.

## E. Race Discrimination

Count IV of the complaint alleges race-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Title VI of the Civil Rights Act of 1964. Plaintiffs acknowledge that to prevail on any of these claims, they must plead and prove intentional discrimination. *See Moore*, 293 F.3d at 369 (citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977)). As the Seventh Circuit explained in *Hearne*, that means that they must show that the statute was motivated by a discriminatory purpose, noting that:

> "Discriminatory purpose"...implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Hearne*, 185 F.3d at 776 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). The court emphasized that allegations to that effect are not "automatically enough" to defeat a motion to dismiss on the pleadings. *Id.*

In *Hearne*, the plaintiff claimed that Article 34 of the Illinois School Code was "intentionally crafted" to discriminate against African Americans. The Seventh Circuit upheld dismissal of the claim, concluding:

> There is nothing here to indicate that the Illinois General Assembly structured the Chicago school reform legislation specifically because it wanted to disadvantage African Americans. There are substantial numbers of African Americans in many other cities in the state, and it is simply too great a stretch to say that the population represented by the Chicago school system is such a good proxy for African Americans that the ostensibly neutral classification is an obvious pretext for racial discrimination.

*Id.* at 776.

Although plaintiffs' claims target a different section of the same Chicago school reform legislation, they urge me to conclude that unlike in *Hearne*, their allegations raise a plausible inference of discriminatory purpose based on the "historical background" of the legislation, the "specific sequence of events" leading up to its enactment, and the presence of "racially-charged" remarks in the legislative history. But their allegations are too speculative to support that inference.

For instance, plaintiffs point generally to allegations directed to Chicago's history of school segregation and ensuing consent decree, but they do not draw any link between these facts and the legislature's enactment of

28

Section 34-3. Instead, they make the sweeping argument that
"[j]ust as African Americans became independent of white
political control while Harold Washington was mayor, and
just after a Democratic-controlled General Assembly in 1988
had given more control to African American voters through
LSCs, a different and hostile General Assembly in 1995
adopted Section 34-3 which stripped African Americans of
these new rights." Pl.'s P.I. Br. at 24. But if plaintiffs'
observations about the "independence" of Black voters under
Mayor Washington and the "hostility" of the General Assembly
in 1995 are supported by specific facts or analysis, the
complaint does not hint at it. Even if true, these generic
trends are a far cry from the "specific sequence of events"
the Court suggested in *Village of Arlington Heights* might
reflect a discriminatory motive. *See* 429 U.S. at 267
(speculating that a sudden re-zoning of land in response to
a real estate development project likely to attract minority
tenants might support an inference of intentional race
discrimination). It bears emphasizing that, as plaintiffs
concede, Chicago's school board has *never* been elected.
Their argument that the legislature enacted a "switch to an
even less democratic" process with the purpose of
discriminating against African Americans is simply too
speculative to support their claims.

Next, plaintiffs argue that "racially charged" comments by white legislators suggest that the statute was motivated by a discriminatory purpose, citing 89th Ill. Gen. Assem., House Proceedings, May 24, 1995, at 48 (statement of Rep. Murphy) and 55-56 (statement of Rep. Mitchell). Pl.'s P.I. Br. at 9. I have reviewed the cited pages, however, and can find no statement that can remotely be characterized as "coded racial language." *Id*. at 8. In fact, the only reference to race in these pages is explicit: Rep. Murphy states, "[t]his is about leadership and 410,000 children of Chicago. It is not about race. It is about getting...addressing the need when we have 50% of the children of Chicago dropping out, the remainder in the bottom 1% of national scores." *Id*. at 48. These statements may be incorrect or wildly exaggerated, and they may even reflect racial stereotypes. They do not, however, reasonably suggest that Section 34-3 was motivated by race discrimination.

Lastly, plaintiffs confront the fact that school districts outside of Chicago that likewise serve largely minority race students, such as Harvey, Riverdale, and East St. Louis have elected school boards (a fact that militates, one might suppose, against an inference that the legislative classification in Article 34 was a pretext for intentional

discrimination), with the theory that the Illinois General Assembly "was motivated by the concern that the massive property wealth of Chicago, relatively little of which is owned by people of color, would be taxed to pay for the education of children of color." Pl.'s Opp. at 11. But, as the City defendants point out, plaintiffs do not allege that the Board has declined to use its taxing authority to the fullest, and they offer no factual basis from which to infer that the appointive process established in Section 34-3 was designed to minimize the property tax exposure of Chicago's white residents or to deprive minority children of adequately funded schools. Indeed, as discussed above, the Board's taxing authority in this respect is subject to a statutory cap, which applies regardless of whether the Board is elected or appointed.

III.

For the foregoing reasons, defendants' motions to dismiss are granted. Plaintiffs' motion for a preliminary injunction is denied as moot.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: February 13, 2017