In the

# United States Court of Appeals

For the Seventh Circuit

_____

No. 17-1565

PATRICK QUINN, *et al.*,

                          *Plaintiffs-Appellants*,

*v.*

STATE OF ILLINOIS and BOARD OF EDUCATION OF THE CITY OF CHICAGO,

                          *Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 9514 — **Elaine E. Bucklo**, *Judge*.

_____

ARGUED MARCH 28, 2018 — DECIDED APRIL 10, 2018

_____

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Illinois law provides that the Mayor of Chicago appoints the City's Board of Education. 105 ILCS 5/34-3. Until 1995, when this law took effect, the Mayor needed the consent of the City Council; now the Mayor acts on his own. In this suit under §2 of the Voting Rights Act, 52 U.S.C. §10301, plaintiffs (registered voters, some of whom are parents or grandparents of school-age

children) contend that this system deprives black and Latino citizens of their right to vote. School boards elsewhere in Illinois are elected; plaintiffs say that failure to elect the school board in Chicago has a disproportionate effect on minority voters. The district court dismissed the complaint. 234 F. Supp. 3d 922 (N.D. Ill. 2017).

> Section 2 provides:
>
> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 2(a) covers any "voting qualification or prerequisite to voting or standard" that results in an abridgement of the right to vote, and it is here that plaintiffs' claim founders. Although §2 governs the conduct of elections, it does not guarantee that any given public office be filled by election rather than appointment, a civil service system, or some other means.

No. 17-1565 3

The Voting Rights Act has been on the books for 53 years, and as far as we are aware no court has understood §2 to require that any office be filled by election. Several courts have rejected contentions to that effect. See, e.g., *Mixon v. Ohio*, 193 F.3d 389, 406–08 (6th Cir. 1999) (appointing Cleveland's school board is consistent with §2); *Moore v. Detroit School Reform Board*, 293 F.3d 352, 363–68 (6th Cir. 2002) (appointing Detroit's school board is consistent with §2); *African-American Citizens for Change v. St. Louis Board of Police Commissioners*, 24 F.3d 1052 (8th Cir. 1994) (appointing St. Louis's police commissioners is consistent with §2). *Mixon*, *Moore*, and *African-American Citizens for Change* collect similar decisions. They rely in part on the observation in *Chisom v. Roemer*, 501 U.S. 380, 401 (1991), that, although the election of judges is subject to §2, "Louisiana could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed". What is true of judges is true of school boards.

*Moore*, the most recent of the decisions we have cited, was issued in 2002; no court since then has disagreed. We, too, find the statutory text conclusive and hold that appointive positions are outside its scope. Whether having an appointed board is "good government" or good for pupils (plaintiffs say no, defendants say yes) is irrelevant to the Voting Rights Act, which just does not speak to the question whether a particular governmental function (such as public education) may be part of a larger unit (such as a city) and as a result not be separately elected.

Plaintiffs rely on §2(b), which tells us that a violation of §2(a) can be established by proof that "the political processes leading to nomination or election in the State or political

4                                                              No. 17-1565

subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." They observe that everyone in Rockford or Springfield or Peoria can vote for local school boards while black and Latino citizens in Chicago cannot; the political process in Illinois thus is not "equally open" to minority voters. They add that black and Latino voters are more likely to live in Chicago and contend that the difference is adverse to them as groups:

> According to the U.S. Census American Community Survey, in 2014, about one-third of Chicago's population was Black. About 32% of Chicago's population is non-Hispanic white. In other words, more than two-thirds of Chicago's residents are people of color. According to the same data set, about 15% of the population of Illinois is Black and about 63% of the population of Illinois is non-Hispanic white. Thus, just over one third of the Illinois residents are people of color. However, because Chicago's African American population makes up about 45% of the total African American population in Illinois, and its Latino population makes up about 37% of the State's total, the percentages of people of color in Illinois outside of Chicago are even lower. Outside of Chicago, only 10.6% of the State's population is Black and 71% of the population is non-Hispanic white. Thus, about 29% of Illinois residents that live outside of Chicago are people of color. This means that Section 34-3 of the Illinois School Code deprives 45% of all African American people in Illinois of the right to elect the body that taxes them and provides public education where they live, deprives 37% of all Latino people in Illinois of the same, but deprives less than 11% of the white people in Illinois of that right.

Quinn Br. 12–13 (citations omitted). Yet this observation does not expand the scope of §2(a): unless an office is elected, §2 as a whole does not apply. Plaintiffs beg the question by as-

No. 17-1565                                                5

suming that §2 requires each municipality to choose a school board by voting.

There is a further problem with plaintiffs' position. Black and Latino citizens do not vote for the school board in Chicago, but neither does anyone else. Every member of the electorate is treated identically, which is what §2 requires. See, e.g., *Frank v. Walker*, 768 F.3d 744, 752–55 (7th Cir. 2014). It is misleading to say that political processes in Chicago are not equally open to participation by persons of all races. Every voter in Chicago exercises the same influence when voting for a candidate who has a particular position on education—as well as policing, zoning, the parks, and the many other issues any city must address. Every voter throughout Illinois influences education policy. Some do this by electing a school board, some by electing a mayor who appoints a board, but influence is there for everyone to wield.

True, the Mayor of Chicago is selected in an at-large election, and historically some jurisdictions have used at-large elections to dilute minority voters' influence. See, e.g., *Rogers v. Lodge*, 458 U.S. 613 (1982). But plaintiffs have not contended that what amounts to an at-large election of the school board violates the Voting Rights Act. The dispute here concerns the choice between election and appointment, not whether some voters' influence is diluted by casting ballots in a jurisdiction the size of Chicago. The proposition that §2 applies only to elections thus resolves plaintiffs' claim.

Plaintiffs have a second theory: that allowing the Mayor to appoint the Board's members violates the Equal Protection Clause of the Fourteenth Amendment. They pursue this claim, under 42 U.S.C. §1983, against the Board of Education only, given the rule that a state is not a "person" for the pur-

Case: 1:16-cv-09514 Document #: 64 Filed: 05/02/18 Page 6 of 6 PageID #:559
Case: 17-1565   Document: 00713209711   Filed: 05/02/2018   Pages: 6

6                                                    No. 17-1565

pose of §1983. See *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989).

This equal-protection theory is brought up short by *Sailors v. Board of Education*, 387 U.S. 105 (1967), which holds that appointing a school board is constitutionally permissible, and by *Hearne v. Board of Education*, 185 F.3d 770 (7th Cir. 1999), which holds that the 1995 Illinois statute is valid notwithstanding the line it draws between Chicago and every other city in Illinois. Accord, *Quinn v. Board of Education*, 2018 IL App (1st) 170834 (Mar. 29, 2018) (applying the Constitution of Illinois). Plaintiffs insist that *Sailors* and *Hearne* are outdated, but we must follow the Supreme Court no matter what arguments can be leveled against its decisions. And we are quite content to follow *Hearne*, whose reasoning is as strong now as it was when it was issued 19 years ago.

*Hearne* addresses and rejects the sort of racial-impact contention that plaintiffs pursue. 185 F.3d at 775–76. This approach is just a repackaged version of the contention that some citizens have been disfranchised. We have explained why that is wrong: all citizens of Chicago have equal influence, though it is exercised indirectly (by voting for Mayor) rather than directly (by voting for the Board's members). There is neither disparate treatment nor disparate impact— and, as *Hearne* observed, disparate impact does not violate the Equal Protection Clause at all. See *Personnel Administrator v. Feeney*, 442 U.S. 256 (1979); *Washington v. Davis*, 426 U.S. 229 (1976).

AFFIRMED

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit